808 So.2d 1041 (1999)
Roy Edward PERKINS
v.
State.
CR-93-1931
Court of Criminal Appeals of Alabama.
November 19, 1999.
Rehearing Denied February 18, 2000.
*1052 Joseph S. Dice, Tuscaloosa; and Andrew A. Smith, Northport, for appellant.
Bill Pryor, atty. gen.; and Jeremy W. Armstrong, Paul H. Blackwell, Jr., and Andy Scott Poole, asst. attys. gen., for appellee.
LONG, Presiding Judge.
The appellant, Roy Edward Perkins, was convicted of murder made capital because it was committed during the course of a kidnapping in the first degree. See § 13A-5-40(a)(1), Ala.Code 1975. The jury, by a vote of 10-2, recommended that Perkins be sentenced to death. The trial court accepted the jury's recommendation and sentenced Perkins to death.
The State's evidence tended to show the following. On August 9, 1990, at approximately 4:00 p.m., 33-year-old Cathy Gilliam was abducted at gunpoint from her home in the Tuscaloosa County community of New Lexington. Candace Gilliam, Mrs. Gilliam's daughter, testified that she was in her bedroom at approximately 4:00 p.m. on August 9, when she heard her mother scream. After this testimony, Candace, *1053 who was 14 years old at the time of the trial, was excused from the courtroom; in lieu of further live testimony from Candace, it was stipulated that her testimony would have been as follows had she continued to testify: When she heard her mother scream a second time, Candace went to the kitchen. There she saw a man holding her mother and pointing a black pistol at her mother's head. She heard her mother yell for help and say "something about a rapist." (R. 1755.) Candace watched as the man led her mother outside to a vehicle parked behind her mother's car. She could not see the vehicle well, but did notice that it was bigger than a car and that it was gray in color. At that point, Candace telephoned her grandmother. Candace was unable to give a detailed description of the man who had abducted her mother, but she did tell police that the man had brown, straight hair and a thin beard, and that he was not much taller than her mother.
Maudeen Hood, a resident of New Lexington who lived two to three miles from the Gilliam residence, testified that at approximately 5:00 p.m. on August 9, Cathy Gilliam knocked on her back door. According to Hood, Mrs. Gilliam stated that she had been shot and that she was going to die, and she asked Hood to call her father-in-law and to take her to the hospital. Hood stated that she helped Mrs. Gilliam into her kitchen, where Mrs. Gilliam lay on the floor; Hood then telephoned Mrs. Gilliam's father-in-law. When no one answered, Hood telephoned for help. Mrs. Gilliam told Hood that her assailant was about her husband's size, had long brown hair, a beard, and a mustache, and was driving a gray pickup truck. Mrs. Gilliam also told Hood that her assailant had brought her to Hood's house and that he had said that he did not mean to shoot her.
At approximately 5:15 p.m. on August 9, Norman Eldon Willingham, an Alabama state trooper, and Harry Montgomery, Chief Deputy Sheriff of the Tuscaloosa County Sheriffs Department, arrived at the Hood residence. Willingham testified that upon arriving, he saw Mrs. Gilliam lying on the kitchen floor; she had a gunshot wound to her chest. He stated that although Mrs. Gilliam had been shot in the chest, he immediately noticed that there was no hole in the front of her shirt. He stated that Mrs. Gilliam appeared pale, that she was having trouble breathing, and that she was complaining of pain and asking for help. When Willingham asked Mrs. Gilliam to describe her assailant, Mrs. Gilliam told him that he was a white male, approximately 30 years old, with medium-length hair and facial hair, and he was driving a gray full-size pickup truck. In addition, Mrs. Gilliam told Willingham that she had been sitting down when she was shot, and that it had been at least one hour since the shooting. Montgomery testified that he asked Mrs. Gilliam if she knew her assailant, and that she responded that she did not.
Gary Wayne Hunnicut, fire chief with the Samantha Volunteer Fire Department, testified that he was dispatched to the Hood residence on August 9, 1990. He stated that when he arrived, Donnie Hallman, a fellow volunteer, was already on the scene treating Mrs. Gilliam. In addition, both Willingham and Montgomery were present. Hunnicut testified that while he and Hallman were treating Mrs. Gilliam, he heard either Willingham or Montgomery ask Mrs. Gilliam if Perkins was her assailant. According to Hunnicut, Mrs. Gilliam "grunted" and nodded her head in the affirmative. (R. 1287.) In addition, Hunnicut said he heard Mrs. Gilliam grunt and saw her nod her head in the affirmative when either Willingham or *1054 Montgomery asked her if she had been shot with a pistol.
Scott Sassaman, a paramedic with the Suburban Ambulance Company, testified that he arrived at the Hood residence at approximately 5:46 p.m. on August 9. Hallman was already working on Mrs. Gilliam. Sassaman stated that he took over Mrs. Gilliam's treatment and put Mrs. Gilliam in "mass trousers"air-filled pants that move blood from the lower body to the upper extremities. (R. 2023.) Sassaman stated that he saw no gunpowder residue on Mrs. Gilliam. According to Sassaman, Mrs. Gilliam was placed in the ambulance at approximately 6:00 p.m. While in the ambulance, Sassaman said, Mrs. Gilliam expressed concern about her family and stated that she was going to die. Mrs. Gilliam died in the ambulance on the way to the hospital.
On August 10, 1990, Kenneth Warner, the State Medical Examiner for Tuscaloosa County, performed an autopsy on Mrs. Gilliam. Warner testified that Mrs. Gilliam died from a gunshot wound to her chest that destroyed her liver. He stated that, in addition to the gunshot wound, there was a stab wound just above Mrs. Gilliam's right collarbone. The hyoid bone in Mrs. Gilliam's neck was broken, Warner said, and there was hemorrhaging in her neck muscles. Warner stated that these injuries were consistent with a struggle having taken place. Warner also stated that he found no evidence that Mrs. Gilliam had been raped and that there was no gunpowder residue around the gunshot wound. He testified that if Mrs. Gilliam was wearing a shirt at the time of the shooting, the absence of gunpowder residue around the wound would be meaningless, but that if Mrs. Gilliam was not wearing a shirt when she was shot, the absence of gunpowder residue would indicate that the fatal shot was fired from at least 18 inches away.
Vernon Hudson, Chief Deputy of the Fayette County Sheriff's Department, testified that he was driving south on Highway 63 on August 9, 1990, at approximately 5:30 p.m., when he saw Perkins, whom he knew personally, driving north in a gray pickup truck. Hudson stated that he knew Perkins was wanted in connection with the shooting of a woman in Tuscaloosa County, so he turned around and followed Perkins. According to Hudson, he lost sight of the pickup truck briefly when he turned around, but he saw dust on a dirt road off Highway 63 and he turned down the road. Hudson said he found a gray, 1979 Chevrolet pickup truck abandoned just off the dirt road, and that the keys were in the ignition. Hudson stated that he notified a dispatcher that he had found the truck Perkins was driving and that he stayed with the truck until the homicide unit arrived, at which time, he said, he turned the truck over to Investigator J.R. Simpson. Hudson testified that he found the truck approximately one-half mile from the homes of Perkins's mother and grandmother.
Investigator Simpson testified that he responded to a call regarding an abandoned truck believed to have been driven by Perkins. He stated that when he arrived in Fayette County just off Highway 63, he took photographs of the abandoned truck. He stated that the truck had a gunshot hole in the front windshield and a gunshot hole in the roof of the cab. On cross-examination, he stated that he believed both holes were caused by shots fired from within the truck, most likely from the driver's side. The truck was towed to the homicide unit's impound lot and was "processed" for evidence by Simpson and Dr. John McDuffie, a trace-evidence *1055 examiner with the Alabama Department of Forensic Sciences.
At trial, Perkins stipulated to the following facts, which the trial judge read to the jury:
"The defendant caused the death of Cathy Gilliam with a .357 Magnum pistol. That's number one. Number two, the defendant, Mr. Roy Perkins, was in the 1979 Chevrolet gray pickup truck shown in State's Exhibit number 23. Number three, Cathy Gilliam's blood was found in the 1979 gray Chevrolet pickup truck shown in State's Exhibit number 23."
(R. 2087.)
The State presented evidence that Simpson and McDuffie found a wallet containing Perkins's driver's license and a fragment of a projectile in the gray truck. Fibers from the shorts Mrs. Gilliam was wearing at the time of her abduction were also found in the truck. Perkins's fingerprints were found on the outside of the driver's door of the truck. Further, both the driver and front passenger seats contained reddish stains; the stained portions of the seats were cut out and sent to Dr. Phyllis T. Rollan, a forensic serologist with the Alabama Department of Forensic Sciences. Dr. Rollan testified that the stain found on the back of the front passenger seat was consistent with Mrs. Gilliam's blood.
After the abandoned truck was discovered, the police began searching for Perkins in Fayette County. Bobby Mason, an enforcement agent with the Alabama Alcoholic Beverage Control Board, testified that he participated in the search for Perkins in Fayette County. He stated that on August 11, 1990, he found a campsite in the woods near the homes of Perkins's mother and grandmother. At the campsite, Mason found quilts, cigarettes, various food items, wire-cutters, 10 feet of rope, and a .357 Magnum handgun.
Baxter Pate, a police officer with the City of Northport, also helped in the search for Perkins. Pate testified that at approximately 3:50 p.m. on August 12, 1990, he found Perkins lying on the ground in the woods near the houses of his mother and grandmother. Pate stated that Perkins was crying and whimpering and that he said, "Please, please, don't shoot me." (R. 2106.) After Pate told Perkins not to move, Perkins again stated, "Please, don't shoot me," and then said, "I didn't mean to do it.... I didn't mean to hurt her." (R. 2107.) Pate stated that he called for backup, and that several officers arrived and handcuffed Perkins. At the time of his arrest, Perkins had a gunshot wound to his right knee that he suffered during a struggle with Mrs. Gilliam.
Darlene Hall, a resident of New Lexington who lived approximately one to two miles from the Gilliam residence, also testified at trial. Hall stated that at approximately 3:50 p.m. on August 9, 1990, Perkins came to her home and asked to use her telephone to call a tow truck. According to Hall, she recognized Perkins from a picture in a newspaper article she had been reading, and she immediately retrieved a gun from her bedroom closet. Perkins left when he saw the gun. At trial, Hall positively identified Perkins as the man who had come to her home on August 9.
In addition to Hall's testimony, the State also presented evidence of two rapes allegedly committed by Perkins in the two weeks preceding the abduction of Mrs. Gilliamone committed on August 1, 1990, and one committed on August 6, 1990. The State presented testimony from the alleged rape victims, B.P. and D.W.; from the doctors who treated them following the alleged rapes; from the nurses who administered the rape kits; from Dr. Rollan, *1056 who performed DNA tests on the rape kits from both victims and compared them to Perkins's DNA; and from the police officers who investigated the alleged rapes.
On appeal, Perkins raises 37 issues, many of which he did not raise by objection in the trial court. Because Perkins was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
This court has recognized that "`the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." `"Burton v. State, 651 So.2d 641, 645 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting, in turn, United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)). Accordingly, we address each of the 37 issues Perkins raises.

I.
Perkins contends that he was improperly charged under a duplicitous indictment (Issue XX in Perkins's brief to this court), and that the trial court erred in failing to give the jury a specific unanimity instruction. (Issue III in Perkins's brief to this court.) Specifically, he complains that the language of the first-degree kidnapping statute under which he was charged and found guiltythat requires the intent to inflict physical injury or to violate or sexually abuseimproperly permitted him to be convicted by a jury whose verdict was not unanimous. He maintains that under the language of the statute, the indictment, and the trial court's jury instructions, it was possible that some of the jurors "believed beyond a reasonable doubt that [he] abducted Mrs. Gilliam with the intent to physically injure her while the remaining jurors believed beyond a reasonable doubt that he abducted her with the intent to sexually abuse or violate her." (Perkins's brief to this court, p. 46.) As a result, he concludes, the jury's verdict was not unanimous. As this issue was never presented to the trial court, we may review it only under the plain error rule. Rule 45A, Ala.R.App.P.
In support of his argument, Perkins relies on this court's rationale in Knotts v. State, 686 So.2d 431 (Ala.Cr.App.1995), on return to remand, 686 So.2d 484 (Ala.Cr. App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997), regarding the requirement of a unanimous verdict. In Knotts, the defendant was charged with two counts of capital murder: murder committed during the course of a burglary and murder committed during the course of a robbery. The trial court failed to instruct the jury that it had to unanimously agree as to one or both counts, and the jury came back with a general verdict of *1057 guilty of capital murder, without any indication as to which count of capital murder it had rested its verdict on. We stated that: "Under Alabama law, the appellant, having been accused of two distinct criminal acts, had the right to a unanimous finding of guilt as to one count or as to both counts." Knotts, 686 So.2d at 462. In addition, we stated that "[t]he general instructions on unanimity in the instant case raise the possibility that the jury was not adequately informed that its duty was to agree on a unanimous verdict as to each count." Id. at 463. Perkins contends that the same is true in his case. However, as the State correctly points out in its brief to this court, Perkins, unlike Knotts, was not charged with two counts of capital murder nor was he accused of two distinct criminal acts; rather, he was charged with one count of capital murder based on one criminal act: murder committed during a kidnapping in the first degree. Thus, the majority of our discussion in Knotts regarding jury unanimity is inapplicable to the case at hand.
Rather, we find our discussion in Harris v. State, 632 So.2d 503 (Ala.Cr.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), to be controlling. In Harris, the appellant argued that his indictment for murder made capital because it was done for a pecuniary or other valuable consideration or pursuant to a contract or for hire, was duplicitous and violated his right to a unanimous verdict. Harris maintained that he was entitled to a specific unanimity instruction to ensure that all 12 jurors agreed as to whether he had committed the murder for pecuniary gain or for hire. In addressing the validity of the indictment in that case, we quoted the following from Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991):
"`A way of framing the issue is suggested by analogy. Our cases reflect a long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed. In Andersen v. United States, 170 U.S. 481 [18 S.Ct. 689, 42 L.Ed. 1116] (1898), for example, we sustained a murder conviction against the challenge that the indictment on which the verdict was returned was duplicitous in charging that the theft occurred through both shooting and drowning. In holding that "the Government was not required to make the charge in the alternative," id., at 504 [18 S.Ct. at 694], we explained that it was immaterial whether death was caused by one means or the other. Cf. Borum v. United States, 284 U.S. 596 [52 S.Ct. 205, 76 L.Ed. 513] (1932)(upholding the murder conviction of three co-defendants under a count that failed to specify which of the three did the actual killing); St. Clair v. United States, 154 U.S. 134, 145 [14 S.Ct. 1002, 1006, 38 L.Ed. 936] (1894). This fundamental proposition is embodied in the Federal Rules of Criminal Procedure 7(c)(1), which provides that "[i]t may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means."'"
632 So.2d at 514. We then went on to say:
"`In effect, the indictment charged, in a single count, alternative methods of proving the same crime. See Sisson v. State, 528 So.2d 1151 (Ala.Cr. App.1987), affirmed, Ex parte State, 528 So.2d 1159 (Ala.1988)("Section 32-5A-191(a)(1) and (2) are merely two different methods of proving the same offensedriving under the influence.") "When an offense may be committed by different means or with different intents, such means or intents *1058 may be alleged in an indictment in the same count in the alternative." Alabama Code 1975, § 15-8-50. Chappell v. State, 52 Ala. 359, 360-61 (1875), held that in an indictment for common law robbery, the taking of the property from the victim may be charged to have been "against his will, by violence to his person," or "by putting him in such fear as [to cause him] unwillingly to part with the same" in different counts or in the same count in the alternative.'
"Williams v. State, 538 So.2d 1250, 1252 (Ala.Cr.App.1988). Thus, in Tucker v. State, 537 So.2d 59 (Ala.Cr.App.1988), this court held that an indictment that charged the capital murder of a police officer in alternative language complied with the statutory language of § 13A-6-2(a)(1) and § 13A-5-40(a)(5), Code of Alabama 1975. By statutory definition, the murder of a police officer is made capital when the officer is intentionally killed `while such officer is on duty' or `because of some official or job-related act or performance.' This court reasoned:
"`"An apparent purpose of these several provisions [§ 15-8-50, -51, -52] is to obviate the necessity of a multiplicity of counts, permitting one count to serve the purposes accomplished by several at common law...." Horton v. State, 53 Ala. 488, 492 (1875). The indictment was properly framed to conform with the proof. It charged only one offense capital murder of a peace officer which was committed for one of two reasons: either because the officer was trying to arrest Tucker's stepmother or because the officer was trying to arrest Tucker. This indictment completely satisfied the constitutional requirements of due process. Summers v. State, 348 So.2d 1126, 1132 (Ala.Cr.App.), cert. denied, Ex parte Summers, 348 So.2d 1136 (Ala.1977), cert. denied, 434 U.S. 1070, 98 S.Ct. 1253, 55 L.Ed.2d 773 (1978). See Davis v. State, 505 So.2d 1303, 1304 (Ala.Cr.App.1987)(operating a motor vehicle "while under the influence of intoxicating liquors or narcotic drugs"); Wilson v. State, 84 Ala. 426, 4 So. 383 (1888)(murder "by striking him in the head ... or by choking him with a piece of ... cord"); King v. State, 137 Ala. 47, 34 So. 683 (1903)(murder "by hitting him or by striking him with a miner's pick, or by stabbing or cutting him with a knife, or with some sharp instrument").'
"Tucker v. State, supra, at 61.
"As in Tucker v. State, supra, in the present case, the indictment in the present case charged only one offensecapital murder for hirewhich was committed for one of two reasons: either Isaiah Harris was killed pursuant to a contract in order for Louise Harris [the defendant] and Lorenzo McCarter to continue their relationship, or Isaiah Harris was killed pursuant to a contract in order for the perpetrators to secure pecuniary gain, specifically $100 paid by Louise Harris and the proceeds of certain insurance policies on the victim's life, which were to be divided among all the participants. Thus, the indictment was not duplicitous."
632 So.2d at 514-15. See also Sockwell v. State, 675 So.2d 4 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).
Similarly, here, contrary to his contention, Perkins was charged with a single offensemurder made capital because it was committed during the course of a kidnapping in the first degreewhich was committed with one of two intents: the *1059 intent to physically injure Mrs. Gilliam or the intent to sexually abuse Mrs. Gilliam. The alternative intents were properly charged in a single count; thus, the indictment was not duplicitous.
Moreover, the trial court's jury instructions regarding jury unanimity were proper. The trial court instructed the jury that it had to reach a unanimous verdict. Although Perkins contends that he was entitled to a specific instruction that the jury must unanimously agree as to his specific intent when he kidnapped Mrs. Gilliam, i.e., whether he intended to physically injure Mrs. Gilliam or whether he intended to sexually abuse Mrs. Gilliam, we find "that the jury did not have to decide between this alternative language." Harris, 632 So.2d at 515. "`If a statute describes a single offense which may be committed in more than one factual manner, or by way of different acts, jury unanimity is not necessary as to the means by which it is committed, where the acts are conceptually similar or not repugnant to each other.'" Knotts, 686 So.2d at 461, quoting 23A C.J.S. Criminal Law § 1398 (1989). The intent to sexually abuse and the intent to physically harmthe two alternative intents for first-degree kidnapping are so conceptually similar as to make it constitutionally permissible for the jurors to agree on a unanimous verdict without necessarily unanimously agreeing on Perkins's intent; any combination of the two alternative intents would be permissible. See Schad v. Arizona, supra.
Accordingly, we find no error, plain or otherwise, as to this matter.

II.
Perkins also contends that the trial court abused its discretion in granting the State's motion to disqualify the Tuscaloosa County public defender's office from representing him. (Issue XVIII in Perkins's brief to this court.) He maintains that the trial court's disqualification of the public defender's office violated his Sixth Amendment right to counsel and his "presumptive right to counsel of choice." (Perkins's brief to this court, p. 97.)
In February 1993, over a year before Perkins's trial, the State filed a motion to disqualify the public defender's office from representing Perkins based on a potential conflict of interest. The State argued that the hiring of Shirley Fieldsa former captain in the Tuscaloosa homicide unit and second in command of that unit during its investigation of Mrs. Gilliam's murderas an investigator with the public defender's office, created a potential conflict of interest because Fields had been involved in the murder investigation in a supervisory capacity, was privy to confidential government information concerning the case that was not subject to disclosure, and was a possible witness for the State at Perkins's trial. At a hearing on the motion in March 1993, Fields testified that he played a supervisory role in the investigation of Mrs. Gilliam's death, that he was privy to sensitive information about the investigation, that he participated in the processing of one of the State's most important pieces of evidence (the gray pickup truck), but that he had not been actively involved in every aspect of the investigation. In addition, he stated that, in the past, the district attorney's office had often consulted him about trial strategy in cases in which he had played a supervisory role. Following Fields's testimony, the public defender representing Perkins argued against the motion, stating that although there was a potential conflict if the State ultimately called Fields to testify, Perkins was willing to waive that potential conflict. After the hearing, the trial court entered a written order granting the State's motion to disqualify *1060 the public defender's office, stating, in pertinent part:
"This Court finds no evidence of a violation of Rule of Professional Responsibility 1.11. However, the nature of this case and the scrutiny to which it would be subjected upon possible appellate review, warrants this Court to act with extreme caution to avoid any appearance of impropriety or appearance of a conflict of interest. The Court noted this exercise of caution is to protect both the rights of the State and the defendant. The Court further finds that substitution of counsel at this stage of the proceedings produces no injury to Mr. Perkins's defense."
(C. 71-72.)
On appeal, Perkins contends that there was no actual or potential conflict of interest because, he says, Fields was not actively involved in the investigation of Mrs. Gilliam's murder and because Fields was ultimately not called to testify by the State at his trial. He maintains that the State "`manufactur[ed] [a] conflict in order to prevent [him] from having a particularly able defense counsel at his side.'" (Perkins's brief to this court, p. 100, quoting Wheat v. United States, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).) Thus, he concludes, his right to counsel of choice was violated. We disagree.
Fields's testimony at the hearing on the State's motion to recuse revealed that he was involved in the investigation of Mrs. Gilliam's murder in a supervisory capacity and that he was privy to sensitive information concerning the case. In addition, Fields was a potential witness for the State based on his involvement in the processing of the gray pickup truck. This created not only an "appearance of impropriety," as the trial court stated, but a real potential for conflict. Contrary to Perkins's contention, merely because this potential conflict did not burgeon into an actual conflict of interest (Fields was, in fact, not called as a witness for the State), does not lessen the duty of the trial court to exercise caution, especially in a case where the most severe of all penalties might be imposed.
Although we recognize that a criminal defendant has a presumptive right to counsel of his choosing, that right is not absolute. In Snell v. State, 723 So.2d 105 (Ala.Cr.App.1998), we stated:
"An indigent defendant who cannot afford to retain an attorney has an absolute right to have counsel appointed by the court in all criminal proceedings in which representation by counsel is constitutionally required. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Strickland v. State, 280 Ala. 31, 189 So.2d 771 (1965); U.S. Const. amend. VI and XIV; Art. I, Ala. Const.1901, § 6; Ala.Code 1975, § 15-12-21; Ala.R.Crim.P. 6.1. While an indigent defendant may have the right to be represented by counsel, he has no absolute right to be represented by any particular counsel or by counsel of his choice. Briggs v. State, 549 So.2d 155 (Ala.Cr.App.1989). The essential aim of the Sixth Amendment is to guarantee an effective advocate, not counsel preferred by the defendant. Wheat v. United States, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). The Sixth Amendment does not guarantee a defendant a meaningful relationship, rapport, or even confidence in court-appointed counsel. Morris v. Slappy, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); Siers v. Ryan, 773 F.2d 37 (3d Cir.1985), cert. denied, 490 U.S. 1025, 109 S.Ct. 1758, 104 L.Ed.2d 194 (1989).
"The decision to substitute or to remove court-appointed counsel and to appoint new counsel for an accused rests *1061 within the sound discretion of the trial court. Boldin v. State, 585 So.2d 218 (Ala.Cr.App.1991); Cox v. State, 489 So.2d 612 (Ala.Cr.App.1985)."
723 So.2d at 107 (emphasis added).
"In determining whether or not to disqualify defense counsel, the court must balance two Sixth Amendment rights: (1) the right to be represented by counsel of choice and (2) the right to a defense conducted by an attorney who is free of conflicts of interest. [Wheat, 486 U.S.] at 160, 108 S.Ct. at 1697. The need for fair, efficient, and orderly administration of justice overcomes the right to counsel of choice where an attorney has an actual conflict of interest, such as when he has previously represented a person who will be called as a witness against a current client at a criminal trial.... Indeed, even a potential conflict suffices for disqualification...."
United States v. Ross, 33 F.3d 1507, 1523 (11th Cir.1994), cert. denied, 515 U.S. 1132, 115 S.Ct. 2558, 132 L.Ed.2d 812 (1995). As stated above, there was a clear potential for conflict in this case. Fields's employment with the office representing Perkins, after his involvement in the investigation of Mrs. Gilliam's death, combined with the possibility that he may have been called as a witness for the State at Perkins's trial, created a potential conflict for the public defender's office, as well as for the State. Given the heightened scrutiny this court must undertake in cases in which the death penalty has been imposed, we see no abuse of discretion on the part of the trial court in exercising its own scrutiny to ensure a fair trial to both sides in a case where the death penalty is a possible punishment.
Perkins also contends, however, that the trial court erred in disqualifying the public defender's office because he offered to waive his right to conflict-free counsel. Although we recognize that a criminal defendant may choose to waive his right to conflict-free counsel, it is entirely within the trial court's discretion to accept or to reject such a waiver. In Wheat, supra, the United States Supreme Court stated that trial courts "must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." 486 U.S. at 163, 108 S.Ct. at 1699. The Court then went on to say:
"Unfortunately for all concerned, a [trial] court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials."
486 U.S. at 162-63, 108 S.Ct. at 1699. We see no abuse of discretion in the trial court's rejection of Perkins's offer to waive the potential conflict.
Finally, we point out that there is no evidence that Perkins's defense was prejudiced by the disqualification of the public defender's office. Although Perkins makes a bare allegation that the two attorneys subsequently appointed to represent him lacked the resources of the public defender's office, he has failed to provide any proof of this assertion. In addition, even if the personal resources of his counsel were less than the public defender's office, there is no evidence that this resulted *1062 in an inadequate defense; the record reveals that Perkins's attorneys filed numerous motions for extraordinary expenses that the trial court grantedPerkins's attorneys were clearly provided with the resources necessary to defend him.
Accordingly, we find no abuse of the trial court's discretion in granting the State's motion to disqualify the public defender's office from representing Perkins.

III.
Perkins further contends that he was denied his Sixth Amendment right to counsel because, he says, he was denied access to his attorneys before trial. (Issue XXIV in Perkins's brief to this court.) Because Perkins received no adverse ruling on any motion, written or oral, regarding access to his attorneys, we may review this claim only for plain error. Rule 45A, Ala. R.App.P.
Perkins contends that his counsel filed a motion requesting that Perkins be transferred from the William Donaldson Correctional Facility in Bessemer to the Tuscaloosa County jail "so that he would be readily available to assist [his counsel] in preparing his defense," and that the trial court denied the motion. (Perkins's brief to this court, pp. 146-47.) A review of the record reveals that no such motion was ever filed by Perkins's counsel. Rather, when first appointed, Perkins's counsel filed a motion to transfer Perkins to Tuscaloosa for an interview. That motion was granted by the trial court, and Perkins was, in fact, transferred to Tuscaloosa where an interview was conducted. The record also reveals that Perkins's counsel, in a pretrial hearing on August 12, 1993, orally requested that Perkins be transferred to Tuscaloosa "from time to time in preparation for his hearing[s]." (R. 33.) Again, the trial court granted the request, but told Perkins's counsel "to keep the Court apprised by motion" when Perkins would need to be transferred. (R. 38.) No motions were filed by Perkins's counsel in compliance with the court's request. Moreover, the trial court granted extraordinary travel expenses to Perkins's defense team so that they could travel to Bessemer when they needed to meet with Perkins if a problem arose and Perkins was unable to be transferred to Tuscaloosa. At another pretrial hearing on October 27, 1993, Perkins's counsel again orally raised the issue of transferring Perkins to the Tuscaloosa County jail. Because the county jail was overcrowded and Perkins had not been transferred since the August 12 hearing, Perkins's counsel suggested that the court allow extraordinary expenses so they could travel to Bessemer. However, Perkins's counsel made no objection to Perkins not being transferred to Tuscaloosa. Again, the trial court granted counsel's request and permitted extraordinary travel expenses. On March 24, 1994, Perkins's counsel filed a motion requesting that Perkins be transferred to Tuscaloosa one week before his trial. The trial court granted that request.
Clearly, Perkins was not denied access to his attorneys. Although overcrowding at the Tuscaloosa County jail prevented his transfer between August 12, 1993, and October 27, 1993, the record indicates that Perkins was transferred to Tuscaloosa on at least three other occasions before his trial on April 18, 1994. His attorneys were provided with extraordinary expenses to pay for their travel to and from Bessemer to consult with Perkins when he could not be transferred. Perkins did not object to this arrangement at trial. Given these circumstances, we conclude that Perkins was not denied access to his attorneys before trial; therefore, he was not deprived of his Sixth Amendment right to counsel. See Smith v. State, 698 So.2d 189 *1063 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997) (defendant was not denied due process of law or deprived of his right to counsel when the trial court denied his motion to be transferred from Holman Prison to the Lee County jail before his trial). Accordingly, we find no, error, plain or otherwise, as to this claim.

IV.
Perkins contends that the trial court committed several errors in its discovery orders. (Issue XXII in Perkins's brief to this court.)

A.
First, Perkins contends that the trial court erred in requiring him to disclose to the State the materials considered by his experts in forming their opinions regarding Perkins's mental condition at the time of the crime.[1] Specifically, he contends that the results from a Minnesota Multiphasic Personality Inventory ("MMPI"), and the results from psychological evaluations conducted while he was in prison before the present offense (during the years 1983-1990), were not discoverable because, he says, his experts, Dr. John Goff, a neuropsychologist, and Ed Owens, a social worker, did not "rely" on these items in forming their opinions. Perkins did not object to the State's motion for discovery of these items or to the trial court's order granting the motion; thus, we may determine only whether allowing such discovery was plain error. Rule 45A, Ala.R.App.P.
Although Perkins provides a laundry list of constitutional rights that he says were violated by the trial court's discovery order, after reviewing Perkins's 12-page argument, we believe that Perkins's claim is best summarized in a single sentence in his appellate brief: "If the adversarial process is to mean anything, it must permit defense counsel to pursue an investigation unfettered by discovery rules that require [him] to disclose any unfavorable and potentially incriminating results which the investigation may reveal." (Perkins's brief to this court, p. 125; emphasis added.) Clearly, had the results of his MMPI and his prison records been favorable to his defensePerkins's expert, Dr. Goff, in fact, utilized the favorable portions of his prison records to support his conclusions regarding Perkins's mental condition Perkins would not now be objecting to their discovery. In essence, Perkins is arguing that the items were not discoverable merely because they were unfavorable to his defense. This simply is not the law.
Materials used by experts (for the State and the defense alike) in forming their opinions are clearly discoverable under Rule 16.2(c), Ala.R.Crim.P. Such materials do not have to be exclusively relied on by the experts in order to be discoverable, as Perkins contends, but must only be read and considered by the expert. Here, Owens specifically stated that he considered Perkins's prison records in making his social history and social assessment of Perkins. In addition, Dr. Goff specifically stated that he considered the MMPI results, although invalid, in forming his opinion, and his report included a reference to the invalidity of the results and the possible reasons for that invalidity. These items, although not favorable to the defense, were discoverable by the State because they were materials considered by the defense experts in forming their opinions.
*1064 Perkins contends, however, that because his MMPI results were invalid, Dr. Goff could not consider them in forming his opinion. Although we acknowledge that Dr. Goff stated in his report that the invalid MMPI results were not "particularly helpful," he in no way stated that he ignored the results or that he could not consider them in reaching his conclusions. (C. 326.) Rather, as stated above, the invalid results and the possible reasons for their invalidityincluding the possibility that Perkins intentionally faked the test results to make it appear that he was mentally illwere included in Dr. Goff's written report. Moreover, even if Dr. Goff did ignore the results, they would still be discoverable by the State. The State is entitled to a thorough and sifting cross-examination of defense witnesses, just as a defendant is entitled to a thorough and sifting cross-examination of State witnesses. The State is entitled to examine an expert on the facts that formed the basis of the expert's opinion, including facts relevant to the opinion that were ignored or excluded by the expert. The fact that Perkins may have intentionally faked the test results in order to appear mentally ill was certainly relevant to Dr. Goff's testimony regarding Perkins's mental condition. Merely because such materials were not favorable to Perkins does not render them undiscoverable. Accordingly, we find no error, plain or otherwise, regarding this claim.

B.
Second, Perkins contends that the State violated Rule 16.1, Ala.R.Crim.P., by not disclosing, until one week before trial, a statement Perkins made to Officer Baxter Pate at the time of his arrest. He maintains that because Rule 16.1(a), Ala. R.Crim.P., requires disclosure within 14 days of a request and because his request was made nearly 2 years before the State disclosed the statement, the State violated Rule 16.1, and the statement should have been excluded from evidence. Perkins did not object to the allegedly untimely disclosure, nor did he object to the admission of the statement at trial; thus, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
On July 8, 1992, Perkins filed a motion for discovery, in which he requested all statements made by him to law enforcement personnel. That motion was granted, and several statements made by Perkins were disclosed by the State over the two-year period leading up to Perkins's trial in 1994. At a hearing on April 14, 1994, the week before trial, the prosecutor informed the court that he had, within a week before the hearing, learned of the existence of the statement Perkins made to Pate at the time he was arrested. The prosecutor informed the trial court that he had mailed a summary of the statement to defense counsel as soon as he had learned of its existence. Defense counsel confirmed that he had received notice of the statement on April 12, 1994, and made no objection to the timeliness of the disclosure.
In Thomas v. State, 508 So.2d 310 (Ala. Cr.App.1987), this court addressed an identical issue and stated:
"`The appellant provides no evidence that the untimeliness of the State's compliance [with the discovery order] prejudiced her case. Moreover, this court has found that even if the State failed to comply with an order for discovery, the items may still be admissible because the State offered the defense counsel an opportunity to inspect and examine [the materials] in accordance with Rule 18.5(a), Alabama Temporary Rules of Criminal Procedure. Clemons v. State, 491 So.2d at 1060 (Ala.Cr.App.1986).'" *1065 508 So.2d at 313. See also Travis v. State, 776 So.2d 819 (Ala.Cr.App.1997). Similarly, Perkins has provided no evidence, indeed he has not even alleged, that he was prejudiced by the State's failure to disclose the statement until one week before trial. Perkins had ample time to prepare his cross-examination of Pate. Accordingly, we find no error, plain or otherwise, regarding this claim.

C.
Finally, Perkins contends that numerous other disclosures by the State were untimely under the 14-day rule of Rule 16.1, Ala.R.Crim.P., resulting, Perkins says, in "trial by ambush." (Perkins's brief to this court, p. 133.) Perkins did not object to any of the State's allegedly untimely disclosures. Moreover, as stated above, he has failed to provide any evidence, nor does he even allegeother than his bare allegation that he suffered from "trial by ambush"that he was prejudiced by the allegedly untimely disclosures. After reviewing the record, we find that Perkins was provided with all the discovery materials ordered by the trial court before trial. The record reveals that the trial court was diligent in overseeing ongoing discovery before trial and that Perkins made no objections to any of what he now says were late disclosures. Thus, we find no error, plain or otherwise, regarding these claims.

V.
Perkins contends that he was denied his right to a fair trial and an impartial jury when the trial court refused to allow him to conduct individual, sequestered voir dire examination of the venire regarding the prospective jurors' exposure to pretrial publicity and their views on capital punishment. (Issue XXV in Perkins's brief to this court.)
The record reflects that Perkins initially moved for individual, sequestered voir dire examination of all prospective jurors on the grounds of "[e]motionally charged and prejudicial publicity." (C. 152.) In addition, he argued that individual, sequestered voir dire was necessary to obtain honest answers from prospective jurors regarding their views on capital punishment. After conducting a hearing on Perkins's motion, the trial court denied his request for individual, sequestered voir dire regarding prospective jurors' views on capital punishment, but, contrary to Perkins's contention on appeal, the trial court granted Perkins's request for individual, sequestered voir dire regarding pretrial publicity. The following procedure, outlined by the trial court in its order on Perkins's motion, was used during voir dire: After the initial, general qualification of the venire, by the trial court and by counsel for both Perkins and the State, the 88-member venire was divided into 7 panels[2] and counsel was allowed to question the panels regarding the veniremembers' views on capital punishment. (R. 107.) Following the questioning of each panel, the trial court asked each panel if anyone had read or heard about the case in any manner. Those who responded affirmatively were then questioned by counsel individually, in a sequestered setting. Thus, the only issue we may review is whether the trial court erred in denying Perkins's request for individual, sequestered voir dire to determine the prospective jurors' views on capital punishment.
This court has repeatedly held that questioning the venire in panels meets the requirements of due process and provides *1066 reasonable assurance that any prejudice on the part of the jurors will be exposed. Haney v. State, 603 So.2d 368, 402 (Ala.Cr. App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
"`In Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court.' Coral v. State, 628 So.2d 954, 968 (Ala. Cr.App.1992). `The fact that the appellant's case involved capital murder is not alone reason to require individual voir dire.... A trial court's decision in denying individual voir dire examination of a jury panel will not be disturbed on appeal absent an abuse of that discretion.' Smith v. State, 588 So.2d 561, 579 (Ala.Cr.App.1991). See also Henderson v. State, 583 So.2d 276, 283 (Ala.Cr.App. 1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992)."
Taylor v. State, 666 So.2d 36, 66 (Ala.Cr. App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). See also Smith v. State, 727 So.2d 147 (Ala.Cr.App.1998); and George v. State, 717 So.2d 827 (Ala.Cr. App.), aff'd in pertinent part, 717 So.2d 844 (Ala.1996), aff'd on return to remand, 717 So.2d 849 (Ala.Cr.App.1997), aff'd, 717 So.2d 858 (Ala.), cert. denied, 525 U.S. 1024, 119 S.Ct. 556, 142 L.Ed.2d 462 (1998). Perkins offered no evidence in the trial court to show how he was prejudiced as a result of prospective jurors being questioned in panels, as opposed to individually, regarding their views on capital punishment. On appeal, he offers only general arguments concerning the possibility of prejudice and fails to show that any comments by a prospective juror improperly influenced other members of a panel.
"A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion." Ex parte Land, 678 So.2d 224, 242 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996). A careful review of the record reveals that the method of voir dire employed by the trial court was sufficient to "provide[] reasonable assurance that prejudice would have been discovered if present." Haney, supra, 603 So.2d at 402. Accordingly, we find that the trial court did not abuse its discretion by denying Perkins's motion for individual, sequestered voir dire examination regarding the veniremembers' views on capital punishment.

VI.
Perkins contends that the trial court erred in denying his motion for a change of venue based on pretrial publicity because, he says, the pretrial publicity in his case was so extensive and prejudicial that he could not receive a fair and impartial trial in Tuscaloosa County. (Issue XXI in Perkins's brief to this court.)
Before trial, Perkins filed a motion for a change of venue. To his motion, he attached several newspaper articles about the case from the Tuscaloosa News, and a videotape of a news broadcast regarding the case that had run on one of the local Tuscaloosa television stations.[3] After two *1067 hearings, the trial court denied the motion. Following the voir dire examination, Perkins renewed his motion, arguing that because a majority of the venire indicated that they had read or heard something about the case from the news media, including an article that had been published the day before jury selection began, he could not obtain a fair and impartial jury in Tuscaloosa County. The trial court again denied the motion and stated:
"[W]e did grant the Defendant's motion, in part, for individual voir dire on the issue of pretrial publicity and knowledge of the case. And jurors were individually examined on that. There were actually there was actually a small percentage, as I recall, that actually read the articles in this past Sunday's paper. And based on that and the other considerations that we covered when the motion on this was first submitted, the Court will deny the motion to transfer."
(R. 1678.)
When reviewing the correctness of a trial court's ruling on a motion for a change of venue, we must determine whether the trial court abused its discretion.
"`The determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.'
"Nelson v. State, 440 So.2d 1130, 1132 (Ala.Cr.App.1983). See also Trahan v. State, 450 So.2d 1102 (Ala.Cr.App.1984). An appellant must prove a `gross abuse of discretion' before the trial court's ruling on a motion for change of venue will be reversed on appeal. Anderson v. State, 443 So.2d 1364 (Ala.Cr.App. 1983)."
Hunt v. State, 642 So.2d 999, 1042 (Ala.Cr. App.1993), aff'd, 642 So.2d 1060 (Ala.1994). "A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case." Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994).
In Oryang v. State, 642 So.2d 979 (Ala. Cr.App.1993), we stated the following regarding the standard a trial court should use in deciding whether to grant a motion for a change of venue based upon pretrial publicity:
"`"`There are two situations in which a change of venue is mandated. The first is when the defendant can show that prejudicial pre-trial publicity "has so saturated the community as to have a probable impact on the prospective jurors" and thus renders the trial setting "inherently suspect." McWilliams v. United States, 394 F.2d 41 (U.S.C.A. 8th Cir.1968); Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In this situation, a "pattern of deep and bitter prejudice" must exist in the community. Irvin v. Dowd, [366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) ] supra.
"`"`The second situation occurs when the defendant shows "a connection between *1068 the publicity generated by the news articles, radio and television broadcasts in the existence of actual prejudice." McWilliams v. United States, supra.'
"`"Nelson, 440 So.2d at 1131-32."
"`Thomas v. State, 539 So.2d 375 (Ala. Crim.App.1988). See also Robinson v. State, 430 So.2d 883 (Ala.Crim.App. 1983).'
"Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.1989), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
"Thus, a change of venue must be granted only when it can be shown that the pretrial publicity has so `pervasively saturated' the community as to make the `court proceedings nothing more than a "hollow formality,"' Hart v. State, 612 So.2d 520, 526-27 (Ala.Cr.App.), affirmed, 612 So.2d 536 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), citing Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963), or when actual prejudice can be demonstrated. The burden of showing this saturation of the community or actual prejudice lies with the appellant. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In order to show community saturation, the appellant must show more than the fact `that a case generates even widespread publicity.' Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). `"Newspaper articles alone would not necessitate a change of venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945]."' Thompson v. State, supra at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala. Cr.App.), cert. denied, 353 So.2d 35 (Ala. 1977). Furthermore, in order for a defendant to show [actual] prejudice, the `"proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination." Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim. App.1978).' Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985)."
642 So.2d at 982-83.
We acknowledge that Perkins's case received extensive publicity in Tuscaloosa County. However, "`in order to obtain a change of venue, it must be shown that pre-trial publicity surrounding the case was inherently prejudicial.'" Oryang, supra, at 983, quoting Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App. 1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989). We recognize that the "presumptive prejudice" standard is "`rarely' applicable, and is reserved for only `extreme situations.'" Hunt, 642 So.2d at 1043, quoting Coleman v. Kemp, 778 F.2d 1487, 1537 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). We also recognize that Perkins's burdento show that pretrial publicity so saturated the community as to deny him a fair trialis a very heavy burden. See Hunt, supra at 1043. "`Prejudicial' publicity usually must consist of much more than stating the charge and reporting on the pretrial and trial processes. `Publicity' and `prejudice' are not the same thing. Excess publicity does not automatically or necessarily mean that *1069 the publicity was prejudicial." 642 So.2d at 1043.
We do not find that the pretrial publicity in this case so "pervasively saturated" the community as to render the court proceedings nothing more than a "hollow formality." Oryang, supra, at 983. Nor do we find that the publicity was so inherently prejudicial as to create a presumption of prejudice. To justify a change of venue, the publicity must be both extensive and sensational in nature. "If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice." United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.), cert. denied, 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990). We have examined the media materials presented to the trial court, and we find that most of the reports were factual and relatively objective rather than accusatory, inflammatory, or sensational. Perkins has failed to prove that the media reports so inflamed or saturated the community as to create an emotional tide against him. Thus, he has not shown that the pretrial publicity in this case was so inherently or presumptively prejudicial as to constitute one of those "extreme situations" that warrant a presumption of prejudice.
In addition, we find no evidence of bias on the part of prospective jurors so pervasive as to indicate actual prejudice. On appeal, Perkins offers us nothing more than the assertion that the majority of the prospective jurors on the venire had heard about the case and that 25 of the 88 prospective jurors had been excused for cause based on their exposure to pretrial publicity. However, as the Alabama Supreme Court stated in Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985):
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, `[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978)."
479 So.2d at 80. "`"The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).'" Siebert v. State, 562 So.2d 586, 589 (Ala.Cr.App. 1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990), quoting Fortenberry v. State, 545 So.2d 129 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990). The jury venire in this case was extensively and thoroughly examined in an individual, sequestered setting regarding each prospective juror's knowledge about the case. While the majority of prospective jurors were aware of the abduction and murder of Mrs. Gilliam, and of the manhunt by law enforcement officials to capture Perkins following the murder, opinions of less than one-third (25 *1070 of 88) of the venire were actually tainted by pretrial publicity. See Russell v. State, 739 So.2d 58 (Ala.Cr.App.1999).
Perkins has failed to show either that the community was saturated with pretrial publicity or that actual prejudice existed among the jurors at his trial. The media coverage was not so sensational and inflammatory as to create a presumption of prejudice. The record contains no indication that any juror who sat on Perkins's jury had a fixed opinion of Perkins's guilt or that the verdict was not impartially rendered on the evidence presented at trial. Accordingly, we find that the trial court did not abuse its discretion in denying Perkins's motion for a change of venue.

VII.
Perkins contends that his right to due process, his right to counsel, and his right to a fair and impartial jury were violated when the circuit court clerk excused prospective jurors outside his presence. (Issue XXVI in Perkins's brief to this court.) Before trial, Perkins objected to the clerk's excusing of prospective jurors and requested that the trial judge personally handle all requests for excusal. The trial judge denied the request, stating that the clerk had been designated to handle such requests.
This claim has been decided adversely to Perkins on numerous occasions. Windsor v. State, 683 So.2d 1021 (Ala.1994), on remand to 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___ (Ala.Cr.App.1998); Slaton v. State, 680 So.2d 879 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997); Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.), on return to remand, 672 So.2d 1353 (Ala.Cr.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996). Accordingly, we find no error here.

VIII.
Perkins contends that the trial court erred in permitting the victim's husband, Wally Gilliam, to sit at the prosecution's table during his trial. (Issue XV in Perkins's brief to this court.) He claims that Mr. Gilliam's presence "created the grave and impermissible risk that the jury would identify the prosecution of Roy Perkins with the suffering and desires of the victim's family." (Perkins's brief to this court, p. 86.) Moreover, he maintains that it was error for the prosecutor to introduce Mr. Gilliam to the venire as a "prosecuting witness."[4] (Perkins's brief to this court, p. 85.) Because Perkins did not object either to Mr. Gilliam's introduction to the jury or to Mr. Gilliam's presence at the prosecution's table during trial, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
Perkins's argument concerning the presence of a relative of the victim at the prosecution's table has been addressed and rejected by this court on numerous occasions. See Minor v. State, 780 So.2d 707 (Ala.Cr.App.1999); Maples v. State, 758 So.2d 1 (Ala.Cr.App.1999); Roy Burgess v. State, 811 So.2d 557 (Ala.Cr.App.1998); Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d *1071 1004 (1995); Coral v. State, 628 So.2d 954, 984 (Ala.Cr.App.), aff'd on return to remand, 628 So.2d 988 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Williams v. State, 601 So.2d 1062 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992); and Henderson v. State, 583 So.2d 276 (Ala.Cr. App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). In Henderson, this court stated:
"The presence of a victim seated at the counsel table for the prosecution is specifically provided for by `The Alabama Crime Victims' Court Attendance Act,' codified at §§ 15-14-50 et seq., Code of Alabama 1975. This act gives victims of a criminal offense the right to be present in the courtroom and seated alongside the prosecutor during the trial of the individual charged with that offense."
583 So.2d at 285-86.
Section 15-14-56(a), Ala.Code 1975, specifically provides:
"Whenever a victim is unable to attend such trial or hearing or any portion thereof by reason of death; disability; hardship; incapacity; physical, mental, or emotional condition; age; or other inability, the victim, the victim's guardian or the victim's family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article."
The right of the victim or the victim's representative to sit at the counsel table applies in both capital and noncapital cases. Burgess, 811 So.2d at 575, citing Coral, 628 So.2d at 984. Clearly, Mr. Gilliam had a right to be present in the courtroom and to sit at the prosecution's table during the trial of the man accused of murdering his wife.
Moreover, because a victim or a member of a victim's family is entitled to sit at the prosecution's table during a trial, "[l]ogically, it would therefore follow that there is nothing wrong with introducing that person to the jury." Henderson, 583 So.2d at 286. See also Slaton v. State, 680 So.2d 879, 906 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). Accordingly, there was no error, plain or otherwise, when the trial court introduced Mr. Gilliam to the venire or when it allowed Mr. Gilliam to sit at the prosecution's table during the trial.

IX.
Perkins contends that the trial court erred in granting the State's challenge for cause as to prospective juror C.R. on the ground that her ability to be fair and impartial was substantially impaired due to her views on the death penalty. (Issue XIX in Perkins's brief to this court.) He maintains that C.R. did not have a deep-seated opposition to capital punishment and at most had "vague personal feelings against capital punishment," which, he says, were insufficient to justify a challenge for cause. (Perkins's brief to this court, p. 106.) Because Perkins did not oppose the State's challenge as to C.R., we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
After the 88-member venire was divided into panels, the trial court began the panel voir dire examination by asking each panel if anyone was so opposed to the death penalty that their views would substantially impair their duties as jurors. In response to this question, C.R. remained silent. During individual voir dire of C.R. by the prosecutor, C.R. indicated that she *1072 had no feelings about the death penalty one way or the other. However, in response to specific questioning by Perkins's counsel, C.R. stated that she was strongly opposed to the death penalty, but that she would consider the evidence on mitigating and aggravating circumstances as instructed by the trial court. Further questioning by the prosecutor revealed that C.R. was completely against the death penalty; she indicated that she could never personally return a verdict for death. In an attempt to rehabilitate C.R., Perkins's counsel then asked C.R. if she could impose a verdict of death for people such as Adolph Hitler, Jeffrey Dahmer, and Ted Bundy. C.R. indicated that she could sentence Hitler to death, but she refused to answer the question as to the others; instead, C.R. merely reiterated that she was "strongly against the death sentence." (R. 1132-33.)
"`"The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is `whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."' Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). `The crucial inquiry is whether the veniremen could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment.' Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with `unmistakable clarity' because `juror bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism.' Id.

"`"A trial judge's finding on whether or not a particular juror is biased `is based upon determination of demeanor and credibility that are peculiarly within a trial judge's province.' Witt, 469 U.S. at 428, 105 S.Ct. at 854. That finding must be accorded proper deference on appeal. Id. `A trial court's ruling on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.' Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981)."
"`Martin v. State, 548 So.2d 488, 490-91 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). "[A] blanket declaration of support of or opposition to the death penalty is not necessary for a trial judge to disqualify a juror." Ex parte Whisenhant, 555 So.2d 235, 241 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).'"
Dallas v. State, 711 So.2d 1101, 1107 (Ala. Cr.App.1997), aff'd, 711 So.2d 1114 (Ala.), cert. denied, 525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998), quoting Taylor v. State, 666 So.2d 36, 47 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
Considering C.R.'s initial responses regarding the death penaltythat she had no feelings about it one way or the other together with her subsequent vacillating answersfirst, that she could consider the death penalty, then that she could never impose the death penaltyit appears that the trial court was unsure whether C.R.'s statement to Perkins's counsel that she *1073 could consider the death penalty was candid, or rather was merely an attempt to please Perkins's counsel.[5] See, e.g., Hyde v. State, 778 So.2d 199 (Ala.Cr.App.1998). "`The trial judge was in the best position to evaluate the demeanor of [C.R.] and to "hear not only the words recorded by the court reporter but also the meaning actually conveyed by [C.R.]."'" Drinkard v. State, 777 So.2d 225, 250 (Ala.Cr.App. 1998), quoting Stewart v. State, 730 So.2d 1203, 1226 (Ala.Cr.App.1996), quoting in turn, Clark v. State, 443 So.2d 1287, 1289 (Ala.Cr.App.1983). "It is sufficient if the trial court, after taking into consideration the veniremember's answers and demeanor, `is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.'" Williams v. State, 601 So.2d 1062, 1069 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992), quoting Wainwright v. Witt, 469 U.S. 412, 426, 105 S.Ct. 844, 853, 83 L.Ed.2d 841 (1985). Based on the record before us, we find no abuse of the trial court's discretion in granting the State's challenge for cause as to prospective juror C.R. Therefore, there is no error, plain or otherwise, as to this claim.

X.
Perkins contends that the trial court erred by denying 14 of his challenges for cause as to prospective jurors. (Issue XXIII in Perkins's brief to this court.)
We note that the trial court granted 30 of Perkins's challenges for cause. We also note that several of the reasons Perkins raises on appeal to support his contention that these 14 jurors should have been excused for cause were never presented to the trial court, and therefore, may be reviewed only for plain error. Rule 45A, Ala.R.App.P. Likewise, some of the reasons Perkins asserted at trial to support his challenges for cause have been abandoned on appeal. Regardless of whether the reasons were raised at trial, we find no error, plain or otherwise, in the trial court's denial of these 14 challenges for cause for any reason.
"To justify a challenge for cause, there must be a proper statutory ground or `"some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court."' Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App.1992)(quoting Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App. 1983)). This Court has held that `once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions' about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror `need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.' Kinder v. State, 515 So.2d 55, 61 (Ala. Cr.App.1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, at 60-61. In order to justify disqualification, a juror `"must have more than a bias, or *1074 fixed opinion, as to the guilt or innocence of the accused"'; `"[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render."' Oryang v. State, 642 So.2d 979, 987 (Ala.Cr.App.1993) (quoting Siebert v. State, 562 So.2d 586, 595 (Ala.Cr. App.1989))."
Ex parte Davis, 718 So.2d 1166, 1171-72 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).
In Harris v. State, 632 So.2d 503 (Ala. Cr.App.1992), aff'd, 632 So.2d 543 (Ala. 1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), we stated:
"`"The test to be applied is can the juror eliminate the influence of his scruples and render a verdict according to the evidence. Ordinarily a juror is not disqualified where it appears that he is willing to follow the instructions of law given by the trial court and is able to decide the case impartially according to the evidence notwithstanding his scruples. The determination of this question is based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Tidmore [v. City of Birmingham, 356 So.2d 231 (Ala.Cr. App.1977), cert. denied, 356 So.2d 234 (Ala.1978) ]. A juror is incompetent whose answers show that he would follow his own views regardless of the instructions of the court. Watwood v. State, 389 So.2d 549, 550 (Ala.Cr. App.), cert. denied, 389 So.2d 552 (Ala. 1980).
"`Barbee v. State, 395 So.2d 1128, 1130-31 (Ala.Cr.App.1981)....
"`"Thus, where a juror states that he has opinions but that he would try the case fairly and impartially according to the law and the evidence and that he would not allow his opinion to influence his decision, it is not error for a trial judge to deny a challenge for cause. Howard v. State, 420 So.2d 828, 831 (Ala.Cr.App.1982). `A juror who brings his thoughts out into the open in response to voir dire questions may be the one who later "bends over backwards" to be fair....' Clark v. State, 443 So.2d 1287, 1289 (Ala.Cr. App.1983)." "Mahan v. State, 508 So.2d 1180 (Ala.Cr.App.1986)."'
"Kinder v. State, 515 So.2d 55, 60-61 (Ala.Cr.App.1986)."
632 So.2d at 520-21.
Perkins's predominant argument on appeal is that eight prospective jurors whom he challenged should have been excused for cause because, he says, they had been exposed to pretrial publicity concerning the case. Although all of these jurors stated honestly during voir dire examination that they had read or heard something about the case, all specifically stated that they could set aside what they had read or heard and could render a fair and impartial verdict based solely on the evidence presented at trial. "[A] defendant is not entitled to jurors who are totally ignorant of the facts and issues involved in the case." Neal v. State, 731 So.2d 609, 613 (Ala.Cr.App.1997), aff'd, 731 So.2d 621 (Ala.), cert. denied, 527 U.S. 1027, 119 S.Ct. 2377, 144 L.Ed.2d 780 (1999).
As to Perkins's remaining complaints, we have thoroughly reviewed the record of the voir dire examination, and find no evidence that any of the jurors Perkins challenges had such a bias or fixed opinion so as to impair their ability to be fair and impartial in rendering a verdict. All 14 jurors stated during voir dire examination that they could be fair and impartial, that they could follow the law as the court instructed them, that they could render a verdict based solely on the evidence presented, and that they could set aside any personal views they may have had and not *1075 let those views influence their decision in any way.
Thus, we find no error, plain or otherwise, in the trial court's denial of Perkins's 14 challenges for cause.

XI.
Perkins contends that the trial court erred in denying his motion made pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), because, he says, he established a prima facie case of racial discrimination in the selection of the jury. (Issue XVI in Perkins's brief to this court.) Specifically, he contends that the State's use of 10 of its 18 peremptory strikes to remove blacks from the venire established a prima facie case of racial discrimination and that the trial court's reference, when it denied his motion, to the fact that the percentage of blacks on the jury exceeded the percentage of blacks on the venire violated the principle announced by the Alabama Supreme Court in Ex parte Thomas, 659 So.2d 3 (Ala.1994).
In Thomas, the Alabama Supreme Court held that the mere fact that the percentage of blacks on the jury is equal to or exceeds the percentage of blacks on the venire cannot negate what would otherwise be a prima facie case of racial discrimination. In other words, if a trial court would otherwise have found a prima facie case of racial discrimination, the court cannot find that no prima facie case exists solely because the percentage of blacks on the jury exceeds the percentage of blacks on the venire. Implicit in this holding is the requirement that a prima facie case of racial discrimination was actually established before the trial court used "statistics" to negate it. Thus, contrary to Perkins's contention, Thomas does not prevent the trial court from considering statistics, along with the numerous other factors set out in Ex parte Branch, 526 So.2d 609 (Ala.1987), in denying a defendant's Batson motion. In Thomas, the Supreme Court specifically stated:
"We emphasize that our disapproval of the construction that has been given Harrell II [Harrell v. State, 571 So.2d 1270 (Ala.1990), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1990)] does not mean that an increased percentage of blacks on the jury can never be a circumstance to be considered in ruling whether a discriminatory use of peremptory strikes has been shown. In a proper case, the fact that the percentage of blacks on the jury is higher than the percentage of blacks on the venire may be a factor to be considered in deciding whether a prima facie case of discrimination has been made or rebutted. However, where, as here, the prosecutor has used such a large portion of his strikes against blacks as to indicate a pattern of striking blacks from the venire, the fact that the jury has a higher percentage of blacks than the venire had does not mean that no prima facie case of discrimination has been made."
659 So.2d at 8 (emphasis added).
In Thomas, the Supreme Court found that the State's use of 9 of its 10 peremptory strikes to remove blacks from the venire was, alone, sufficient to establish a prima facie case of racial discrimination. Thus, the Court concluded, the trial court's finding that there was no prima facie case solely because the percentage of blacks on the jury exceeded the percentage of blacks on the venire was clearly erroneous. Here, unlike in Thomas, the State's use of 10 of its 18 peremptory strikes to remove blacks from the venire was not sufficient, in and of itself, to establish a prima facie case of racial discrimination. Contrary to Perkins's contention, *1076 the prosecutor did not use "such a large portion of his strikes against blacks as to indicate a pattern of striking blacks from the venire." Thomas, 659 So.2d at 8. It is well established that the mere fact that the prosecutor used one or more of his strikes to remove blacks is not sufficient to establish a prima facie case of discrimination. In Harrell v. State, 555 So.2d 263, 268 (Ala.1989), on return to remand, 571 So.2d 1269 (Ala.Cr.App.), writ quashed, 571 So.2d 1270 (Ala.1990), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991), the Alabama Supreme Court stated:
"The defendant may not prove his prima facie case solely from the fact that the prosecutor struck one or more blacks from his jury. United States v. Lane, 866 F.2d 103, 106 (4th Cir.1989). The defendant must offer some evidence in addition to the striking of blacks that would raise the inference of discrimination. In determining whether the evidence is sufficient to create an inference of discrimination, the court should look to the factors listed in Branch, supra, for guidance."
Perkins failed to offer the trial court and has failed to offer this courtany evidence, other than the number of strikes used by the prosecutor to remove blacks, that would raise an inference of discrimination and establish a prima facie case. After thoroughly reviewing the record in light of the factors set out in Branch, supra, we find no evidence that the black veniremembers who were struck by the State shared only the characteristics of race.[6] We find nothing in the type or manner of the prosecutor's questions during the extensive voir dire examination that indicates any intent to discriminate against black jurors; nor do we find a lack of meaningful voir dire directed at black jurors. On the contrary, it appears that the prosecutor thoroughly questioned both black and white jurors alike. Furthermore, Perkins has provided no evidence that the prosecutor in this case had a history of misusing peremptory challenges so as to discriminate against blacks.[7] In essence, Perkins offers this court nothing, other than the number of blacks struck, to support his contention that the State improperly struck jurors based solely on their race. "Without more, we do not find that the number of strikes this prosecutor used to remove [blacks] from the venire is sufficient to establish a prima facie case of [racial] discrimination." Ex parte Trawick, 698 So.2d 162, 168 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997).
Because we find that Perkins failed to establish a prima facie case of *1077 racial discrimination through the pattern of the prosecutor's strikes, or any of the other factors set out in Branch, supra, the trial court's reference, in response to Perkins's purely statistical argument at trial, to the fact that the percentage of blacks on the jury exceeded the percentage of blacks on the venire did not violate the Supreme Court's holding in Thomas. Clearly, the trial court was merely responding in-kind to Perkins's purely statistical argument by also referring to statistics, a factor that the Alabama Supreme Court specifically stated could be considered in determining whether a prima facie case existed. Such a reference to statistics is not an indication that Perkins had established a prima facie case or that the trial court refused to make that finding solely because of statistics the practice expressly disapproved of in Thomas. Rather, this reference indicates that the trial court, faced with an argument based solely on numbers, decided to frame its response also in terms of numbers. Because Perkins failed to establish a prima facie case of racial discrimination in the first place, the trial court could not have, as Perkins contends, violated the principles in Thomas by negating a prima facie case through the use of statistics. In a case such as this, where the trial court cites statistics in response to a defendant's purely statistical Batson motion, the trial court does not violate the principles of Thomas when the record clearly indicates that the defendant failed to establish a prima facie case of racial discrimination. Accordingly, we find that the trial court's denial of Perkins's Batson motion was not clearly erroneous.

XII.
Perkins contends that the State improperly used its peremptory strikes to remove male jurors from the venire, in violation of the principles of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). (Issue XVII in Perkins's brief to this court.) Because Perkins did not raise a J.E.B. objection at trial, we may review this claim only for plain error. Rule 45A, Ala.R.App.P. In a Batson claim, the plain-error analysis is triggered only if the record supports an inference that the prosecution engaged in purposeful discrimination. See Ex parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).
On appeal, the only evidence Perkins offers in support of his claim that the prosecutor discriminated against men is that the prosecutor used 11 of his 18 peremptory challenges to remove men from the venire. In Ex parte Trawick, 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997), the Alabama Supreme Court held:
"A party making a Batson or J.E.B. challenge bears the burden of proving a prima facie case of discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609 (Ala.1987); Ex parte Bird, 594 So.2d 676 (Ala.1991). In Branch, this Court discussed a number of relevant factors a defendant could submit in attempting to establish a prima facie case of racial discrimination; those factors are likewise applicable in the case of a defendant seeking to establish gender discrimination in the jury selection process. Those factors, stated in a manner applicable to gender discrimination, are as follows: (1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct *1078 of the state's attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state's questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender."
698 So.2d at 167-68. See also Willie Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___, ___ (Ala.Cr.App. 1998).
Here, we have thoroughly reviewed the record in light of the factors set out in Branch, and we find no evidence that the male veniremembers who were struck by the State shared only the characteristics of gender. We find nothing in the type or manner of the prosecutor's questions during the extensive voir dire examination that indicates any intent to discriminate against male jurors; nor do we find a lack of meaningful voir dire directed at male jurors. On the contrary, it appears that male and female jurors alike were thoroughly questioned regarding their personal opinions on issues ranging from circumstantial evidence to the death penalty. Furthermore, Perkins has provided no evidence that the prosecutor in this case had a history of misusing peremptory challenges so as to discriminate against either gender. Although Perkins has raised a claim of gender discrimination on appeal, that is all he has doneraise the claim. He offers this court nothing, other than the number of men struck, to support his contention that the State improperly struck jurors based solely on their gender. "Without more, we do not find that the number of strikes this prosecutor used to remove [men] from the venire is sufficient to establish a prima facie case of gender discrimination." Ex parte Trawick, 698 So.2d at 168. See also Armstrong v. State, 710 So.2d 531 (Ala.Cr.App.1997); Merriweather v. State, 629 So.2d 77 (Ala.Cr.App. 1993). Accordingly, we find no plain error as to this claim.

XIII.
Perkins contends that his right to a fair trial and his due process rights were violated because, he says, he was forced to wear a leg restraint during his trial. (Issue VII in Perkins's brief to this court.) Specifically, he contends that the leg restraint, put on by the sheriff's department as a security measure, made his movements "visibly awkward," limited his range of motion, and prejudiced the jury against him. (Perkins's brief to this court, p. 64.) Because Perkins never received an adverse ruling from the trial court as to this issue, we may review this claim only under the plain-error rule. Rule 45A, Ala. R.App.P.
A review of the record reveals the following facts relevant to this claim. During the final day of the voir dire examination of the venire, Perkins's counsel objected to the leg restraint, arguing that it caused Perkins to limp, and that it unduly focused the jury's attention on the fact that he had been shot in the leg. (R. 1422-28.) Perkins's counsel requested that the restraint be removed. Because at that time the sheriff was unavailable to be questioned concerning the security measure, the court deferred ruling on Perkins's motion until the following morning. The next morning, after voir dire had ended, but before the jury had been struck, the trial court held a hearing on whether the leg restraint should be removed. (R. 1601-06.) After *1079 the hearing, the court granted Perkins's motion to have the leg restraint removed. (R. 1606.) Following the hearing, the striking of the jury continued. After the jury was struck, a recess was taken to allow the jurors to make arrangements for their sequestration. While the trial court was instructing the jurors regarding the recess, Perkins's counsel requested to approach the bench. The following then occurred:
"[Perkins's counsel]: The Sheriff's Department has to take Roy to get something to eat.
"[Perkins's counsel]: And to take the device off.
"[Perkins's counsel]: So we probably need to have the jurors somewhere other than the court, someplace in your office.
"[Prosecutor]: We can't here?
"[The Court]: He was saying that the defendant is going to have to go get something to eat and have the brace taken off. So we might just can put them back there and let them be organizing and finding out what can be done back there."
(R. 1695.) After the recess, the trial began.
Contrary to Perkins's contention, there is nothing in the record to indicate that he was forced to wear the leg restraint throughout his trial. The above-quoted portion of the record reveals that the restraint was removed during the recess before the trial beganthe first practical opportunity to remove the restraint following the court's ruling. The remainder of the record, however, is silent regarding this issue; there is nothing in the record to show whether the restraint was again placed on Perkins at any point later in the trial.
"`"This court cannot predicate error on matters not shown by the record, nor can we presume error from a silent record." Smelcher v. State, 520 So.2d 229 (Ala.Cr.App.1987); Abbott v. State, 494 So.2d 789 (Ala.Cr.App.1986). "Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done." Jolly v. State, 405 So.2d 76 (Ala. Cr.App.1981); Watson v. State, 398 So.2d 320 (Ala.Cr.App.1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).'"
Gaddy v. State, 698 So.2d 1100, 1130 (Ala. Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997), quoting Owens v. State, 597 So.2d 734, 736 (Ala.Cr.App. 1992). The fact that the restraint is never again mentioned in the record, combined with the lack of any objection by Perkins's counsel at a subsequent point in the trial, even though this was obviously an important issue to Perkins, indicates that the restraint was, in fact, never put back on Perkins after it was initially removed pursuant to the court's order.
We point out, however, that even if Perkins had been forced to wear the restraint throughout the trial, there would have been no error. It is not always reversible error for a defendant to be handcuffed or shackled in front of the jury. See Brock v. State, 555 So.2d 285 (Ala.Cr. App.1989), on return to remand, 580 So.2d 1390 (Ala.Cr.App.1991); Campbell v. State, 484 So.2d 1168 (Ala.Cr.App.1985). Here, it is clear from the record that the restraint was not visible to the jury; it was, apparently, placed under Perkins's pants. In discussing Perkins's objection, the trial court specifically stated, "I have not been able to see any evidence of any device except the fact that he [Perkins] may be walking a little differently." (R. 1425.) In addition, Perkins's counsel admitted that, *1080 after getting accustomed to the restraint, Perkins "was walking better" than he had when he first got the restraint. (R. 1602.) Under these circumstances, it would not have been error to require Perkins to wear the restraint.
Based on the foregoing, we find no error, plain or otherwise, regarding this claim.

XIV.
Perkins contends that the trial court erred by allowing the State to introduce evidence regarding several collateral bad acts and crimes allegedly committed by him in the two weeks preceding Mrs. Gilliam's abduction and murder. (Issue I in Perkins's brief to this court.)

A.
First, Perkins contends that the trial court erred by allowing the State to present the testimony of several witnesses that tended to show that he had raped two women, B.P. and D.W., on August 1, 1990, and August 6, 1990, respectively.
State's witness B.P. testified that on August 1, 1990, at approximately 6:00 p.m., Perkins, whom B.P. knew personally, came to her home in Alberta City in Tuscaloosa County, and asked her to ride with him to Fayette County to return the car he was driving to his friend. B.P. stated that she agreed to ride with Perkins and that she and Perkins were drinking beer and smoking marijuana in the car when Perkins suddenly turned off the main road onto a dirt road. According to B.P., Perkins told her that he and some friends had a "camp house" in the woods, and that he wanted to see if anyone was there before driving on. (R. 1894.) Perkins then pulled up next to a white building, honked the horn, and hollered out the car window. When no one came out of the building, B.P. asked Perkins to take her home. Perkins agreed, but told B.P. that she would have to drive because he was too drunk. B.P. got out of the passenger side of the car and walked around the car to the driver's side. Perkins likewise got out of the car, and when B.P. turned her back to him to get in the driver's seat, Perkins grabbed her and put a knife to her throat. B.P. testified that the knife was approximately 12 inches long and that it looked like a hunting knife.
According to B.P., Perkins removed a string from the bottom of her shirt, tied her hands behind her back, and led her into the white building, where he forced her to lie on a mattress on the floor. B.P. testified that Perkins then removed her clothes and began to masturbate. B.P. attempted to convince Perkins to let her go, but when she did, Perkins threatened to kill her. At that point, B.P. said, she asked Perkins for a cigarette; Perkins agreed, and he walked B.P. outside to the car to get her a cigarette. He then told B.P. to go back inside the building; B.P. complied. B.P. stated that Perkins remained outside the building, and she then used her lit cigarette to burn the string around one of her wrists. B.P. testified that she was unable to burn the string around both wrists because Perkins came back inside the building.
B.P. testified that when Perkins returned to the building, he raped her. Afterwards, B.P. said that Perkins apologized for raping her, told her that he did not mean to do it, and asked for her forgiveness. B.P. stated that Perkins then lay beside her on the mattress and, after a period of time, passed out. After Perkins passed out, B.P. retrieved a shotgun that was standing against a wall in the building and hit Perkins on the head. B.P. stated that she then grabbed her clothes and ran to the car. According to B.P., as she was trying to start the car, Perkins ran out of the building and toward the car. B.P. got *1081 the car started before Perkins could reach her, and drove to Miller's Grocery in Northport, where she telephoned the police. B.P. stated that she arrived at Miller's Grocery between 1:30 a.m. and 2:00 a.m. on August 2, 1990.
State's witness William Carl Gaddy, a deputy with the Tuscaloosa County Sheriff's Department, testified that he responded to a call from Miller's Grocery on August 2, 1990. He stated that he arrived at the grocery at approximately 1:29 a.m. and spoke with B.P. He stated that he noticed B.P. had marks on her wrists and bruises on her right arm.
State's witness Mark Seigel, an emergency room physician at Druid City Hospital in Tuscaloosa, testified that he examined B.P. on August 2, 1990. Dr. Seigel stated that he noticed that B.P. had reddened and "abraded areas" on both wrists, which, he said, were consistent with having been tied or bound. (R.2007.) In addition, Dr. Seigel completed a rape kit on B.P. According to Deborah Herren, a registered nurse who was present when the rape kit was completed on B.P., she gave the kit to Sergeant J.R. Simpson. Sergeant Simpson testified that he transported B.P.'s rape kit to Dr. John McDuffie at the Alabama Department of Forensic Sciences.
State's witness D.W. testified that on August 6, 1990, at approximately 5:00 p.m., she met a friend in the woods near Perkins's grandmother's house. According to D.W., who knew Perkins from elementary school, she and her friend talked for awhile, and then the friend left. D.W. stated that when her friend left, she got into her car to leave, but then got out again to go to the bathroom. According to D.W., when she got out of her car, Perkins grabbed her from behind and put a knife to her throat. She stated that the knife was approximately 12 inches long and that it appeared to be a hunting knife. D.W. testified that Perkins tied her hands behind her back with rope he had and forced her to lie on the front seat of her car. Perkins then drove her car across a field to a white building, where he dragged a mattress outside. D.W. stated that Perkins forced her to lie on the mattress, and that he then raped and sodomized her repeatedly. Afterwards, Perkins drove D.W. down a dirt road, got out of her car, and allowed D.W. to leave. D.W. immediately drove to her brother's house, where she notified the police.
D.W. testified that she gave a statement to Vernon Hudson, chief deputy of the Fayette County Sheriff's Department, while at her brother's house. According to D.W., she identified Perkins as her assailant. Hudson corroborated D.W.'s testimony. On cross-examination, D.W. testified that the written statement she gave to police did not include Perkins's name as her assailant, even though her oral statement did. D.W. also stated on cross-examination that she believed that Perkins had pleaded guilty to her rape and that he had been sentenced to 99 years' imprisonment.[8]
State's witness Paul Ashley, an emergency room physician at Fayette County Hospital, testified that he examined D.W. on the night of August 6, 1990. Dr. Ashley stated that he completed a rape kit on D.W. which he gave to Jean Perkins, a registered nurse. Nurse Perkins testified that she, in turn, gave the rape kit to Hudson. Hudson stated that, after receiving the rape kit from Nurse Perkins, he *1082 turned it over to J.W. Stough, who, at the time, was a deputy sheriff with the Fayette County Sheriff's Department. Stough testified that he transported D.W.'s rape kit to the Alabama Department of Forensic Sciences. In addition, Stough testified that he later had occasion to go to the white building described by a rape victim. In the building, Stough found a mattress, an old chair, and some bailing twine.
State's witness Phyllis T. Rollan, a forensic serologist with the Alabama Department of Forensic Sciences, testified that on August 28, 1990, she received the rape kits performed on B.P. and D.W. Rollan testified that she tested the kits and found the presence of semen in each one. According to Rollan, the DNA of the semen found in both rape kits was consistent with Perkins's DNA. Rollan stated that, statistically, Perkins's DNA type could be located in 1 in 33 members of the white population.
Before trial, Perkins filed a motion in limine seeking to prevent the State from introducing evidence of any collateral crimes committed by Perkins, including the rape of B.P. and the alleged rape of D.W. The trial court denied the motion without stating a reason. At trial, Perkins's counsel objected to the testimony of B.P., Gaddy, Dr. Seigel, Nurse Herren, Simpson, D.W., Hudson, Dr. Ashley, Nurse Perkins, Stough, and Rollan, regarding the alleged rapes. The objections were overruled, and the trial court admitted the testimony, again without stating a reason.
On appeal, Perkins contends that evidence of the alleged rapes was inadmissible because, he says, it was not probative of any issue in the case, it did not fall within any of the exceptions to the exclusionary rule, and it was offered solely to show his bad character or his propensity to commit criminal acts. Moreover, he maintains that, even if the evidence was probative of an issue in the case and did fall within one of the exceptions to the exclusionary rule, its prejudicial effect far outweighed its probative value, and, he says, the detail with which the State proved the alleged prior rapes "exceeded all permissible bounds of relevancy." (Perkins's brief to this court, pp. 11-12.)
"On the trial for the alleged commission of a particular crime, evidence of the accused's having committed another act or crime is not admissible if the only probative function of such evidence is to prove bad character and the accused's conformity therewith. This is a general exclusionary rule which prevents the introduction of prior acts or crimes for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question....
". . . .
"The foregoing exclusionary rule does not work to exclude evidence of all crimes or acts, only such as are offered to show the defendant's bad character and conformity therewith on the occasion of the now-charged crime. If the defendant's commission of another crime or misdeed is relevant for some other material purpose in the case then it may be admitted."
Charles W. Gamble, McElroy's Alabama Evidence, § 69.01(1) at 300-01 (5th ed.1996) (footnotes omitted).
"[E]vidence of collateral offenses may be admissible under certain exceptions to the exclusionary rule or for `other purposes' than to prove the accused's guilt." Williamson v. State, 629 So.2d 777, 780 (Ala. Cr.App.1993). In Nicks v. State, 521 So.2d 1018 (Ala.Cr.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), this court discussed the exceptions to the general exclusionary rule:

*1083 "Numerous Alabama cases list the exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted. These exceptions include the following:
"`(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.'
"Nelson v. State, 511 So.2d 225, 233 (Ala.Cr.App.1986). See also Twilley v. State, 472 So.2d 1130 (Ala.Cr.App.1985); Brewer v. State, [440 So.2d 1155 (Ala.Cr. App.), cert. denied, 440 So.2d 1155 (1983)]; Miller v. State, 405 So.2d 41 (Ala.Cr.App.1981); Thompson v. State, 374 So.2d 377 (Ala.Cr.App.1978), aff'd, 374 So.2d 388 (Ala.1979); McMurtrey v. State, 37 Ala.App. 656, 74 So.2d 528 (1954); Wilkins v. State, 29 Ala.App. 349, 197 So. 75, cert. denied, 240 Ala. 52, 197 So. 81 (1940); [Charles W. Gamble,] McElroy's [Alabama Evidence] §§ 69.01(1)-(11) [ (3d Ed.1977)]; Schroeder, Evidentiary Use in Criminal Cases of Collateral Crimes and Acts: A Comparison of the Federal Rules and Alabama Law, 35 Ala.L.Rev. 241 (1984). All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Noble v. State, 253 Ala. 519, 45 So.2d 857 (1950).
"`All evidence is relevant which throws, or tends to throw, any light upon the guilt or the innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove, that at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime, or may establish some collateral and unrelated fact. Evidence of other acts to be available must have some logical connection and reveal evidence of knowledge, design, plan, scheme, or conspiracy of the crime charged; or circumstantial evidence of identity of the person charged with the crime; or tends to corroborate direct evidence admitted.'
"Underhill, Criminal Evidence § 154 (3d ed. 1923)."
521 So.2d at 1025-26. "`The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge.'" Akin v. State, 698 So.2d 228, 234 (Ala.Cr.App. 1996), cert. denied, 698 So.2d 238 (Ala. 1997), quoting Blanco v. State, 515 So.2d 115, 120 (Ala.Cr.App.1987).
In Bradley v. State, 577 So.2d 541 (Ala. Cr.App.1990), this court stated:
"We have recognized that the list of traditionally recognized exceptions is not exhaustive and fixed. See Nicks v. State, 521 So.2d [1018] at 1025 [(Ala.Cr.App 1987), aff'd, 521 So.2d 1035 *1084 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988) ]. `It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than that of showing his guilt through the medium of bad character.' C. Gamble, McElroy's Alabama Evidence § 69.0(1) (3d ed. 1977) (quoting Mr. Justice McElroy, 2nd ed.)
"`In all instances, the question is whether the proposed evidence is primarily to prove the commission of another disconnected crime, or whether it is material to some issue in the case. If it is material and logically relevant to an issue in the case, whether to prove an element of the crime, or to controvert a material contention of defendant, it is not inadmissible because in making the proof the commission of an independent disconnected crime is an inseparable feature of it.'
"Snead v. State, 243 Ala. 23, 24, 8 So.2d 269, 270 (1942). However, even though evidence of collateral crimes or acts may be relevant to an issue other than the defendant's character, it should be excluded if `it would serve comparatively little or no purpose except to arouse the passion, prejudice, or sympathy of the jury,' Spellman v. State, 473 So.2d 618, 621 (Ala.Cr.App.1985), or put another way, `unless its probative value is "substantially outweighed by its undue prejudice,"' United States v. Stubbins, 877 F.2d 42, 43 (11th Cir.), cert. denied, 493 U.S. 940, 110 S.Ct. 340, 107 L.Ed.2d 328 (1989) (quoting United States v. Beechum, 582 F.2d 898 (5th Cir.1978) (en banc), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472(1979)).
". . . .
"Rather than uphold the trial court by straining to neatly fit the evidence of the three prior incidents into the narrow confines of the traditionally recognized categories, we have chosen to review the court's ruling by determining whether the evidence was `material and logically relevant' to an issue or issues in the case."
577 So.2d at 547-48.
In this case, the evidence of the alleged collateral rapes was material and logically relevant to show Perkins's intent and motive in committing the charged crime. See Knight v. State, 675 So.2d 487, 499 (Ala.Cr. App.1995), cert. denied, 675 So.2d 502 (Ala. 1996). "`If an accused is charged with a crime that requires a prerequisite intent,... then prior or subsequent criminal acts are admissible to establish that he had the necessary intent when he committed the instant crime.'" Hinton v. State, 632 So.2d 1345, 1347-48 (Ala.Cr.App.1993), cert. denied, 632 So.2d 1350 (Ala.1994), quoting Jones v. State, 439 So.2d 1308, 1310 (Ala.Cr.App.1983) (emphasis in Hinton omitted). In addition, "evidence tending to establish motive is always admissible." Jordan v. State, 629 So.2d 738, 741 (Ala.Cr.App.1993), cert. denied, 511 U.S. 1112, 114 S.Ct. 2112, 128 L.Ed.2d 671 (1994). "`It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.'" Bradley, 577 So.2d at 549, quoting Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988) (emphasis in Bowden).
To prove the capital-murder charge, the State was required to show that Perkins intentionally murdered Mrs. Gilliam during the course of a kidnapping in the first degree. Section 13A-6-43(a)(4), Ala.Code 1975, defines kidnapping in the first degree as "abduct[ing] another person with intent to ... [i]nflict physical injury upon him, or to violate or abuse him sexually." *1085 At trial, the defense theory was that Perkins did not intend to physically harm or to sexually abuse Mrs. Gilliam when he abducted her, nor did he intend to kill Mrs. Gilliam. During opening and closing statements, Perkins's counsel argued that Perkins was guilty of murder, but was not guilty of capital murder. Specifically, Perkins's counsel argued to the jury that Perkins did not intend to physically harm or to sexually abuse Mrs. Gilliam when he abducted her, but that he was merely looking for food and money when Mrs. Gilliam surprised him by coming outside. According to the defense theory, when Mrs. Gilliam saw Perkins, she panicked, and Perkins instinctively grabbed her and took her to the gray truck. Perkins's counsel further argued that a struggle ensued in the truck, that the gun went off accidentally, and that Perkins then took Mrs. Gilliam to Maudeen Hood's house for help. Throughout opening and closing arguments, Perkins's counsel repeatedly emphasized that there was no evidence that Perkins intended to physically harm or to sexually abuse Mrs. Gilliam or to kill her. Because Perkins's motive and intent in abducting Mrs. Gilliam were called into question, evidence of the alleged prior rapes was relevant to contradict Perkins's version of events and to prove that Perkins's intent, when he abducted Mrs. Gilliam, was "to inflict physical injury upon or to violate or abuse [Mrs. Gilliam] sexually," an essential element of the charged crime. The testimony regarding the alleged rapes was admissible because it was probative of matters in issue other than Perkins's bad character or his propensity to commit criminal acts.
Furthermore, contrary to Perkins's contention otherwise, because evidence of the alleged prior rapes was clearly admissible, the State was entitled to prove the details of the circumstances surrounding the alleged rapes. "If evidence of the accused's commission of another crime is admissible, the state may prove in meticulous detail the manner in which the accused committed such other crime." Bush v. State, 695 So.2d 70, 85 (Ala.Cr. App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). Finally, we find that the probative value of the collateral-crimes evidence clearly outweighed its prejudicial effect, particularly in view of Perkins's theory of defense at trial. Accordingly, the trial court did not abuse its discretion by admitting testimony regarding the two rapes allegedly committed by Perkins in the two weeks preceding Mrs. Gilliam's abduction and murder.

B.
Second, Perkins contends that the trial court erred by allowing the testimony of Darlene Hall because, he says, her testimony was inadmissible evidence of collateral crimes.
As stated above, Perkins filed a motion in limine before trial seeking to prevent the State from introducing evidence of any collateral crimes he committed. That motion was denied.
"`A party who suffers an adverse ruling on a motion in limine can preserve the ruling for post-judgment and appellate review only by objecting to the introduction of the proffered evidence and assigning specific grounds at the time of trial, unless he or she obtains the express acquiescence of the trial judge that a subsequent objection and assignment of grounds are not necessary.'"
Grimsley v. State, 678 So.2d 1197, 1208 (Ala.Cr.App.1996), quoting Miles v. State, 650 So.2d 583, 586 (Ala.Cr.App.1994), quoting in turn, Parks v. State, 587 So.2d 1012 (Ala.1991) (emphasis added). Here, Perkins did not object to Hall's testimony, nor *1086 did he obtain the express acquiescence of the trial court that an objection would be unnecessary. Therefore, this issue may be reviewed only for plain error. Rule 45A, Ala.R.App.P.
Darlene Hall testified that on August 9, 1990, at approximately 3:50 p.m. (just minutes before Mrs. Gilliam was abducted), Perkins arrived at her house in a bluegray pickup truck and honked the horn. Hall stated that she opened her front door and Perkins asked her if her husband was home. Hall replied that he was not. Perkins then told Hall that he needed to come in and use her telephone to call a tow truck because, he said, his truck was stuck in a field behind her house. Hall told Perkins that he could not come in, but that she would call a wrecker for him. Perkins then gave Hall a telephone number to call, but before Hall could go back inside her house, Perkins told Hall that he was not sure if the number he had given her was the right number, and he told her to wait while he looked in his glove compartment for the number. Hall told Perkins not to bother looking, that she would try the number he had given her. Hall then went inside her house, locked the door, and retrieved a gun from her bedroom closet. When Hall came back to her front door, Perkins was looking through her front window. At that point, Hall told her daughterwho had been present throughout the entire incidentthat she was going to shoot Perkins. Perkins stated, "I think I'll go somewhere else," and then quickly left. (R. 1764.) Hall stated that she had recognized Perkins when he first arrived because she had been reading the newspaper, which contained a photograph of Perkins. Hall also stated that she went to the Hood residence later that evening, after hearing about a shooting, and gave a statement to the police regarding the incident with Perkins. Hall testified that she did not see a gun or a knife in Perkins's possession when Perkins was at her home.
Perkins contends that Hall's testimony amounted to evidence of an inadmissible collateral bad act, which, he says, did not fit into any exception to the exclusionary rule. In addition, he maintains that, even if Hall's testimony was admissible under an exception to the exclusionary rule, its prejudicial effect far outweighed its probative value; therefore, he argues its admission was error.
Assuming Perkins's alleged conduct at Hall's house constituted a "bad act," we find that Hall's testimony regarding Perkins's actions only minutes before Mrs. Gilliam's abduction was admissible to show part of the continuous transaction leading up the charged crime. In Travis v. State, 776 So.2d 819 (Ala.Crim.App.1997), we stated:
"`The rule has been stated many times by the appellate courts of this State that in a prosecution for homicide, evidence of connected acts and transactions leading up to and explanatory of the killing is admissible. Byrd v. State, 257 Ala. 100, 57 So.2d 388 (1952); Keith v. State, 253 Ala. 670, 46 So.2d 705 (1950); Levert v. State, 252 Ala. 308, 42 So.2d 532 (1949); Stallings v. State, 249 Ala. 580, 32 So.2d 236 (1947); McCoy v. State, 232 Ala. 104, 166 So. 769 (1936); Jordan v State, 81 Ala. 20, 1 So. 577 (1887); Golden v. State, 39 Ala.App. 361, 103 So.2d 52, reversed on other grounds, 267 Ala. 456, 103 So.2d 62 (1958); Sexton v. State, 28 Ala.App. 59, 180 So. 729 (1937); Newman v. State, 25 Ala.App. 526, 149 So. 724 (1933); Roberts v. State, 25 Ala.App. 477, 149 So. 356 (1933).'"
776 So.2d at 858, quoting Twilley v. State, 472 So.2d 1130, 1135-37 (Ala.Cr.App.1985).
Further, in Davis v. State, 740 So.2d 1115 (Ala.Cr.App.1998), aff'd, 740 So.2d 1135 (Ala.1999), we stated the following *1087 regarding the continuous transaction exception to the exclusionary rule:
"In Rowell v. State, 570 So.2d 848 (Ala.Cr.App.1990), we held that evidence of uncharged crimes may properly be admitted under the following circumstances:
"`Evidence of the accused's commission of another crime is admissible if such other crime is inseparably connected with or is a part of the res gestae of the now-charged crime. This rule is often expressed in terms of the other crime and the nowcharged crime being parts of one continuous transaction or one continuous criminal occurrence.' C. Gamble, McElroy's Alabama Evidence (3d ed. 1977), § 69.01(3). See also Orr v. State, 462 So.2d 1013, 1015 (Ala.Cr. App.1984). "Evidence of other crimes is properly admissible as part of the res gestae if all of the criminal acts are part of one continuous criminal adventure by the same party occurring within a matter of hours. Miller v. State, 405 So.2d 41 (Ala.Crim.App. 1981). See also Moseley v. State, 357 So.2d 390 (Ala.Crim.App.1978); Summers v. State, 348 So.2d 1126 (Ala. Crim.App.), cert. denied, 348 So.2d 1136 (Ala.1977)." Pettaway v. State, 494 So.2d 884, 886 (Ala.Cr.App.1986). In the present case, this evidence "was intimately connected with the same transaction which is the basis of the State's case.... The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge." Blanco v. State, 515 So.2d 115, 120 (Ala.Cr.App.1987), and cases cited therein. "The trial court did not err in overruling appellant's objection to the admission of such evidence. No matter how many distinct crimes may be involved, all the details of one continuous criminal occurrence or adventure may be given as part of the offense with which the defendant is charged." Coleman v. State, 487 So.2d 1380, 1385 (Ala.Cr.App.1986) and cases cited therein.'
"570 So.2d at 852. See also Windsor v. State, 683 So.2d 1027, 1035-36 (Ala.Cr. App.1994), aff'd, 683 So.2d 1042 (Ala. 1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997)."
740 So.2d at 1115. Additionally:
"`In a prosecution for unlawful homicide it is "permissible to show all that transpired at the time of the difficulty and everything leading up to and explanatory of the tragedy." Moulton v. State, 19 Ala.App. 446, 450, 98 So. 709, cert. denied, 210 Ala. 656, 98 So. 715 (1923). Testimony is admissible if it "tend(s) to prove the surrounding facts and circumstances leading up to and relating to the homicide." Hill v. State, 25 Ala.App. 264, 265, 144 So. 582 (1932). "Evidence of connected acts leading up to and explanatory of killing, throwing light on action, animus, or intent of accused, is admissible, though not res gestae." Smallwood v. State, 26 Ala.App. 360, 361, 159 So. 699 (1935). See also Palmer v. State, 401 So.2d 266, 269-70 (Ala.Crim.App.), cert. denied, Ex parte Palmer, 401 So.2d 270 (Ala.1981).'"
Read v. State, 686 So.2d 563, 566 (Ala.Cr. App.1996), quoting Smith v. State, 447 So.2d 1327, 1330 (Ala.Cr.App.1983), aff'd, 447 So.2d 1334 (Ala.1984).
In this case, Perkins's attempt to gain entry into Hall's home and the kidnapping of Mrs. Gilliam occurred within minutes of each other and were part of one continuous criminal transaction. Therefore, the trial court did not abuse its discretion in admitting Hall's testimony.
*1088 Moreover, we find that Hall's testimony was also admissible to show Perkins's intent. As stated previously, evidence of collateral crimes and acts is admissible if it is material and logically relevant to an issue in the case, and is not offered for the purpose of showing the accused's bad character. Section 13A-6-43(a)(4), Ala.Code 1975, states that "[a] person commits the crime of kidnapping in the first degree if he abducts another person with intent to ... inflict physical injury upon him, or to violate or abuse him sexually." Section 13A-6-40(2), Ala.Code 1975, defines "abduct," in pertinent part, as "restrain[ing] a person with intent to prevent his liberation." Thus, to establish the crime of kidnapping in the first degree, the State must prove the intent to inflict physical injury or to sexually abuse, and the intent to prevent liberation. We stated above that testimony that Perkins had allegedly raped two women was relevant to show his intent to sexually abuse Mrs. Gilliam when he kidnapped her. Here, Hall's testimony would allow a logical inference that Perkins intended to abduct Mrs. Gilliam, i.e., to prevent her liberation.
Because Hall's testimony was not probative only to show Perkins's bad character or to show that Perkins acted in conformity with that bad character, it was properly admitted into evidence. Moreover, the probative value of the testimony clearly outweighed its prejudicial effect. Accordingly, there was no error, plain or otherwise, in the trial court's admission of the testimony.

C.
Third, Perkins contends that the trial court erred by allowing the testimony of Mrs. Gilliam's daughter, Candace Gilliam whose statement was read into the record by the prosecutor pursuant to a stipulation by Perkinsthat she heard Mrs. Gilliam say, at the time of the abduction, "something about a rapist." (R. 1755.) Because Perkins not only failed to object to Candace's testimony, but actually stipulated to it, we may review this claim only for plain error. Rule 45A, Ala. R.App.P.
During trial, Perkins and his counsel agreed to stipulate to the testimony to prevent Candace from testifying in open court.[9] Included in the agreed-upon statement that was read to the jury by the prosecutor was the following statement: "Candace heard her mother yell for her help and something about a rapist." (R. 1755.) Perkins's contention on appeal is that this statement was inadmissible hearsay. Perkins contends that the State impermissibly introduced Candace's testimony regarding Mrs. Gilliam's statement about "a rapist" to prove that Perkins was, in fact, a rapist, and to show that he intended to sexually abuse Mrs. Gilliam. He further contends that the testimony was not only hearsay, but double hearsay, because, he says, Mrs. Gilliam's cry of "rapist," was not based on Mrs. Gilliam's personal knowledge of Perkins, but on newspaper articles about Perkins that she had read before her abduction. Thus, he concludes, the statement was "the equivalent of the plainly impermissible tactic of *1089 introducing through Candace Gilliam a copy of the newspaper articles which referred to [him] as a rapist." (Perkins's brief to this court, p. 16.)
"`Hearsay testimony consists of an out-of-court statement offered to prove the truth of the matter asserted.'" Laney v. State, 643 So.2d 1024, 1025 (Ala.Cr.App. 1994), quoting Brannon v. State, 549 So.2d 532, 539 (Ala.Cr.App.1989).[10] "The hearsay rule is based upon the idea that out-of-court statements are to be excluded because they are unreliable and untrustworthy." Charles W. Gamble, McElroy's Alabama Evidence, § 242.01(1) (4th ed. 1991).
Here, Candace's testimony that Mrs. Gilliam yelled the word "rapist" as she was being abducted clearly falls within the "excited utterance" exception to the hearsay rule. In Berryhill v. State, 726 So.2d 297 (Ala.Crim.App.1998), this court stated:
"McElroy's Alabama Evidence provides:
"`Generally, a person's statement concerning a startling occurrence made while perceiving the occurrence, or soon after perception thereof, and while the declarant is under the stress of a nervous excitement created by such perception, is admissible as tending to prove the truth of the matter asserted. A statement of this kind is frequently referred to as a spontaneous exclamation or excited utterance and is an exception to the hearsay evidence rule. This historic exception is continued under the Alabama Rules of Evidence by means of the following language found in Rule 803(2):
"`"Rule 803. Hearsay Exceptions; Availability of Declarant Immaterial
"`"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
"`". . . .
"`"(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."'
"`This rule sets out three conditions which must be met for admission of the statement. There must be a startling event or condition, the statement must relate to the circumstances of the occurrence and the statement must be made before time has elapsed sufficient for the declarant to fabricate. The statement must be the apparently spontaneous product of that occurrence operating upon the visual, auditory, or other perceptive sense of the speaker. The declaration must be instinctive rather than deliberative. In short, it must be the reflex product of the immediate sensual impressions, unaided by retrospective mental action. Whether a statement qualifies as an excited utterance is a preliminary and discretionary question for the trial court.
"`Although a statement of this kind is nearly always referred to or described in the Alabama decisions as being a part of the res gestae, it is submitted that the terms "spontaneous exclamation" and "excited utterance" are preferable because the words "res gestae" have been used to signify so many different things that their use is calculated to promote confusion as to the proper scope of the present exception.'

*1090 "C. Gamble, McElroy's Alabama Evidence, § 265.01(1) at 1281 (5th ed. 1996). (Emphasis added; footnotes omitted.)"
726 So.2d at 300. See also Reeves v. State, 456 So.2d 1156, 1159 (Ala.Cr.App.1984) (testimony by daughter of kidnapping victim about conversation between victim and defendant fell within the res gestae exception to the hearsay rule because the statements "were incident to what was done and shed light on the main facts of the case").
Candace's testimony revealed that Mrs. Gilliam yelled the word "rapist" and cried for help as Perkins held a pistol to her head and dragged her away from her home, and from her onlooking daughter. Mrs. Gilliam's statement was clearly an excited utteranceit was "a spontaneous exclamation" concerning "a startling occurrence" made while perceiving that occurrence. Thus, it was admissible under the excited utterance exception to the hearsay rule.
Moreover, Perkins's contention that the statement by Mrs. Gilliam was "double hearsay" is equally meritless. Perkins maintains that Mrs. Gilliam's cry of "rapist" was prompted by a newspaper article about Perkins that Mrs. Gilliam had allegedly read just before her abduction and that admitting the statement was the equivalent of admitting the newspaper article. Although we recognize that such an inference could have been supported by the evidence presented at trialespecially in light of Darlene Hall's testimony that, in fact, an article about Perkins appeared in the newspaper on the day of Mrs. Gilliam's abductionwe point out that an inference is all that could be gleaned from the record on this issue.[11] There was no evidence introduced to show that Mrs. Gilliam had, in fact, read the newspaper article before she was abducted, nor was the alleged article introduced into evidence at the trial. In fact, there is no direct evidence in the record tending to indicate why Mrs. Gilliam yelled the word "rapist" as she was being abducted. Because there was no evidence of a second hearsay statement, i.e., the newspaper article, there was no "double hearsay," as Perkins contends.
Accordingly, the admission of Candace Gilliam's testimony regarding Mrs. Gilliam's statement during her abduction was not error, plain or otherwise.

D.
Last, Perkins contends that the trial court erred by permitting testimony from three witnesses, Harry Montgomery, James Hudson, Jr., and Roy Sanderson, regarding the gray pickup truck that Perkins was driving on the day of Mrs. Gilliam's abduction. Specifically, he contends that Montgomery, Hudson, and Sanderson all testified that the truck, which belonged to James Hudson, Sr., was stolen, and that at the time it was stolen, inside it were a.357 Magnum pistol and a high-powered rifle. He maintains that this evidence was not relevant "for any proper purpose" and that its prejudicial effect far outweighed its probative value. (Perkins's brief to this court, p. 23.) Because Perkins either failed to object to the complained-of testimony or did not receive an adverse ruling on any objection, this claim may be reviewed only for plain error. Rule 45A, Ala.R.App.P.
*1091 Included in Perkins's pretrial motion in limine seeking to prevent the State from introducing evidence of any collateral crimes or acts was a request that the State be prevented from introducing any testimony regarding the fact that approximately two to three days before he abducted and killed Mrs. Gilliam, Perkins had stolen the gray pickup truck, and that when he stole it, both a .357 Magnum and a high-powered rifle were inside the truck. While arguing against the motion, the State presented to the trial court the following facts: Two to three days before Perkins abducted and killed Mrs. Gilliam, he stole the gray pickup truck from the home of James Albert Hudson, Jr., who was keeping the truck for its owner, Hudson's father, James Albert Hudson, Sr. At the time of the theft, Hudson had a .357 Magnum pistol and a high-powered rifle in the truck. In addition, there were no bullet holes in the truck while it was in Hudson's possession, and Hudson could not recall that anyone had bled while in the truck. As stated above, Perkins's motion in limine was denied.
During opening arguments, the prosecutor told the jury that the evidence would show that the gray pickup truck that Perkins was seen driving "had originally come from the home of James A. Hudson, Jr." (R. 1727), and that the truck contained a.357 Magnum pistol and a high-powered rifle while it was in Hudson's possession. The prosecutor also told the jury that, when the gray pickup truck was found, the.357 Magnum pistol and the high-powered rifle were missing, but were later found near Perkins's mother's and grandmother's houses in the Berry area. Perkins did not object to these statements by the prosecutor.
The record reveals that, in contrast to the prosecutor's opening statements and his proffer to the trial court during the pretrial hearing on the motion in limine, the State did not present any evidence to the jury that the truck, or the weapons inside the truck were stolen by Perkins. Rather, the State presented only the following testimony at trial regarding the truck and the weapons: Harry Montgomery, chief deputy of the Tuscaloosa County Sheriff's Department, testified that, pursuant to the investigation of the gray pickup truck, he discovered that the truck "belong[ed]" to a man named James Albert Hudson, Sr. (R. 1962.) Perkins did not object to this testimony. After Montgomery's testimony, Roy Sanderson, a state trooper, testified that he was conducting personal business in the Berry area near Perkins's mother's and grandmother's houses on August 12, 1990, when he noticed a high-powered rifle under one of the houses. Perkins objected to Sanderson's testimony, but a review of the record reveals that the trial court did not rule on the objection; rather, the State agreed to cease its questioning of Sanderson and to put on no further evidence regarding the rifle. This concession was made by the State after Perkins offered to make the following stipulation of facts, which was read to the jury by the trial court:
"The defendant caused the death of Cathy Gilliam with a .357 magnum pistol. That's number one. Number two, the Defendant, Mr. Roy Perkins, was in the 1979 Chevrolet gray pickup truck shown in State's Exhibit number 23. Number three, Cathy Gilliam's blood was found in the 1979 gray Chevrolet pickup truck shown in State's Exhibit number 23."
(R. 2087.) During discussions regarding the stipulation, Perkins refused to stipulate that he killed Mrs. Gilliam while she was in the gray pickup truck, or that the bullet holes found in the truck after the murder were not there two to three days before the murder. Perkins claimed that *1092 such evidence was irrelevant. The State agreed to the stipulation, but stated its intention to present the testimony of James Hudson, Jr., that there were no bullet holes in the truck two to three days before Mrs. Gilliam's abduction. Immediately following the stipulation, the State presented Hudson's testimony. Hudson testified that he was very familiar with the gray pickup truck and that he had last seen the truck two to three days before Mrs. Gilliam's abduction. He stated that when he last saw the truck, there were no bullet holes in it. Hudson did not testify that he was in possession of the truck, or that the truck had been stolen. Perkins did not object to Hudson's testimony.
Perkins contends on appeal that the State's evidence that Perkins stole the gray pickup truck, the .357 Magnum pistol, and the high-powered rifle was inadmissible evidence of collateral crimes. Because it is clear from the record that no evidence was actually introduced at trial that Perkins stole the truck from Hudson, or that Perkins did not have permission to drive the truck, or that the truck even contained a .357 Magnum pistol or a high-powered rifle while it was in Perkins's possession, Perkins's argument on appeal is moot. Apparently, Perkins's argument is based on the prosecutor's statements to the trial court during the pretrial hearing on Perkins's motion in limine about the origins of the truck and the weapons, rather than on the evidence that was actually introduced at trial. As the evidence that was actually presented to the jury did not reveal a collateral crime, we find no error, plain or otherwise, in its admission.
Moreover, even if the evidence that the State intended to introduce at trial, but did noti.e., that Perkins stole the truck, along with the .357 Magnum pistol and the high-powered rifle inside the truckhad been introduced, there would have been no error. As stated above, although Perkins stipulated that he caused Mrs. Gilliam's death with a .357 Magnum pistol, he refused to stipulate that Mrs. Gilliam was shot while she was inside the truck. The State was entitled to prove the circumstances of Mrs. Gilliam's death, including the location of her shooting. Such evidence was highly relevant to a material element of the State's case. Furthermore, because such evidence would have been admissible had the State chosen to introduce it, the fact that the prosecutor referred to such evidence during his opening statementbefore he agreed not to proceed with the evidencewas not error, plain or otherwise.

E.
Finally, Perkins contends that even if all of the collateral-crimes evidence addressed above was admissible, the trial court's failure to give an instruction to the jurors explaining the limited purpose for which the evidence could be considered constituted reversible error. Because Perkins did not request a limiting instruction, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
We recognize that "[w]here evidence is admissible on a certain point only, the trial court should advise the jury to consider it on that point alone." King v. State, 521 So.2d 1360, 1362 (Ala.Cr.App.1987). However, "[w]hen such evidence is admitted against an appellant, it is the sole responsibility of the appellant to request the court to instruct the jury as to the limited and proper purpose for which such evidence is admitted. If the appellant failed to request such an instruction, she may be considered to have waived the right to the protective instruction." Miller v. State, 405 So.2d 41, 47 (Ala.Cr.App.1981). See also Minor, 780 So.2d 707; Varner v. State, 497 So.2d 1135 (Ala.Cr.App.1986); *1093 Weaver v. State, 466 So.2d 1037 (Ala.Cr. App.1985); Robinson v. State, 361 So.2d 379 (Ala.Cr.App.), cert. denied, 361 So.2d 383 (Ala.1978).
Perkins failed to request a limiting instruction regarding the collateral crimes evidence, even after being repeatedly told by the prosecutor that the State would not object to such an instruction. Thus, "[b]ased on established precedent [set forth above] we conclude that the trial court's failure to instruct the jury that evidence of [Perkins's collateral crimes] could be used only for the limited purpose of [showing his intent] was not plain error. Plain error is "error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Trawick, 698 So.2d 162, 167 (Ala.1997), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997). Here, the error was not so "egregious" that it "has or probably has substantially prejudiced" Perkins. Trawick, 698 So.2d at 167.

XV.
Perkins contends that the trial court erred in admitting DNA evidence tending to connect him to the earlier rapes of B.P. and D.W. (Issue VI in Perkins's brief to this court.) He maintains that the State failed to lay the proper predicate under Ex parte Perry, 586 So.2d 242 (Ala. 1991)[12]specifically, that the State failed to satisfy the third prong of Perryand that, therefore, the DNA evidence was inadmissible. The State's DNA expert, Phyllis Rollan, testified that the DNA of semen found in the rape-kit examinations of B.P. and D.W. was consistent with Perkins's DNA, and that Perkins's DNA type could be located in 1 in 33 members of the white population. At trial, Perkins did not object to the admission of this DNA evidence; therefore, we may review his claim on appeal only for plain error. Rule 45A, Ala.R.App.P.
In Hyde v. State, 778 So.2d 199 (Ala.Cr. App.1998), we stated the following regarding plain-error review:
"`The Alabama Supreme Court has adopted federal case law defining plain error, holding that "`[p]lain error' only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983)(quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981)).'
"Haney v. State, 603 So.2d 368, 392 (Ala. Cr.App.1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). To rise to the level of plain error, the claimed error must not only seriously affect a defendant's `substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations. United States v. Young, 470 U.S. 1, 16-17 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1, 13 n. 14 (1985). Finally, a failure to object will weigh heavily against a claim of prejudice. Williams v. State, 601 So.2d 1062, 1066 (Ala.Cr. App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992). See also Brooks v. State, 695 So.2d 176 (Ala.Cr. App.1996), aff'd, 695 So.2d 184 (Ala.), *1094 cert. denied, 522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997)."
778 So.2d at 209.
Perkins argues that the State did not present testimony regarding the third prong of the Perry testi.e., that in this particular case the testing laboratory performed generally accepted scientific techniques without error in the performance or interpretation of the DNA testingbefore Rollan testified concerning DNA matching and DNA population frequency statistics. However, under the circumstances of this case, the admission of the DNA evidence was not plain error. As noted above, Perkins did not object to the DNA evidence when it was offered during trial, nor did he request a hearing outside the presence of the jury to determine the admissibility of the DNA evidence. On appeal, Perkins makes only the conclusory assertion that the State's DNA matching and population frequency evidence was unreliable. However, he has provided no support for this conclusion. Perkins offers no proof that, had his counsel challenged the DNA evidence at trial by demanding that the State's witnesses provide testimony fully satisfying all prongs of the Perry test, the State would have been unable to lay a sufficient predicate for the admission of the DNA evidence. We find that, absent an objection at trial, and absent any suggestion that the DNA evidence was unreliable, the admission of the DNA evidence in Perkins's case was not plain error. See McDonald v. State, 743 So.2d 501 (Fla. 1999) (admission of DNA evidence in capital-murder trial without the proper predicate, absent an objection by the defendant, was not "fundamental error"). Furthermore, we find it especially significant that the DNA evidence about which Perkins complains on appeal was offered specifically to connect Perkins to two prior rapes. The admission of this DNA evidence did not have the powerful effect of "conclusively" establishing in the eyes of the jury some element of the capital offense for which Perkins was being tried or of uniquely "identifying" Perkins as the person who committed the now-charged offense. The DNA evidence was offered to prove Perkins's commission of prior offenses, the commission of which, the State argued, tended to show one element of the now-charged capital offensePerkins's intent to sexually abuse Mrs. Gilliam when he abducted her. In addition to the DNA evidence presented through Rollan, the State offered the testimony of several other witnesses, including the alleged rape victims, B.P. and D.W., in attempting to prove Perkins's commission of the prior offenses. (See Part XIV of this opinion wherein we hold that evidence of the two prior alleged rapes was admissible to show Perkins's intent to sexually abuse Mrs. Gilliam.) Moreover, the record shows that Perkins in fact pleaded guilty to the first-degree rape of B.P. and was sentenced to 99 years' imprisonment. Under the circumstances, we conclude that Perkins has failed to show that the admission of the DNA evidence seriously affected his substantial rights or had an unfair prejudicial impact on the jury's verdict. Thus, there was no plain error here.

XVI.
Perkins contends that the trial court erred in admitting into evidence several alleged hearsay statements. (Issue XIV in Perkins's brief to this court.)

A.
First, Perkins contends that the trial court erred by allowing Maudeen Hood, Norman Willingham, Robert Carter, Scott Sassaman, and Gary Hunnicut to testify regarding statements made by Cathy Gilliam shortly before her death. He maintains that the statements made by *1095 Mrs. Gilliam were inadmissible hearsay because, he says, they "failed to meet the ... prerequisites of dying declaration testimony." (Perkins's brief to this court, pp. 84-85.) Before trial, Perkins filed a motion to suppress the statements made by Mrs. Gilliam. After a hearing, the trial court denied the motion, without stating a reason.
Perkins challenges the following testimony: Scott Sassaman's testimony that, in the ambulance on the way the hospital, Mrs. Gilliam expressed concern about her family; Maudeen Hood's and Norman Willingham's testimony that Mrs. Gilliam gave them a description of her assailant and of the truck her assailant was driving; Robert Carter's testimony that Mrs. Gilliam gave him a description of the truck that her assailant was driving and of the general direction in which the truck was traveling; and Gary Hunnicut's testimony that, in response to questioning by law enforcement officials, Mrs. Gilliam "grunted" and nodded her head when asked whether Perkins was her assailant and whether she had been shot with a pistol.
"A dying declaration is a statement by a person who believes that his death will certainly occur soon. He must be gripped by that despair of life which is naturally produced by an impression of almost dissolution, a dissolution so near as to cause all motives of falsehood to be superseded by the strongest inducements to strict accuracy. It has been said that the declarant, when making the statement, must have been in settled, hopeless expectation of impending death."
Charles W. Gamble, McElroy's Alabama Evidence, § 248.01(1) (4th ed. 1991)(footnotes omitted). In O'Cain v. State, 586 So.2d 34 (Ala.Cr.App.1991), this court stated:
"`A dying declaration is a statement made by the victim of a homicide, at a time when the victim believes that death is impending, describing the cause of, and the circumstances attending, the homicide. Such a statement is admissible, as an exception to the hearsay rule, on the ground of necessity, and on the theory that a person expecting imminent death, just as a person testifying under the obligation of an oath, will speak nothing but the truth.
"`It must be shown that the declarant was facing death, with no hope of recovery, and that he was aware thereof. If these requirements are satisfied, the declaration is admissible to the same extent that the testimony of the declarant would have been, had he been called as a witness.'
"C. Torcia, Wharton's Criminal Evidence § 301 (14th ed. 1986). See also, C. Gamble, McElroy's Alabama Evidence, § 248.01(1) (3d ed. 1977).
"It is not indispensable that the declarant should have said that he believed that he must or would die soon, as such belief may in the circumstances be inferred from his condition and his conduct. C. Gamble, supra, at § 248.01(1). In determining whether the declarant believed that death was imminent, the trial court may look to statements of the deceased, the nature of his wounds, his weakness, and all the circumstances tending to show the deceased's state of mind at the time. Ragland v. State, 238 Ala. 587, 192 So. 498 (1939); Bell v. State, 402 So.2d 1 (Ala.Cr.App.1981); Voudrie v. State, 387 So.2d 248 (Ala.Cr. App.), cert. denied, 387 So.2d 256 (Ala. 1980). Statements by the declarant are admissible to show his belief that death was impending, and such statements alone may constitute a sufficient foundation. Carson v. State, 439 So.2d 1350 *1096 (Ala.Cr.App.1983); Voudrie v. State; C. Torcia, supra, at § 309. A dying person need not expressly state that he is going to die. The use of words which are the equivalent of such a statement is sufficient. Marshall v. State, 219 Ala. 83, 121 So. 72 (1929). It has been held that the use of the expression, `I think I am going to die,' was a sufficient predicate for the admission of a statement as a dying declaration. Evans v. State, 209 Ala. 563, 96 So. 923 (1923).
"Whether the declarant believed that death was certain to occur soon is for the determination of the trial court, reversible upon appeal only if the evidence did not warrant such a finding. Marshall v. State; Carson v. State; Shikles v. State, 31 Ala.App. 423, 18 So.2d 412 (1944), cert. denied, 245 Ala. 641, 18 So.2d 417 (1944). `"The circumstances of each case will show whether the requisite consciousness existed; and it is poor policy to disturb the ruling of the trial judge upon the meaning of these circumstances.'" Evans v. State, 209 Ala. at 564, 96 So. at 924 (quoting 2 Wigmore on Evidence § 1442, p. 1809)."
586 So.2d at 37-38.
We conclude that the circumstances surrounding Mrs. Gilliam's statements clearly supported admitting those statements as dying declarations. Maudeen Hood's testimony that, when Mrs. Gilliam knocked on her door, Mrs. Gilliam stated that she had been shot and that she was going to die, and that Mrs. Gilliam asked Hood to take her to the hospital clearly indicated Mrs. Gilliam's knowledge of the severity of her wounds and of her impending death. The complained-of testimony of Scott Sassamanthat Mrs. Gilliam expressed concern about her family although not related to the circumstances surrounding her abduction and shooting, and, thus, not a dying declaration, was clearly an indication of Mrs. Gilliam's belief that she was going to die and was therefore properly admitted as a statement "to show [her] belief that death was impending." O'Cain, 586 So.2d at 37. Sassaman's further testimony that he heard Mrs. Gilliam specifically say that she was going to die also showed that Mrs. Gilliam was aware of her impending death. Moreover, the circumstances surrounding the statementsthe severity of Mrs. Gilliam's wounds, her weakened condition exhibited by the fact that she was lying on Hood's kitchen floor, and her repeated requests for something to lessen her pain also support the conclusion that Mrs. Gilliam was aware that death was near. Because Mrs. Gilliam was aware that her death was impending, and because her statements to Hood, Willingham, and Carter (which were also overheard by Hunnicut) were about her assailant and the circumstances surrounding the shooting, the statements were properly admitted as dying declarations.
Perkins contends, however, that, even if the statements did meet the requirements of the dying declaration exception to the hearsay rulei.e., they were made with Mrs. Gilliam's knowledge of her impending deathHunnicut's testimony that he heard Mrs. Gilliam grunt and nod her head in response to questioning by law enforcement officials was not within the dying declaration exception because, he says, "such gestures do not constitute a statement." (Perkins's brief to this court, p. 84.) Contrary to Perkins's contention, "[n]onverbal conduct of a person constitutes a statement, for hearsay purposes... if it was intended by the actor as an assertion." Charles W. Gamble, supra, at § 242.01(2). Clearly, Mrs. Gilliam's actions of grunting and of nodding her head in response to questions by law-enforcement officials regarding her assailant were *1097 intended by Mrs. Gilliam to be answers to those questions. Although nonverbal assertions, Mrs. Gilliam's actions constituted statements for purposes of the hearsay rule and thus were admissible under the dying declaration exception to that rule.
Because all of Mrs. Gilliam's statements to Sassaman, Hood, Willingham, Carter, and Hunnicut fell within the dying declaration exception to the hearsay rule, or were admissible to show her belief that her death was near, there was no error in their admission.

B.
Second, Perkins contends that the trial court erred by allowing J.W. Stough, former deputy sheriff of Fayette County, to testify that he obtained information about the white buildingwhere both B.P. and D.W. testified that Perkins raped themfrom "another rape victim." (Perkins's brief to this court, p. 83.) He maintains that Stough's testimony was hearsay, "completely irrelevant to the case, and intended only to play upon the passions and sympathies of the jury." (Perkins's brief to this court, p. 83.) Because Perkins did not object to Stough's testimony, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
Stough testified as follows:
"[Prosecutor]: Did you have an occasion to actually go out to what I call a block house in the Fayette County area?
"[Stough]: Yes, sir, I did.
"[Prosecutor]: And where did you get information concerning this block house?
"[Stough]: From one of the residents that lived in Berry, told me
"[Prosecutor]: Did you find out from somebody else where this place could be?
"[Stough]: Yes, sir, I did.
"[Prosecutor]: Had you had a description of where this was before you found it?
"[Stough]: Yes, sir.
"[Prosecutor]: And without going into what the description was, where did you receive that description from?
"[Stough]: From another victim, a rape victim.
"[Prosecutor]: Where did you [get] this information from, somebody else?
"[Stough]: Where the building was located?
"[Prosecutor]: Yes, sir.
"[Stough]: Yes, sir, from someone else."
(R. 2216.)
"`Hearsay testimony consists of an out-of-court statement offered to prove the truth of the matter asserted.'" Laney v. State, 643 So.2d 1024, 1025 (Ala.Cr.App. 1994), quoting Brannon v. State, 549 So.2d 532, 539 (Ala.Cr.App.1989). Stough's testimony that he received a description of the white building from "another victim, a rape victim" was not offered to prove the truth of the matter asserted, i.e., that another rape victim existed, just as Stough's statement that he learned of the location of the building from "someone else" was not offered to prove that "someone else" existed. Rather, it was offered to explain how Stough determined the location of the building, which he later searched. "`A statement may be admissible where it is not offered to prove the truth of whatever facts might be stated, "but rather to establish the reason for action or conduct by the witness."'" Sawyer v. State, 598 So.2d 1035, 1038 (Ala.Cr.App.), cert. denied, 506 U.S. 943, 113 S.Ct. 386, 121 L.Ed.2d 295 (1992), quoting Edwards v. State, 502 So.2d 846, 849 (Ala.Cr.App.1986), quoting in turn, Tucker v. State, 474 So.2d 131, 132 (Ala.Cr.App.1984), rev'd on other grounds, 474 So.2d 134 (Ala.1985). Because *1098 Stough's testimony was not hearsay, there was no error, plain or otherwise, in its admission.

XVII.
Perkins contends that the trial court violated the principles of Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), when it accepted two stipulations from himwhich, he says, amounted to a guilty plea to felony murder, or at least to reckless manslaughter without determining whether he entered into those stipulations knowingly and voluntarily. (Issue IV in Perkins's brief to this court.)
At trial, the State called Candace Gilliam, Mrs. Gilliam's 14-year-old daughter, to testify regarding her mother's abduction. After a few introductory questions by the prosecutor, Candace was unable to continue, and requested a break. During this break, Perkins's counsel offered to stipulate to Candace's testimony, stating that he did not "see any need for the young girl to go through this." (R. 1747.) Perkins acknowledged, on the record, that he understood that he had the right to cross-examine Candace, and stated that he "absolutely" agreed with his counsel and wanted to waive that right and to have Candace's statement read into the record by the prosecutor. (R. 1754.) After this exchange, the following stipulation was read by the prosecutor:
"Miss Candace Gilliam would state as follows to this effect: When she heard her mother screaming a second time, Candace went to the kitchen to see what was happening. Candaceshe saw a man with what she believes was a black pistol pointed at her mother's head. And he was holding her with his other hand. She heard a broom drop. Candace heard both of them say something, but she is not sure what was said. The man said: `Drop the broom.' She had a broom in her hand. Candace heard her mother yell for her help and something about a rapist. The man led her mother to a vehicle behind her mother's car. She is not sure what kind of vehicle, but she did see an antenna, gray windshield, bigger than a car. At that point, Candace ran back to a room and called her grandmother. Candace was unable to give a physical description of the man other than a: One, thin beard unlike her father's beard. The hair was straight like regular hair. Two, brown hair appeared to be windblown hair. Three, not much taller than her mother. Four, she believed the pistol was black in color. Candace was unable to pick anyone out of a lineup."
(R. 1754-55.)
The State also called State Trooper Roy Sanderson to testify at trial. Sanderson testified that he was in the Berry area near the houses of Perkins's mother and grandmother on August 12, 1990, when he noticed a high-powered rifle under one of the houses. At this point, Perkins's counsel objected to testimony regarding the rifle. In response, the prosecutor explained his intent to present Dr. Warner's testimony that he was unable to determine what weapon had been used to shoot Mrs. Gilliam, but that her gunshot wound was consistent both with a rifle and with a .357 Magnum pistol. Perkins's counsel then offered to stipulate that Perkins caused Mrs. Gilliam's death with a .357 Magnum pistol. After a lengthy bench conference regarding the details of the stipulation, the trial court asked Perkins if he was willing to stipulate to certain facts as having been established and proved; Perkins, on the record, agreed. The prosecutor then agreed to forgo putting on any evidence regarding the rifle. The following stipulation was read to the jury by the trial court:

*1099 "Ladies and gentlemen of the jury, the following facts have been stipulated between the State and counsel for the Defense as having been established and proved. And I'll read the following facts to you that have been stipulated and agreed on that have been proved:
"The Defendant caused the death of Cathy Gilliam with a .357 Magnum pistol. That's number one. Number two, the Defendant, Mr. Roy Perkins, was in the 1979 Chevrolet gray pickup truck shown in State's Exhibit number 23. Number 3, Cathy Gilliam's blood was found in the 1979 gray Chevrolet pickup truck shown in State's Exhibit number 23."
(R.2086-87.)
Perkins contends that these two stipulations "constituted uncontroverted proof of all the elements of § 13A-6-2(c), [Ala. Code 1975], defining felony-murder" (Perkins's brief to this court, p. 52), and "satisfied all the elements of § 13A-6-3(a)(1), [Ala.Code 1975,] defining reckless manslaughter." (Perkins's brief to this court, p. 51.) Thus, he concludes, the stipulations were the "functional equivalent of a guilty plea," and "the trial court's glaring oversight" in not engaging in a Boykin colloquy to determine whether this alleged plea was knowing and voluntary violated his constitutional rights. (Perkins's brief to this court, p. 52.)
Initially, we note the obvious: Perkins did not object to these stipulations at trial. In fact, he offered the stipulations, for obvious and beneficial reasons. By stipulating to the testimony of Candace Gilliam, Perkins all but eliminated the impact of her testimony on the jurytestimony that certainly would have been emotionally charged. In addition, by stipulating to the cause and manner Mrs. Gilliam's death, Perkins prevented the State from presenting damaging testimony regarding the rifle. On appeal, however, Perkins contends that the trial court violated his constitutional rights by accepting the stipulations that he offered without engaging in an extensive Boykin colloquy.
"`"A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions."'" Slaton v. State, 680 So.2d 879, 900 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Campbell v. State, 570 So.2d 1276, 1282 (Ala.Cr.App.1990). As we have said in applying the invited-error doctrine, "`It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice.'" Murrell v. State, 377 So.2d 1102, 1105 (Ala.Cr.App.), cert. denied, 377 So.2d 1108 (Ala.1979), quoting Aldridge v. State, 278 Ala. 470, 474, 179 So.2d 51, 54 (1965). "The invited error rule has been applied equally in capital cases and noncapital cases." Rogers v. State, 630 So.2d 78, 84 (Ala.Cr.App.1991), rev'd on other grounds, 630 So.2d 88 (Ala.1992), aff'd on remand, sub nom. Musgrove v. State, 638 So.2d 1347 (Ala.Cr.App.1992), aff'd, 638 So.2d 1360 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).
"An invited error is waived, unless it rises to the level of plain error." Ex parte Bankhead, 585 So.2d 112, 126 (Ala. 1991). Here, it was not plain error for the trial court to accept the stipulations by Perkins without engaging in an extensive Boykin colloquy. The principles announced by the United States Supreme Court in Boykin apply only to guilty pleas. Perkins did not plead guilty to felony murder, or to reckless manslaughter, by making the above-cited stipulations. Despite *1100 his mischaracterization of the stipulations in his brief to this court, the record clearly shows that Perkins did not stipulate to the elements of felony murder, as defined in § 13A-6-2(a)(3), Ala.Code 1975, or even to the elements of reckless manslaughter, as defined in § 13A-6-3(a)(1), Ala.Code 1975. Although Perkins did stipulate that he caused the death of Mrs. Gilliam, causing someone's death is not always a criminal offense. A person may cause the death of someone else and not be guilty of a criminal offense if, for example, that person was acting in self-defense, as defined in § 133-23, Ala.Code 1975. Thus, Perkins's stipulation that he caused Mrs. Gilliam's death was not, as he claims, an "effective guilty plea." (Perkins's brief to this court, p. 52.) Moreover, Perkins's stipulation to Candace Gilliam's testimony was not a stipulation that he abducted Mrs. Gilliam, i.e., that he was guilty of first-degree kidnapping as required under the felony murder doctrine. Perkins did not stipulate that Candace's statement was true, or that the events she allegedly saw did in fact happen; Perkins stipulated only to what Candace's testimony would have been had she continued to testify. The weight and credibility of that testimony/statement was left entirely up to the jury. Further, contrary to Perkins's misrepresentation in brief, Perkins did not stipulate "that Candace Gilliam saw Mr. Perkins abduct Cathy Gilliam and take her away in a large vehicle." (Perkins's brief to this court, p. 47 n. 24.) Candace's statement was that she saw someone abduct her mother, but that she could not identify Perkins, and that she was able to give only a vague description of the assailant to police.
Because the two stipulations entered into by Perkins were in no way the equivalent of a guilty plea, we find no error, plain or otherwise, as to this claim. See Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996) (defendant's claim that a stipulation to the existence of two aggravating circumstances was, in effect, a partial guilty plea was held to be invited error and not to constitute plain error).

XVIII.
Perkins contends that the State failed to establish a proper chain of custody for several items of evidence. (Issue XIII in Perkins's brief to this court.)

A.
First, Perkins contends that there was a missing link in the chain of custody of State's Exhibit 74 (a rape kit from D.W. containing State's Exhibits 75, 76, 77, 78, 80, and 81) and of State's Exhibit 82 (a brown paper bag containing D.W.'s undergarments, which, according to Dr. Rollan's testimony, contained semen with a DNA profile consistent with Perkins's DNA profile.)
A review of the record reveals the following facts relevant to the chain of custody of these items. Dr. Paul Ashley testified that he examined D.W. on August 6, 1990, and that he took specimens for a rape kit (State's Exhibits 75, 76, 77, 78, 80, and 81), which he turned over to Nurse Jean Perkins. Nurse Perkins, who was present when the specimens were taken, testified that she received each of the specimens from Dr. Ashley, sealed them, and placed them inside a standard rape-kit box (State's Exhibit 74), which she also sealed. Nurse Perkins then gave State's Exhibit 74, containing State's Exhibits 75, 76, 77, 78, 80, and 81 to Vernon Hudson, chief deputy of the Fayette County Sheriff's Department. Nurse Perkins also testified that she collected D.W.'s bra and underpants, placed them in a brown paper bag (State's Exhibit 82), sealed the bag, and *1101 gave it to Hudson. Both State's Exhibit 74 and 82 were labeled with D.W.'s name. Hudson testified that he received State's Exhibits 74 and 82 from Nurse Perkins on August 6, 1990, placed them in his personal locker (to which only he had a key), and then later delivered them to J.W. Stough, a deputy with the Fayette County Sheriffs Department, on August 7, 1990. Hudson positively identified State's Exhibits 74 and 82 as the two packages he received from Nurse Perkins on August 6, and gave to Stough on August 7.
Stough testified that he received State's Exhibits 74 and 82 from Hudson on August 7 and placed them in his metal locker, to which only he had the combination. He stated that he did not open either exhibit, that he did not alter their contents, and that he did not make any identifying marks on the packages. He stated that, on August 9, 1990, he removed State's Exhibits 74 and 82 from his metal locker and delivered them to Dr. John McDuffie in the Alabama Department of Forensic Sciences laboratory in Tuscaloosa. On cross-examination, Stough testified that he could not, from his own recollection, positively identify State's Exhibits 74 and 82 as the items he delivered to Dr. McDuffie, but rather, that he had been told that State's Exhibits 74 and 82 were the items he delivered. On redirect examination, Stough stated that he specifically remembered transporting a rape kit and a sealed brown paper bag in D.W.'s case, and that State's Exhibits 74 and 82 looked identical to the pieces of evidence he had transported for D.W.'s case. Dr. McDuffie testified that he received State's Exhibits 74 and 82 from Stough on August 9, 1990. Dr. McDuffie stated that he marked both State's Exhibits 74 and 82 when he received them from Stough, and he positively identified the exhibits as the ones he received from Stough.
Perkins contends that because Stough could not positively identify State's Exhibits 74 and 82 as the two items of evidence he received from Hudson and delivered to Dr. McDuffie, the State failed to establish a proper chain of custody for the items. He maintains that Stough's failure to positively identify the exhibits as the ones he delivered to Dr. McDuffie created a missing link in the chain of custody which requires reversal. We disagree.
In Ex parte Holton, 590 So.2d 918 (Ala. 1991), the Alabama Supreme Court set forth the legal analysis to be used in determining whether a proper chain of custody has been established:
"The chain of custody is composed of `links.' A `link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: `(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' Imwinklereid, The Identification of Original, Real Evidence, 61 Mil.L.Rev. 145, 159 (1973).
"If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a `missing' link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the `link,' as to one or more criteria or as to one or more links, the result is a `weak' link. When the link is `weak,' *1102 a question of credibility and weight is presented, not one of admissibility."
590 So.2d at 920.
"`"The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence." Ex parte Jones, 592 So.2d 210, 212 (Ala.1991); Harrell v. State, 608 So.2d 434, 437 (Ala.Cr.App.1992); Smith v. State, 583 So.2d 990 (Ala.Cr.App. 1991), cert. denied, 583 So.2d 993 (Ala. 1991). Moreover, the evidence need not negate the remotest possibility of substitution, alteration, or tampering, but instead must prove to a reasonable probability that the item is the same as it was at the beginning of the chain. Harrell, at 437; Ex parte Williams, 548 So.2d 518 (Ala.1989). Evidence has been held correctly admitted even when the chain of custody has a weak or missing link. Gordon v. State, 587 So.2d 427, 433 (Ala. Cr.App.1990), rev'd, 587 So.2d 434 (Ala.), on remand, 587 So.2d 435 (Ala.Cr.App.), appeal after remand, 591 So.2d 149 (Ala. Cr.App.1991); Shute v. State, 469 So.2d 670, 674 (Ala.Cr.App.1984).'"
Arthur v. State, 711 So.2d 1031, 1048 (Ala. Cr.App.1996), aff'd, 711 So.2d 1097 (Ala. 1997), quoting Slaton v. State, 680 So.2d 879, 893 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). See also Williams v. State, 505 So.2d 1252 (Ala.Cr.App.1986), aff'd, 505 So.2d 1254 (Ala.1987). Finally, "evidence that an item has been sealed [as were the items in this case] is adequate circumstantial evidence to establish the handling and safeguarding of the item." Lane v. State, 644 So.2d 1318, 1321 (Ala.Cr.App.1994).
Here, the State sufficiently established the chain of custody for State's Exhibits 74 and 82. Contrary to Perkins's contention, direct testimony by Stough positively identifying State's Exhibits 74 and 82 was unnecessary to establish a proper chain of custody. Although Stough testified on cross-examination that he did not have an independent recollection of transporting State's Exhibits 74 and 82, he did recall transporting a rape kit and a brown paper bag of clothes for D.W.'s case, evidence which, he said, he received from Hudson, and evidence which, he said, was identical to State's Exhibits 74 and 82. Hudson positively identified State's Exhibits 74 and 82 as the evidence he gave to Stough for delivery, and Dr. McDuffie positively identified State's Exhibits 74 and 82 as the evidence he received from Stough. Given this positive identification on each end of Stough's link, positive identification of State's Exhibits 74 and 82 by Stough was unnecessary. See Ex parte Slaton, 680 So.2d 909, 918 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997)(although each link in the chain of custody must be identified, it is not necessary that each link actually testify in order to prove a complete chain of custody). See also, Ex parte Holton, supra (circumstantial evidence is sufficient to establish a link in the chain of custody). Perkins has presented no evidence, either at trial or on appeal, to show even the remotest possibility of substitution, alteration, or tampering. Thus, we conclude that Stough's testimony, combined with the testimony of Hudson and Dr. McDuffie, was sufficient to establish the identity of and the continuity of possession of State's Exhibits 74 and 82. Thus, a proper chain of custody was established.
Moreover, the possibility that State's Exhibits 74 and 82 were tampered with, and other specimens containing semen with a DNA profile matching that of Perkins introduced into the stream of evidence, is so exceedingly remote as "to remove from the issue of the chain of *1103 custody of the evidence the question of admissibility and to present instead a question of weight and credibility." Smith v. State, 677 So.2d 1240, 1247 (Ala.Cr.App. 1995).

B.
Second, Perkins challenges the chain of custody for State's Exhibits 51, 52, and 53 (the shirt, underpants, and bra that Mrs. Gilliam was wearing at the time of her death), and blood samples taken from Mrs. Gilliam by Dr. Warner before the autopsy. Perkins does not challenge any individual links in the chain of custody of these items; rather, Perkins challenges the procedure used at the Alabama Department of Forensic Sciences laboratory in Birmingham for safeguarding evidence. Because Perkins did not object to the chain of custody of these items at trial,[13] we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
A review of the record reveals the following facts relevant to this claim. Dr. Warner testified that he received Mrs. Gilliam's body and a bag of clothes (State's Exhibits 51, 52, and 53) on August 10, 1990, in his laboratory in Tuscaloosa. Before performing the autopsy, Dr. Warner drew blood samples from Mrs. Gilliam. Murray Mitchell, a contract driver who transports evidence for the Alabama Department of Forensic Sciences, testified that he picked up Mrs. Gilliam's blood samples from Dr. Warner on August 10, 1990, and transported them to the Alabama Department of Forensic Sciences laboratory in Birmingham. Mitchell stated that Dr. Phyllis Rollan was not available at the time he delivered the blood samples so he placed the samples in Dr. Rollan's personal locker and locked it. He stated that Dr. Rollan later signed for the samples and retrieved them from her locker. Mitchell also testified that he picked up State's Exhibits 51, 52, and 53 from Dr. Warner at the Tuscaloosa laboratory and transported them to the Birmingham laboratory for David Higgins, a firearms and toolmarks examiner with the Alabama Department of Forensic Sciences. He stated that Higgins was not available when he delivered the items so he placed them in a secured locker. Higgins later signed for the items, and retrieved them from the locker. Higgins testified that he received State's Exhibits 51, 52, and 53 from his secured locker at the Birmingham laboratory. In addition, Higgins testified regarding the procedure used at the Birmingham laboratory when a forensic examiner is unavailable to receive evidence. He stated that when an examiner is not available to receive evidence, the individual submitting the evidence places the evidence in a secured locker, locks the locker with a padlock, places the key to the lock in an envelope, seals the envelope, and places the envelope with a receipt. When the examiner is able to retrieve the evidence, he or she signs the receipt, retrieves the key to the locker from the sealed envelope, and gets the evidence from the locker.
Perkins contends that the use of a secured locker in the Alabama Department of Forensic Sciences laboratory in Birmingham, when an examiner is unavailable to personally receive evidence, fails to adequately safeguard the evidence. Regarding State's Exhibits 51, 52, and 53 and Mrs. Gilliam's blood samples, Perkins contends that "[t]he prosecution simply cannot *1104 assure that the evidence retrieved by [Dr.] Rollan and Mr. Higgins from their lockers was the same evidence that Mr. Mitchell deposited into those lockers." (Perkins's brief to this court, p. 82.) We disagree.
In Moorman v. State, 574 So.2d 953 (Ala.Cr.App.1990), this court stated:
"`For the few moments that the evidence was within the purview of the medical staff who did not testify to their parts in the chain of custody, there was only the remotest possibility of substitution, alteration, or tampering. Evidence momentarily unattended in a hospital setting to which only medical personnel have access is admissible, if otherwise sufficiently authenticated. See McIntosh v. State, 443 So.2d 1275 [Ala.Cr.App.], reversed on other grounds, 443 So.2d 1283 (Ala. 1983)(slide delivered to lab reception area and momentarily unattended admissible); Baynes v. State, 423 So.2d 307, 311 (Ala.Cr.App.1982)(panties thrown by rape prosecutrix into clothes hamper, and rape kit unattended for hours in hospital both admissible over chain of custody objection).'
"Reese v. State, 549 So.2d 148, 153 (Ala.Cr.App.1989)(clothing of injured police officers which had been removed by medical personnel in officers' separate hospital rooms, dropped on the floor, and later retrieved by other officers stationed outside the rooms was admissible). See also ... Blackmon v. State, 487 So.2d 1022, 1024 (Ala.Cr.App. 1986)(where examining physician placed sealed rape kit in secured refrigerated area in hospital and an officer picked up the kit at the hospital later the same day, testimony concerning test results was admissible) ... Powell v. State, 47 Ala.App. 582, 585, 258 So.2d 923, 925 (1972)(there was no missing link in the chain of custody where the officer testified that he delivered the drugs in a sealed package to the department of toxicology and the forensic toxicologist testified that he received the package in a sealed condition, even though there was no testimony of who gave the package to the toxicologist).
"`The principles governing chain of custody challenges were outlined in United States v. Lane, 591 F.2d 961 (D.C.Cir.1979), as follows:
"`"Tangible evidence of crime is admissible when shown to be `in substantially the same condition as when the crime was committed.' And it is to be presumed that the integrity of evidence routinely handled by governmental officials was suitably preserved `[unless the accused makes] a minimal showing of ill will, bad faith, evil motivation, or some evidence of tampering.' If, however, that condition is met, the Government must establish that acceptable precautions were taken to maintain the evidence in its original state.
"`"The undertaking on that score need not rule out every conceivable chance that somehow the identity or character of the evidence underwent change. `[T]he possibility of misidentification and adulteration must be eliminated,' we have said, `not absolutely, but as a matter of reasonable probability.' So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in the light of surrounding circumstances."'
"United States v. Roberts, 844 F.2d 537, 549-50 (8th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988), quoting United States v. *1105 Anderson, 654 F.2d 1264, 1267 (8th Cir.), cert. denied, 454 U.S. 1127, 102 S.Ct. 978, 71 L.Ed.2d 115 (1981). `[R]eal evidence is not [in]admissible because one can conjure up hypothetical possibilities that tampering occurred.' United States, v. Haldeman, 559 F.2d 31, 109 (D.C.Cir.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). `If the trial court is satisfied that in reasonable probability the article has not been changed in any important respect, it may permit its introduction into evidence.' United States v. McCowan, 706 F.2d 863, 865 (8th Cir.1983). `Although the ideal practice would be for one person to maintain exclusive and constant control of the [evidence], these rules are made for practical people who deal with such evidence as part of day to day routine. The chain of custody requirements aim at a "reasonable probability" that there has been no tampering; they are not intended as an obstacle course or a walk through a legalistic mine field.' Blanco v. State, 485 So.2d 1217, 1220 (Ala.Cr.App.1986)."
574 So.2d at 956-57, quoted with approval in Smith v. State, 677 So.2d 1240 (Ala.Cr. App.1995).
Here, the State sufficiently established the chain of custody for State's Exhibits 51, 52, and 53, and for Mrs. Gilliam's blood samples. Contrary to Perkins's contention, merely because the items were left in a secured locker for a period of time does not negate the chain of custody. Perkins has not offered, nor does the record reveal, any evidence of substitution or tampering while the items were in the secured locker. The only key to the locker was in a sealed envelope that Dr. Rollan and Higgins had signed for. Although some personnel at the laboratory may have possibly had access to the envelope and, thus, the key to the locker, "it is to be presumed that the integrity of evidence routinely handled by governmental officials was suitably preserved `[unless the accused makes] a minimal showing of ill will, bad faith, or evil motivation, or some evidence of tampering.'" Moorman, 574 So.2d at 956, quoting United States v. Roberts, 844 F.2d 537, 549-50 (8th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988). Here, Perkins has failed to make that minimal showing of substitution or tampering; he makes only a bare and self-serving allegation that is unsupported by the record. For the reasons above, we find that the State sufficiently established the chain of custody of the challenged items of evidence and no error, plain or otherwise, occurred as to this claim.

XIX.
Perkins contends that the trial court erred by allowing Dr. Kenneth Warner, the State's medical examiner for Tuscaloosa County who performed the autopsy on Mrs. Gilliam, to testify regarding the possible cause of Mrs. Gilliam's nonfatal injuries, i.e., the broken hyoid bone in her neck and the stab wound to her right collarbone. (Issue XII in Perkins's brief to this court.) He claims that Dr. Warner's "conclusive testimony" about the cause of the wounds "wrongfully invaded the jury's province and deprived the jurors of their ultimate fact-finding responsibilities." (Perkins's brief to this court, p. 77.) Because Perkins did not object to any of the testimony he now challenges on appeal, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
At the outset, we note that, contrary to Perkins's assertions in his brief to this court, Dr. Warner did not provide "conclusive assertions about the causes of Mrs. Gilliam's nonfatal injuries," nor did he state that "nothing other than a struggle" could have caused the injuries. (Perkins's *1106 brief to this court, pp. 77-78.) Rather, in response to questioning by the prosecutor, Dr. Warner testified that the injuries were "consistent" with a struggle. Dr. Warner testified as follows:
"[Prosecutor]: Is the injury that you described, the stab wound, is that consistent with having been inflicted with a hunting knife?
"[Dr. Warner]: Yes, sir.
"[Prosecutor]: The hyoid bone that you mentioned being fractured, did you note any sort of hemorrhaging in that area?
"[Dr. Warner]: Yes, sir.
"[Prosecutor]: Is that the broken bone, the hyoid bone in the throat area, is that consistent with having been inflicted during a struggle?
"[Dr. Warner]: Yes, sir.
"[Prosecutor]: Could it have occurred Is it likely to have occurred other than in a struggle?
"[Dr. Warner]: I can't imagine how you would get that without struggling, no, sir."
(R. 2122.) This testimony was clearly proper.
"`The admissibility of expert opinions is authorized in this state by § 12-21-160, [Ala.Code 1975], which reads: "The opinions of an expert on any questions of science, skill, trade, or like questions, are always admissible; and such opinions may be given on the facts as proved by other witnesses." The criterion for admission of expert testimony is that the witness, by study, practice, experience, or observation as to a particular subject should have acquired knowledge beyond that of an ordinary witness; an expert witness is one who can enlighten the jury more than the average man on the street, one whose knowledge extends beyond or supersedes that of an ordinary witness, or one who is shown, either by training or experience, to be better informed than a hypothetical average juror. Charles v. State, 350 So.2d 730 (Ala.Cr.App.1977); C. Gamble, McElroy's Alabama Evidence, § 127.01(5) (3rd ed. 1977).
"`"It has been held traditionally in this country that an expert witness cannot give his opinion upon an ultimate issue in the case." C. Gamble, supra, at § 127.01(5). The rationale underpinning the "ultimate issue rule" is that expert opinion should not be permitted to invade the province of the jury. Id. There are Alabama cases upholding this traditional rule. Colvin v. State, 247 Ala. 55, 22 So.2d 548 (1945); see C. Gamble, supra, at § 127.01(5). However, the modern trend is in the direction of permitting experts to give their opinions upon ultimate issues, of which the final determination rests with the jury:
"`"Despite the restrictive rule in the foregoing paragraph, however, there appears to be a modern trend in the direction of permitting experts to give their opinions upon ultimate issues whose final determination rests with the jury. The basic theory underlying the decisions forming this trend is that the expert should be allowed to give his opinion upon an ultimate issue if that will aid the jury in its decision. The Alabama courts have adopted language to the effect that because a question propounded to an expert witness will elicit an opinion from him in practical affirmation or disaffirmation of a material issue in a case will not suffice to render the question improper."'"
Travis v. State, 776 So.2d 819, 849 (Ala.Cr. App.1997), quoting Bailey v. State, 574 So.2d 1001, 1002-3 (Ala.Cr.App.1990), quoting in turn, A. Moenssens and F. Inbau, Scientific Evidence in Criminal Cases, § 1.18(2) (2d ed. 1978).
*1107 In Bell v. State, 435 So.2d 772 (Ala.Cr. App.1983), this court stated:
"However, a properly qualified expert may state his opinion as to the nature, cause, and effect of a wound or injury, Thomas v. State, 249 Ala. 358, 360, 31 So.2d 71 (1947), and the `manner or means by which the injury could have been inflicted.' Tuck v. State, 384 So.2d 1240, 1242 (Ala.Cr.App.1980). He may state what kind of weapon or instrument could have caused a particular wound, but not whether that weapon actually did. White v. State, 294 Ala. 265, 271, 314 So.2d 857 (1975). See Aaron v. State, 271 Ala. 70, 83, 122 So.2d 360 (1960)(cuts consistent with fingernail scratches); Robinson v. State, 243 Ala. 684, 690, 11 So.2d 732 (1943)(injuries could have been caused by having been struck with a hand or fist and by having been choked); Wilson v. State, 195 Ala. 675, 71 So. 115 (1916)(death could have been caused by falling on a railroad rail); Simon v. State, 108 Ala. 27, 18 So. 731 (1895)(death was the effect of a blow); Mitchell v. State, 18 Ala.App. 471, 473, 93 So. 46, cert. denied, Ex parte Mitchell, 208 Ala. 699, 93 So. 923 (1922)(wound was made with a blunt instrument)."
435 So.2d at 775. See also Hampton v. State, 621 So.2d 376, 377 (Ala.Cr.App.1993) (expert's testimony in trial of defendant accused of first-degree rape that victim's wounds were "consistent with `forcible intercourse'" was properly admitted); Moss v. State, 545 So.2d 230, 231 (Ala.Cr.App. 1989) (expert's testimony in trial of defendant accused of first-degree rape that victim "`had had recent intercourse that had been somewhat forceful'" was properly admitted); Meadows v. State, 473 So.2d 582 (Ala.Cr.App.1985) (expert's testimony in trial of defendant accused of first-degree assault that victim's injuries were severe was properly admitted).
Dr. Warner's testimony that the stab wound in Mrs. Gilliam's right collarbone was consistent with a hunting knife and that Mrs. Gilliam's broken hyoid bone was consistent with a struggle was properly admitted. Dr. Warner did not conclusively state that these were the only possible causes for the wounds, but instead, expressed his opinion that the wounds were consistent with these causes. The testimony assisted the jury in understanding the nature of the wounds, and the jury was properly instructed as to the use of the expert testimony. Accordingly, we find no error, plain or otherwise, in the admission of Dr. Warner's testimony.

XX.
Perkins contends that the trial court erred in admitting into evidence 11 autopsy photographs and corresponding slides depicting the wounds to Mrs. Gilliam's body. (Issue X in Perkins's brief to this court.) He maintains that the photographs and slides were "ghoulish ... gruesome, [and] inflammatory," and were, therefore, inadmissible. (Perkins's brief to this court, pp. 70-71.) Moreover, he claims that two photographs were particularly prejudicial because, he says, they depicted the bullet wound being "manipulated by the State's pathologist to reveal the grisly inner portion of the orifice." (Perkins's brief to this court, p. 71.)
The record reveals that, when the State introduced the autopsy photographs, through the testimony of Dr. Warner, Perkins did not object. After Dr. Warner identified the photographs and the photographs were admitted into evidence without objection, the State attempted to introduce slides of the photographs that had been prepared by Dr. Warner specifically for trial. Perkins objected to the slides on the ground that they were cumulative; *1108 however, the trial court never ruled on Perkins's objection. Because Perkins either failed to object (to the photographs), or failed to receive an adverse ruling on his objection (to the slides), we may review this claim only under the plain-error rule. Rule 45A, Ala.R.App.P.
"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973)."
Ex parte Siebert, 555 So.2d 780, 783 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990).
This court has repeatedly held that autopsy photographs depicting the character and location of wounds on a victim's body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter. See Smith v. State, 756 So.2d 892 (Ala.Cr.App.1997); Travis v. State, 776 So.2d 819 (Ala.Cr.App.1997); Scroggins v. State, 727 So.2d 123 (Ala.Cr. App.1997), rev'd on other grounds, 727 So.2d 131 (Ala.1998); Boyd v. State, 715 So.2d 825 (1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998). Moreover, photographic evidence, if relevant, is admissible "`even if it has a tendency to inflame the minds of the jurors.'" Boyd, 715 So.2d at 833, quoting Johnson v. State, 620 So.2d 679, 692 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).
The autopsy photographs and slides depicting Mrs. Gilliam's wounds were relevant to show the extent of Mrs. Gilliam's injuries, including the gunshot wound to her chest and the knife wound to her right collarbone. See Dabbs v. State, 518 So.2d 825, 829 (Ala.Cr.App.1987) (autopsy photographs of victim's head injuries were gruesome, but necessary to demonstrate the extent of the injuries). This evidence tended to support the State's theory of the casethat Mrs. Gilliam struggled with Perkins and that Perkins became enraged, grabbed the gun, and shot her. The photographs and slides also illustrated Dr. Warner's testimony regarding the autopsy he performed on Mrs. Gilliam's body, his opinion regarding the location of the gun when Mrs. Gilliam was shot, and the cause of Mrs. Gilliam's death. "Perpetrators of crimes that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence." Jenkins v. State, 627 So.2d 1034, 1045 (Ala.Cr. App.1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994) (photograph of victim's partially decomposed body properly admitted into evidence).
Perkins's specific challenge to two photographs that depicted Mrs. Gilliam's bullet wound being "reapproximat[ed]" by Dr. Warner, is equally meritless. Warner testified that the condition of Mrs. Gilliam's body when he received it on August 10, 1990, indicated that medical personnel had performed a thoracotomy in an attempt to save Mrs. Gilliam's life. In so doing, Dr. Warner said, "the emergency *1109 resuscitators were not concerned with the wound," they were "concerned with saving [Mrs. Gilliam's] life." (R. 2146.) Thus, Mrs. Gilliam's body sustained wounds not caused by the actual bullet, and Dr. Warner "reapproximat[ed]" the bullet wound with his hands so the jury could see the difference between the wound caused by the bullet and the wound caused by the medical procedures used in the attempt to save Mrs. Gilliam's life. Such "reapproximation" did nothing more than ensure that the jury was aware of which wounds were caused by the bullet and which were caused by the medical procedures. "The fact that [the] photograph[s] [were] gruesome is not grounds to exclude [them] as long as the photograph[s] shed[] light on issues being tried." Smith, 756 So.2d at 892.
Accordingly, we find no error, plain or otherwise, in the trial court's admission of the autopsy photographs and slides.

XXI.
Perkins contends that the trial court erred by permitting the State to introduce a photograph of Mrs. Gilliam while she was alive, and to then compare the photograph to one of the autopsy photographs taken of Mrs. Gilliam's body. (Issue IX in Perkins's brief to this court.) He maintains that the photograph, and its comparison to the autopsy photograph, was inflammatory and that it was offered solely "to inflame the passions of the jury." (Perkins's brief to this court, p. 70.)
The record reveals that during the testimony of the victim's husband, Wally Gilliam, the State introduced a photograph of Mrs. Gilliam taken while she was still aliveState's Exhibit 60. The photograph was taken approximately four months before her death. Perkins did not object to the photograph. Following identification of the photograph by Mr. Gilliam, the State expressed its intention to have Mr. Gilliam testify that the person in State's Exhibit 60 was the same person in State's Exhibit 54, an identifying preautopsy photograph of Mrs. Gilliam's body. At that point, Perkins's counsel offered to stipulate that State's Exhibits 54 and 60 were both photographs of Mrs. Gilliam. Because Perkins not only failed to object to the photograph of Mrs. Gilliam while still alive, but voluntarily stipulated that both photographs were of Mrs. Gilliam, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
The admissibility of a photograph of a homicide victim while still alive has been discussed by Professor Charles W. Gamble:
"The basic question to be asked in deciding the admissibility of a photograph of a victim, just as with any other demonstrative evidence, is whether it has a reasonable tendency to prove or disprove some material fact in issue. This decision is left largely to the sound discretion of the trial judge. Of course, the decision of the trial judge is not necessarily final since his decision is reviewable to determine if there has been an abuse of discretion.
"It generally is agreed that the photograph of the victim of a homicide, taken before the alleged murder, is admissible for the purpose of identification. This is usually admitted in connection with the testimony of a witness who saw the alleged deceased at the time of the killing and who is called upon to identify the deceased as the person in the photograph. The foregoing decisions which admit the victim's photograph into evidence for the purpose of identification are applicable even though there exists no dispute over the identity of the deceased."
*1110 McElroy's Alabama Evidence § 207.01(2) (4th ed. 1991) (footnotes omitted). See also Smith v. State, 756 So.2d 892 (Ala.Cr. App.1997); Knotts v. State, 686 So.2d 431 (Ala.Cr.App.1995), remanded on other grounds, opinion on return to remand, 686 So.2d 484 (Ala.Cr.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997); Taylor v. State, 666 So.2d 36 (Ala. Cr.App.1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); and Jolly v. State, 395 So.2d 1135 (Ala.Cr.App. 1981).
Thus, we find that the photograph of Mrs. Gilliam before she was murdered was properly admitted for identification purposes, as was Perkins's voluntary stipulation that both photographs depicted Mrs. Gilliam. The State was entitled to prove the identity of the victim, even if her identity was not disputed. Accordingly, we find no error, plain or otherwise, regarding this claim.

XXII.
Perkins contends that the trial court erred in admitting victim-impact evidence during the guilt phase of his trial. (Issue VIII in Perkins's brief to this court.) With nothing more than a citation to the record and a general statement regarding the testimony, we must assume that Perkins is complaining about the following evidence elicited through the testimony of Mrs. Gilliam's husband, Wally Gilliam: (1) that Mr. and Mrs. Gilliam were married for 15 years and had two children; (2) the names and ages of the two Gilliam children; and (3) that, at the time of trial, Mr. Gilliam and his children were still living in the house from which Mrs. Gilliam had been abducted. Perkins maintains that the State called Mr. Gilliam to testify solely "about the victim's good character and personal background" (Perkins's brief to this court, p. 67), and that this evidence "was absolutely irrelevant to any issue at that stage of the case, and was offered solely to inflame the jury." (Perkins's brief to this court, p. 68.) Because Perkins failed to object to any of the testimony he now complains about on appeal, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
Contrary to Perkins's claim, the record reveals that Mr. Gilliam was called to testify regarding the events of August 9, 1990not to testify solely about Mrs. Gilliam's character. In response to a few introductory questions, Mr. Gilliam testified that he had been married to Mrs. Gilliam for 15 years, and that they had two children togetherAnthony, age 18, and Candace, age 14. Mr. Gilliam then testified that, while he was at work on August 9, he received a telephone call from his brother. After the call, Mr. Gilliam stated that he went home and found his daughter, Candace, speaking with Deputy Harry Montgomery. Mr. Gilliam also spoke to Montgomery. Following a radio dispatch to Montgomery while he was at the Gilliam home indicating that there was a shooting victim at the Hood residence, Mr. Gilliam rode with Montgomery to the Hood residence and saw his wife. He stated that he rode in the front seat of the ambulance when his wife was transported to the hospital from the Hood residence. Mr. Gilliam then identified his wife from a photograph taken while she was still alive (see Part XXI of this opinion), and stated that his wife was 33 years old at the time of her death. Perkins did not object to any of this testimony. At that point, the prosecutor asked Mr. Gilliam about Mrs. Gilliam's character and personality. Perkins objected before Mr. Gilliam could answer, and the prosecutor withdrew the question; no testimony was actually elicited regarding Mrs. Gilliam's character. Mr. Gilliam then *1111 stated that he and his children were still living in the house from which his wife had been abducted. Again, Perkins failed to object to this testimony.
It is well settled that victim-impact statements "are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible." Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993), citing Charles W. Gamble, McElroy's Alabama Evidence, § 21.01 (4th ed. 1991). However, "when, after considering the record as a whole, the reviewing court is convinced that the jury's verdict was based on the overwhelming evidence of guilt and was not based on any prejudice that might have been engendered by the improper victim-impact testimony, the admission of such testimony is harmless error." Crymes, 630 So.2d at 126. Rule 45, Ala. R.App.P., states:
"No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
In Ex parte Land, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996), the Alabama Supreme Court stated:
"Recently, this Court examined the issue of victim impact evidence in Ex parte Rieber, 663 So.2d 999 (Ala.1995). In Rieber, we acknowledged that testimony regarding a murder victim's children was not relevant to the issue of the accused's guilt or innocence and was, thus, inadmissible during the guilt phase of the trial; we noted, however, that `a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.' 663 So.2d at 1005. After thoroughly reviewing the record of this present case, we conclude that the limited testimony regarding Ms. Brown's infant son and the impact of Ms. Brown's death on her family, and the prosecutor's limited references to such evidence, did not operate to deny Land a fair trial or to prejudice his substantial rights. Thus, we find no reversible error as to this issue."
678 So.2d at 236.
Here, as in Land, Mr. Gilliam's testimony regarding his marriage to the victim, the names and ages of their two children, and where they were living was irrelevant to any issue in the case, and was, thus, inadmissible. However, after reviewing the record as a whole, we find no evidence that the now-challenged testimony affected the outcome of the trial or that it otherwise prejudiced a substantial right of Perkins. See Smith v. State, 756 So.2d 892 (Ala.Cr.App.1997); and Ex parte Rieber, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995). Accordingly, any error in the admission of this limited testimony did not rise to the level of plain error; it was, at most, harmless error. See Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).

*1112 XXIII.
Perkins contends that the trial court erred in denying his motion for a judgment of acquittal, made at the close of the State's case and at the close of all evidence, because, he says, the evidence was insufficient to sustain his conviction for capital murder. (Issue V in Perkins's brief to this court.) He maintains that the State failed to prove that he intended to kill Mrs. Gilliam. Specifically, he contends that because "[t]he prosecution presented absolutely no direct evidence to support its theory that Mr. Perkins intended to kill [Mrs.] Gilliam," and because his theory of the case was that the shooting was accidental, the State failed to prove a prima facie case of capital murder. (Perkins's brief to this court, p. 59.) We disagree.
"`"In reviewing the sufficiency of the evidence the appellate courts of this State are bound by several well settled rules. It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt and to a moral certainty. Instead, the function of this Court is to determine whether there is legal evidence from which a jury could by fair inference find the defendant guilty. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.), cert. denied, 368 So.2d 877 (Ala.1979); Scruggs v. State, 359 So.2d 836, 842 (Ala.Cr.App.), cert. denied, 359 So.2d 843 (Ala.1978).
"`"In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. Ellis v. State, 338 So.2d 428 (Ala.Cr.App.1976); Edson v. State, 53 Ala.App. 460, 301 So.2d 226 (1974). The evidence must be considered in the light most favorable to the prosecution. Colston v. State, 57 Ala. App. 4, 325 So.2d 520 (1975), cert. denied, 295 Ala. 398, 325 So.2d 531 (1976).
"`"Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Bell v. State, 339 So.2d 96 (Ala. Cr.App.1976). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust. Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969); Morton v. State, 338 So.2d 423 (Ala.Cr.App.1976)."'
"Freeman v. State, 505 So.2d 1079 (Ala.Cr.App.1986), quoting, Johnson v. State, 378 So.2d 1164, 1169 (Ala.Cr.App. 1979), writ quashed by Ex parte Johnson, 378 So.2d 1173 (Ala.1979)."
Anderson v. State, 542 So.2d 292, 295-96 (Ala.Cr.App.1987), writ quashed, 542 So.2d 307 (Ala.), cert. denied, 493 U.S. 836, 110 S.Ct. 116, 107 L.Ed.2d 77 (1989), quoted with approval in Pilley v. State, 789 So.2d 870, 875-76 (Ala.Cr.App.1998).
Initially, we note that, contrary to Perkins's contention, "direct evidence" of the intent to kill is not necessary to prove a prima facie case of capital murder. "`"Intent, being a state of mind, is rarely, if ever, susceptible of direct or positive proof and must usually be inferred from the facts testified to by witnesses in the circumstances as developed by and through the evidence."'" Pilley, 789 So.2d at 876, quoting Hunt v. State, 642 So.2d 999, 1008 (Ala.Cr.App.1993), aff'd, 642 So.2d 1060 (Ala.1996).
Moreover, intent "may be inferred from the character of the assault, the use of a deadly weapon and other attendant *1113 circumstances." Farrior v. State, 728 So.2d 691, 695 (Ala.Cr.App.1998), quoting Jones v. State, 591 So.2d 569, 574 (Ala.Cr. App.1991), quoting in turn, Johnson v. State, 390 So.2d 1160, 1167 (Ala.Cr.App.), cert. denied, 390 So.2d 1168 (Ala.1980). See also Scanland v. State, 473 So.2d 1182, 1185 (Ala.Cr.App.), cert. denied, 474 U.S. 1035, 106 S.Ct. 602, 88 L.Ed.2d 581 (1985) ("[i]ntent may be inferred from the use of a deadly weapon"). Here, Candace Gilliam testified that she saw a man take her mother from her home at gunpoint.[14] Perkins admitted that he caused Mrs. Gilliam's death with a .357 magnum pistol. This evidence supported an inference that Perkins intended to kill Mrs. Gilliam.
In addition, the State's evidence tended to show that Mrs. Gilliam was not shot during a struggle, as Perkins contended, but instead was shot from at least 18 inches away. When Mrs. Gilliam arrived at the Hood residence, approximately one hour after she had been abducted from her home, she had a gunshot wound to her chest, but no hole in her shirt, thus indicating that she was not wearing her shirt, or that her shirt had been unbuttoned, when she was shot. Dr. Warner testified that he found no gunpowder residue around Mrs. Gilliam's wound, which, he said, would indicate that the shot was fired from at least 18 inches away, if Mrs. Gilliam was not wearing a shirt at the time she was shot. From this evidence, the jury could have drawn a fair inference that the fatal shot was fired from at least 18 inches away, thus disproving Perkins's claim that the gun accidentally went off during a close-quarters struggle in the gray pickup truck. Viewing this evidence in the light most favorable to the State, we find that it was sufficient to support a reasonable inference that Perkins intended to kill Mrs. Gilliam.
Perkins contends, however, that because his version of eventsthat the gun accidentally discharged during a struggleis also supported by the evidence, the State could not prove a prima facie case of capital murder. The evidence supports the theory that a struggle occurred between Perkins and Mrs. Gilliam in the gray pickup truck, but such evidence in no way reduces or negates the sufficiency of the State's evidence tending to show that Perkins intended to kill Mrs. Gilliam. The State's theory of the case, which was very similar to the defense's theory, was that Mrs. Gilliam struggled against Perkins's sexual advances, that Perkins became angry, and that, with the intent to kill, he shot Mrs. Gilliam. The defense's theory was that Mrs. Gilliam and Perkins struggled, and that the gun accidentally discharged. The fact that the defense's version of events conflicted with the State's version did not render the State's evidence insufficient; any conflict in the evidence was a matter of weight and credibility to be resolved by the jury. As we stated in Farrior, supra:
"Conflicting evidence of intent presents a question for the jury to resolve. Bartlett v. State, 701 So.2d 305 (Ala.Cr.App. 1997). Where the evidence presented raises questions of fact for the jury, `"[a]bsent clear and convincing evidence to the contrary, the jury's finding will not be reversed on appeal."' Hoobler v. State, 668 So.2d 905, 906 (Ala.Cr.App. 1995), quoting Pugh v. State, 536 So.2d 99, 100 (Ala.Cr.App.1986); see also Page v. State, 487 So.2d 999, 1007 (Ala.Cr. App.1986) (finding that the question of intent is a question for the jury)."
728 So.2d at 696.
The State presented sufficient evidence that Perkins had the intent to kill to support *1114 the jury's verdict; thus the trial court did not err in denying Perkins's motion for a judgment of acquittal.

XXIV.
Perkins contends that his conviction and sentence are due to be reversed because, he says, the prosecutor committed misconduct during his closing arguments at the guilt phase. (Issue XI in Perkins's brief to this court.) Because Perkins either failed to object to the comments he now challenges, or he objected on different grounds than he now raises on appeal, we may review these claims only for plain error. Rule 45A, Ala.R.App.P. "`[T]he failure to object will weigh against any claim of prejudice.'" Dobyne v. State, 672 So.2d 1319, 1340 (Ala.Cr.App.), opinion on return to remand, 672 So.2d 1353 (Ala.Cr.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct., 1571, 134 L.Ed.2d 670 (1996), quoting Ex parte Hart, 612 So.2d 536, 537 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).
"`This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.' Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987)."
Kuenzel v. State, 577 So.2d 474, 489 (Ala. Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
At the outset, we note:
"Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Cr.App. 1978), and that court is given broad discretion in determining what is permissible argument. Hurst v. State, 397 So.2d 203, 208 (Ala.Cr.App.), cert. denied, 397 So.2d 208 (Ala.1981). Moreover, this Court has stated that it will not reverse unless there has been an abuse of that discretion. Miller v. State, 431 So.2d 586, 591 (Ala.Cr.App.1983).
". . . .
"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App. 1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982).
"In judging a prosecutor's closing argument, the standard is whether the argument `so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)."
Bankhead v. State, 585 So.2d 97, 105-107 (Ala.Cr.App.1989), aff'd in part, remanded, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), *1115 rev'd on other grounds, 625 So.2d 1146 (Ala.1993).
After the jury had been struck and sworn, but before opening statements, the trial court instructed the jury that "opening statements just like the closing statements are not evidence in this case." (R. 1684.) In addition, as part of its final charge to the jury before deliberations, the trial court instructed the jury as follows:
"Now, ladies and gentlemen, you are to base your verdict on the evidence in this case. And the evidence to be considered by you will be the testimony, the exhibits and all presumptions of law not refuted by the evidence. You are not to consider as evidence the indictment, the argument of the lawyers or rulings of the Court...."
(R. 2710.) Jurors are presumed to follow the trial court's instructions. Holland v. State, 588 So.2d 543, 549 (Ala.Cr.App. 1991).
We now address each of Perkins's claims individually.

A.
First, Perkins contends that the prosecutor improperly recounted the testimony of B.P., D.W., and Darlene Hall regarding collateral crimes and acts committed by Perkins before the abduction of Mrs. Gilliam. He claims that because the evidence of collateral crimes and acts was inadmissible, the prosecutor's argument "emphasizing such inflammatory evidence far exceeded the limits of appropriate prosecutorial behavior." (Perkins's brief to this court, p. 73.) As Perkins failed to object to the prosecutor's comments regarding these collateral crimes and acts, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
In Part XIV of this opinion, we held that the testimony of B.P., D.W., and Darlene Hall regarding prior crimes and acts committed by Perkins was proper to show Perkins's intent to sexually abuse and to abduct when he forcibly took Mrs. Gilliam from her home. Because evidence of Perkins's prior crimes and acts was properly admitted, it was a proper subject for closing arguments. "Whatever is in evidence is considered subject to legitimate comment by counsel." Bankhead, 585 So.2d at 105. Thus, we find no error, plain or otherwise, in the prosecutor's reference during closing arguments to properly admitted testimony.

B.
Second, Perkins contends that the prosecutor "repeatedly stated facts not in evidence" during his rebuttal argument. (Perkins's brief to this court, p. 74.)
Perkins contends that the prosecutor misstated the facts of the case by stating to the jury that Mrs. Gilliam yelled the word "rapist" as she was being abducted because she had recognized Perkins from his picture in a newspaper article. He maintains that because there was no evidence that Mrs. Gilliam had read a newspaper article and because the article itself was not introduced into evidence, the prosecutor's comment amounted to facts not in evidence.[15] During the prosecutor's rebuttal argument, Perkins did object to this comment; however, his objection was on the ground that the evidence was unclear as to who said the word "rapist," not on the ground that the comment was based on facts not in evidence. Thus, we may review *1116 this claim only for plain error. Rule 45A, Ala.R.App.P.
Contrary to Perkins's contention, the prosecutor did not conclusively state that Mrs. Gilliam cried "rapist" because she had read a newspaper article about Perkins. Rather, the prosecutor stated his impressions from the evidence as follows:
"[S]he [Candace Gilliam] hears her mother saying the word, `rapist.' Now that suggests perhaps that Cathy Gilliam had seen that same newspaper that Mrs. Hall had seen just a little earlier. Cathy Gilliam may very well have recognized Roy Perkins. How else would she know immediately that he was a rapist, or did he say something to her? She used the word, `rapist.'"
(R. 2669.)
After a thorough review of the record and of the prosecutor's entire closing argument, we find that the prosecutor's comment regarding the possibility that Mrs. Gilliam had read a newspaper article about Perkins before her abduction was a proper and legitimate inference to be drawn from the evidence.
"`While in argument to the jury, counsel may not argue as a fact that which is not in evidence; nevertheless, he may state or comment on proper inferences from the evidence and may draw conclusions from the evidence based upon his own reasoning. Sanders v. State, 423 So.2d 348 (Ala.Cr.App.1982); Speigner v. State, 369 So.2d 39 (Ala.Cr.App.), cert. denied, 369 So.2d 46 (Ala.1979); Liner v. State, 350 So.2d 760 (Ala.Cr.App.1977). The prosecutor, as does defense counsel, has a right to present his impressions from the evidence. Sanders, supra; Hayes v. State, 395 So.2d 127 (Ala.Cr. App.1980), cert. denied, 395 So.2d 150 (Ala.1981); McQueen v. State, 355 So.2d 407 (Ala.Cr.App.1978). He may argue every legitimate inference and may examine, collate, shift and treat the evidence in his own way. Sanders, supra; Hayes, supra; McQueen, supra. Liberal rules are allowed counsel in drawing inferences from the evidence in their argument to the jury, whether they are truly drawn or not. Sanders, supra; Liner, supra; Smith v. State, 344 So.2d 1239 (Ala.Cr.App.), cert. denied, 344 So.2d 1243 (Ala.1977). Control of closing argument rests in the broad discretion of the trial judge and, where no abuse of discretion is found, there is no error. Thomas v. State, 440 So.2d 1216 (Ala.Cr.App.1983); Robinson v. State, 439 So.2d 1328 (Ala.Cr.App.1983); Elston v. State, 56 Ala.App. 299, 321 So.2d 264 (1975). The trial judge can best determine when discussion by counsel is legitimate and when it degenerates into abuse. Hurst v. State, 397 So.2d 203 (Ala.Cr.App.), cert. denied, 397 So.2d 208 (Ala.1981); Garrett v. State, 268 Ala. 299, 105 So.2d 541 (1958).'
"Sasser v. State, 494 So.2d 857, 859-60 (Ala.Cr.App.1986).
". . . .
"`Of necessity a wide discretion must be allowed the trial judge in regulating the argument of counsel. Trials are adversary in nature. Vigorous prosecution and defense is to be expected. Neither defense counsel nor the prosecutor should be too closely hampered by niceties of speech if he is to be effective, but should be permitted to say his say in his own style. This of course does not mean that unfair and prejudicial argument is to be condoned for one instant. All argument of counsel is to be measured in the background and atmosphere of courtrooms. And as stated in Arant v. State, 232 Ala. 275, 167 So. 540, 544, "Such statements are usually valued by the jury at their true worth ... *1117 and not expected to become factors in the formulation of their verdicts."'
"Bullard v. State, 40 Ala.App. 641, 645, 120 So.2d 580, 584 (1960)."
Taylor v. State, 666 So.2d 36, 64 (Ala.Cr. App.1994), aff'd 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
Accordingly, we find no error, plain or otherwise, in the prosecutor stating his impressions of what inferences could be drawn from the evidence.
Perkins also contends that the prosecutor improperly stated to the jury that, although the rape charge against Perkins had been nol-prossed, D.W. believed that Perkins had pleaded guilty to raping her and had been sentenced to 99 years' imprisonment. Perkins contends that "[t]here is absolutely no support in the record for this statement" and that the prosecutor made the comment solely to bolster D.W's testimony "in the face of the undisputed evidence that the charges lodged against Mr. Perkins by [D.W.] were dismissed." (Perkins's brief to this court, p. 74.) As Perkins failed to object to this comment during closing argument, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
Contrary to Perkins's contention, a review of the record reveals that D.W. testified, on cross-examination by Perkins's counsel no less, that she had been told by someone (she did not specify by whom) that Perkins had pleaded guilty to raping her and had been sentenced to 99 years' imprisonment. The prosecutor's reference to testimony that was properly elicited during cross-examination was well within the legitimate scope of closing argument. Thus, we find no error, plain or otherwise, as to this claim.

C.
Finally, Perkins contends that the prosecutor "improperly implied that the jury should convict Mr. Perkins of intentional murder simply if he intended to shoot Mrs. Gilliam." (Perkins's brief to this court, p. 75.) He complains about the following statement made by the prosecutor:
"Let's keep in mind that he had taken a loaded gun to the Gilliam home, that when he left Cathy Gilliam, when the gun was found, four shots had been fired, and there were only four cartridges in the gun. So the first one, he shoots his knee. The second two are fired in a struggle in some way with Mrs. Gilliam while she's trying to avoid him shooting her. And the second one, he shoots her straight on at least eighteen inches away from her. She struggled, and he got mad. He flew into a rage. And he just shot her. He intended to shoot her, and he did. He just blew her life away...."
(R. 2671-72.) (Emphasis added to indicate that portion of the argument complained of on appeal.) Because Perkins did not object to this statement by the prosecutor, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
The prosecutor's comment was a proper explanation of the State's theory of the case, was clearly not meant as an advisement to the jury regarding the law of intent, and was in direct rebuttal to the defense's closing argument. During the defense's closing argument, Perkins's counsel repeatedly asserted Perkins's theory of the case: that the gun accidentally discharged during a struggle and that Perkins did not intend to shoot Mrs. Gilliam or to kill her. The prosecutor's argument in rebuttal was that Perkins did, in fact, intend to shoot Mrs. Gilliam and to kill her. "Statements made during closing arguments *1118 which are in reply to arguments made by opposing counsel are not grounds for reversal." Sockwell v. State, 675 So.2d 4, 35 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996), citing Stephens v. State, 580 So.2d 11 (Ala.Cr.App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991).
Moreover, a review of the record reveals that the trial court properly instructed the jury on intent and repeatedly advised the jurors that arguments of counsel were not evidence. The prosecutor also repeatedly stated during his closing argument that Perkins not only intended to shoot Mrs. Gilliam, but that he intended to kill her as well. We cannot say that the prosecutor's single, isolated comment complained of by Perkins, in light of the prosecutor's repeated argument that Perkins not only intended to shoot Mrs. Gilliam, but intended to kill her, and in light of the trial court's proper instructions to the jury, "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. at 181, 106 S.Ct. at 2471.
Accordingly, we find no error, plain or otherwise, as to this claim.

XXV.
Perkins contends that the trial court erred in failing to give certain instructions in its oral charge to the jury and that several of the instructions given by the trial court were improper. (Issue II in Perkins's brief to this court.)

A.
Perkins contends that "the trial court committed reversible error by failing to instruct the jury on the only offense which accurately embodied the defense's theory of the case, specifically felony-murder where the underlying felony was kidnapping in the second degree."[16] (Perkins's brief to this court, p. 28.) Because Perkins did not request this instruction, and because he did not object to the trial court's failure to give such an instruction, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
Section 13A-6-2(a)(3), Ala.Code 1975, states that a person commits the crime of felony murder if "[h]e commits or attempts to commit arson in the first degree, burglary in the first or second degree, escape in the first degree, kidnapping in the first degree, rape in the first degree, robbery in any degree, sodomy in the first degree or any other felony clearly dangerous to human life and, in the course of and in furtherance of the crime that he is committing or attempting to commit, or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person." By statutory definition, the felony murder doctrine is invoked only if the underlying felony is a first-degree kidnapping; a person cannot be guilty of felony murder if he committed a second-degree kidnapping.
In Conway v. State, 489 So.2d 641 (Ala. Cr.App.1986), this court stated:
"Here, the jury's verdicts of not guilty of kidnapping in the first degree and guilty of felony-murder were mutually exclusive because, by statutory definition, felony-murder involves causing a death during the commission or attempt to commit certain specific felonies including kidnapping in the first degree. *1119 Alabama Code 1975, § 13A-6-2(a)(3). Because of the very definition of the offenses, the defendant could not be guilty of felony-murder if he only committed kidnapping in the second degree. Conversely, if the defendant was guilty of felony-murder, he could not have been guilty of kidnapping in the second degree, but must have been guilty of kidnapping in the first degree."
489 So.2d at 642 (emphasis added). Because second-degree kidnapping is not a felony that invokes the felony murder doctrine, Perkins could not have been guilty of felony murder if he committed a kidnapping in the second degree, as he contends. Thus, we find no error, plain or otherwise, as to this claim.

B.
Perkins also contends that in charging the jury on the capital offense of murder during a kidnapping in the first degree, the trial court failed to "define for the jury the exceptionally vague and overly broad element of `violate or abuse sexually.'" (Perkins's brief to this court, p. 35.) Because Perkins did not object to this portion of the trial court's instructions, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
The trial court's instructions were materially identical to those set out in the Alabama Proposed Pattern Jury Instructions for Use in the Guilt Stage of Capital Cases Tried Under Act No. 81-178. "A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error." Price v. State, 725 So.2d 1003, 1058 (Ala.Cr.App. 1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). We have reviewed the trial court's jury instructions on the capital offense of murder committed during a kidnapping in the first degree, and we hold that the trial court correctly charged the jury on all elements of the offense. Thus, there was no error, plain or otherwise, as to this matter.

C.
Perkins next contends that the trial court's instruction on voluntary intoxication was "manifestly erroneous" because, he says, it went beyond the pattern jury instructions and required the jury to find that he was legally insane due to intoxication before it could apply the defense of intoxication to negate his intent. (Perkins's brief to this court, p. 38.) Perkins did not object to this instruction at trial; thus, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
The trial court instructed the jury on voluntary intoxication as follows:
"Intoxication of the Defendant, whether voluntary or involuntary, may be considered by the jury whenever it is relevant to negate an element of the offense charged, such as intent. However, mere drunkenness voluntarily produced is never a defense against a criminal charge unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act. A specific, criminal intent is an essential element of the crimes of murder during kidnapping in the first degree, intentional murder and felony murder in this case.
"Partial intoxication will not avail to disprove the specific intent. It must be of such character and extent as to enable the accused incapable of consciousness that he is committing a crime, incapable of discriminating between right and wrong, stupefaction of the reasoning faculties. Proof that the accused was merely drunk or intoxicated at the time of the commission of the offense without more is insufficient to show that the *1120 accused was legally incapable of performing [sic] the specific intent required in murder during kidnapping in the first degree, intentional murder and felony murder in this case. The question of whether the accused's condition rendered him incapable of harboring the special intent is for you, the jury, to decide."
(R. 2705-06.)
In Ex parte Bankhead, 585 So.2d 112 (Ala.1991), the Alabama Supreme Court held that an instruction on intoxication almost identical to the instruction cited above was proper. In so doing, the court stated:
"In Jones v. State, 362 So.2d 1303, 1315 (Ala.Cr.App.1978), the Court of Criminal Appeals held that the intoxication, `must be of such character and extent as to render the accused incapable of consciousness that he is committing a crime.' Also, this Court has stated that `[m]ere drunkenness, voluntarily produced, is never a defense against a criminal charge, and can never palliate or reduce the grade of an offense, unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act.' Gautney v. State, 284 Ala. 82, 88, 222 So.2d 175 (1969), quoting Walker v. State, 91 Ala. 76, 82, 9 So. 87, 89 (1891)(emphasis omitted). Intoxication `must be so excessive as to paralyze the mental facilities, and render the accused incapable of forming or entertaining the design to take life.' Id. The degree of intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity. Crosslin v. State, 446 So.2d 675 (Ala.Cr.App.1983), appeal after remand, 489 So.2d 680 (Ala. Cr.App.1986), citing Maddox v. State, 31 Ala.App. 332, 334, 17 So.2d 283, 285 (1944)(other citations omitted).
"Bankhead contends that the court's instruction requiring that the jury, in order to find a drunkenness defense applicable, had to find Bankhead insane due to intoxication, was prejudicial. We disagree. In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. Lister v. State, 437 So.2d 622 (Ala.Cr.App.1983). The same standard is applicable in homicide cases. Crosslin, supra. Although intoxication in itself does not constitute a mental disease or defect within the meaning of § 13A-3-1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. § 13A-3-2. The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. A jury is capable of determining whether a defendant's intoxication rendered it impossible for the defendant to form a particular mental state. The trial court's instructions on intoxication were proper under Alabama law."
585 So.2d at 120-21. Accordingly, we find no error, plain or otherwise, in the trial court's jury instruction on voluntary intoxication.

D.
Finally, Perkins contends that the trial court's instruction on circumstantial evidence was "hopelessly misleading and confusing." (Perkins's brief to this court, p. 42.) Specifically, he contends that the following sentence should have been omitted from the instruction: "If the evidence is sufficient to show a guilty act by some person and someone other than Defendant *1121 or a number of persons may be shown with equal reason and logic to have committed the guilty act, then the circumstantial evidence would be subject to a reasonable hypothesis consistent with the innocence of the accused." (R. 2714-15.) He maintains that this sentence, in effect, told the jury that "the only way circumstantial evidence could not produce a guilty verdict would have been where the evidence pointed to the guilt of another party." (Perkins's brief to this court, p. 42.) Because no one other than Perkins was implicated in the crime, he concludes, the instruction effectively prohibited the jury from returning a not guilty verdict.
Initially, we note that Perkins did object to this portion of the trial court's charge at trial. However, when the court offered to reread the instruction to the jury without the complained-of sentence, Perkins refused the offer. He then expanded his objection to include a substantial portion of the circumstantial-evidence charge, and refused to allow the trial court to reread the instructions based on his initial objection to the above-cited sentence, arguing that the entire last half of the charge should have been omitted. The trial court denied Perkins's request to reread the instruction absent the entire last half (correctly finding that an instruction so edited would be an incorrect statement of the law), but again offered to reread the charge without the complained-of sentence. Again, Perkins refused the offer. On appeal, Perkins challenges only the single sentence that the trial court offered to remove from the chargean offer that he refused, not once, but twice. Any error here was clearly invited by Perkins himself.
"`"A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions."'" Slaton v. State, 680 So.2d 879, 900 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Campbell v. State, 570 So.2d 1276, 1282 (Ala.Cr.App.1990). "An invited error is waived, unless it rises to the level of plain error." Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991). "When reviewing a trial court's instructions, `"the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather, considered together."'" Maples v. State, 758 So.2d 1, 65 (Ala.Cr.App.1999). "A trial court has broad discretion in its formulation of jury instructions." Id. Viewed as a whole, the trial court's instructions on circumstantial evidence were not misleading or confusing, nor did they improperly convey to the jury that it had to return a verdict of guilty unless the evidence implicated someone other than Perkins in the crime. Contrary to Perkins's contention, the instructions were an accurate reflection of the law on circumstantial evidence; they correctly conveyed the definition of circumstantial evidence and they correctly explained the burden of proof required to sustain a conviction based in whole or in part on circumstantial evidence. Accordingly, we find no error, plain or otherwise, as to this claim.

XXVI.
Perkins contends that because he was not given pretrial notice of the State's intention to introduce evidence of two prior rape convictions to establish the aggravating circumstances that he had been previously convicted of another capital offense or felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975, and that he was under a sentence of imprisonment at the time of the current offense, see § 13A-5-49(1), *1122 Ala.Code 1975, evidence of the convictions was inadmissible to prove the aggravating circumstances and its admission denied him due process. (Issue XXXII in Perkins's brief to this court.) Perkins did not object to this lack of pretrial notice (Perkins was given notice during the guilt phase of his trial), nor did he object to the admission of these convictions on the grounds that he did not receive adequate notice. Thus, we may review this claim only for plain error. Rule 45A, Ala. R.App.P.
In Bush v. State, 695 So.2d 70 (Ala.Cr. App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), this court stated:
"The aggravating circumstances enumerated in § 13A-5-49 that may lead to the imposition of the death penalty in a capital case are not elements of the offense and are not required to be set forth in the indictment. Dobard v. State, 435 So.2d 1338, 1347 (Ala.Cr.App. 1982), aff'd, 435 So.2d 1351 (Ala.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). A defendant has no right to advance notice of the state's intention to rely on any of the aggravating circumstances. Clark v. Dugger, 834 F.2d 1561, 1566 (11th Cir. 1987), cert. denied, 485 U.S. 982, 108 S.Ct. 1282, 99 L.Ed.2d 493 (1988); Knotts v. State, 686 So.2d 431 (Ala.Cr. App.1995); Ruffin v. State, 397 So.2d 277, 282 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981). The list of aggravating circumstances in § 13A-5-49 is exclusive and puts the defendant charged with a capital felony on notice of those circumstances against which the defendant may be required to defend. This statutory notice satisfies constitutional requirements."
695 So.2d at 87. Accordingly, we find no error, plain or otherwise, as to this claim.

XXVII.
Perkins contends that the trial court erred, for various reasons, in permitting the State to use his 1991 first-degree rape conviction (for the rape of B.P.) to prove the aggravating circumstance that he had previously been convicted of a violent felony. See § 13A-5-49(2), Ala.Code 1975.

A.
First, Perkins contends that the trial court erred in allowing the State to use his 1991 rape conviction because, he says, the State failed to properly prove the existence of that conviction. (Issue XXVII in Perkins's brief to this court.)
A review of the record reveals the following facts relevant to this claim. At the beginning of the sentencing hearing before the jury, the State offered into evidence a certified case action summary sheet of Perkins's 1991 rape conviction. Perkins objected to the admission of the case action summary because it contained what he argued was additional irrelevant information. The State agreed to remove the irrelevant information and offer a corrected copy at a later time. Perkins then objected on the grounds that the summary failed to show that he had been represented by an attorney when he pleaded guilty or that his guilty plea was knowing and voluntary. The trial court never ruled on Perkins's objection. However, the record reveals that the State failed to subsequently offer a copy of the corrected case action summary to prove the prior conviction. Instead, during closing arguments, the State argued that B.P.'s testimony during the guilt phase of the trialthat Perkins had pleaded guilty to raping her and had been sentenced to 99 years' imprisonmentwas sufficient to prove Perkins's *1123 1991 rape conviction as an aggravating circumstance. Perkins's objected to the State's argument and moved for a mistrial, contending that the State's argument was improper because the existence of the 1991 conviction had not been proven. (See Part XXX of this opinion wherein we hold that the prosecutor's argument in this regard was proper.) The trial court overruled Perkins's objection. At the sentencing hearing before the trial judge, the State did introduce into evidence a certified copy of the case action summary sheet of Perkins's 1991 conviction.
On appeal, Perkins contends that the testimony of B.P. during the guilt phase of his trial was insufficient to prove his 1991 conviction. He maintains that the only way to prove a prior conviction to use as an aggravating circumstance is through a certified copy of the case action summary sheet. We disagree.
The State has the burden at the sentencing hearing of proving beyond a reasonable doubt the existence of any aggravating circumstance. See § 13A-5-45(e), Ala.Code 1975. Although a prior conviction may be proved by a properly certified case action summary sheet, there is no requirement that the prior conviction can be proved only by this type of documentary evidence. See Smith v. State, 727 So.2d 147 (Ala.Cr.App.1998), aff'd, 727 So.2d 173 (Ala.), cert. denied, 528 U.S. 833, 120 S.Ct. 91, 145 L.Ed.2d 77 (1999); and DeBruce v. State, 651 So.2d 599 (Ala.Cr. App.1993), aff'd, 651 So.2d 624 (Ala.1994). Perkins never denied that he had been convicted of raping B.P., and still does not deny it on appeal. In fact, it was Perkins himself who elicited testimony that he had been convicted of rape. During cross-examination of B.P. by Perkins's counsel during the guilt phase of Perkins's trial, the following occurred:
"[Perkins's counsel]: [B.P.], now Roy has already pled guilty to doing this to you; right?
"[B.P.]: Yes, sir.
"[Perkins's counsel]: And he's in the penitentiary now for 99 years for what you're talking about; is that right?
"[B.P.]: Yes, sir."
(R.1911.) In addition, during closing arguments at the guilt phase, Perkins's counsel stated the following:
"Then they [the State] want to try him on the case of [B.P.]. He's pleaded guilty to that and is serving, as he said, a 99 year sentence on that."
(R. 2633.) Perkins essentially admitted the 1991 rape conviction during the guilt phase of his trial. Thus, that conviction was proven for purposes of § 13A-5-45(e), Ala.Code 1975, at his sentencing hearing. See Smith, supra.
Moreover, even absent Perkins's admission, the State sufficiently proved the 1991 conviction, and the fact that Perkins was represented by counsel at the guilty plea for that offense, by introducing the case action summary sheet into evidence at the sentencing hearing before the trial judge. The case action summary sheet clearly indicated that Perkins was represented by counsel when he pleaded guilty to raping B.P. Thus, we find no merit to Perkins's claim that the State failed to prove his 1991 rape conviction.
Perkins also contends that the State could not use his 1991 conviction to establish the aggravating circumstance that he had previously been convicted of a violent felony because, he says, the State failed to prove that his guilty plea was knowing and voluntary. In Bush v. State, 695 So.2d 70 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), this court stated:

*1124 "The appellant's contention that the trial court should not have relied on his prior conviction because the state failed to prove that his guilty plea was knowingly and voluntarily entered is, likewise, without merit. Such an assertion amounts to a collateral attack on his [prior] conviction. The proper forum for attacking the validity of the prior conviction would be by Ala.R.Crim.P. 32 postconviction petition in the court of conviction. Ex parte Madden, 602 So.2d 1192 (Ala.1991); Johnson v. State, 541 So.2d 1112 (Ala.Cr.App.1989)."
695 So.2d at 91. Accordingly, we find no error as to this claim.

B.
Second, Perkins contends that the trial court erred in admitting evidence of his 1991 rape conviction because, he says, only convictions secured before the date of the charged offense can be used to establish an aggravating circumstance. (Issue XXXV in Perkins's brief to this court.) Perkins did not object to the use of this conviction on these grounds at the penalty phase of his trial; thus, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
Contrary to Perkins's contention, any conviction secured before the date of the sentencing hearing could be used to establish the aggravating circumstance of a prior violent felony. Section 13A-5-39(6), Ala.Code 1975, specifically addressing the terms "previously convicted" and "prior criminal activity," states: "As used in Sections 13A-5-49(2) [aggravating circumstances] and 13A-5-51(1) [mitigating circumstances], these terms refer to events occurring before the date of the sentencing hearing." See Ex parte McWilliams, 640 So.2d 1015 (Ala.1993), on return to remand, 666 So.2d 89 (Ala.Cr.App.), aff'd, 666 So.2d 90 (Ala.1995), cert. denied, 516 U.S. 1053, 116 S.Ct. 723, 133 L.Ed.2d 675 (1996); Smith v. State, 698 So.2d 189 (Ala. Cr.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). Accordingly, we find no error, plain or otherwise, as to this claim.

C.
Finally, Perkins contends that the trial court erred in relying on his 1991 rape conviction to establish the aggravating circumstance that he had previously been convicted of a violent felony, see § 13A-5-49(2), Ala.Code 1975, because, he says, although he was represented by counsel when he pleaded guilty to the rape charge, his counsel was laboring under a conflict of interest, and therefore, he argues, the conviction was unconstitutional. (Issue XXXVII in Perkins's brief to this court.)
As stated above, at the sentencing hearing before the trial court, the State introduced into evidence a certified copy of the case action summary sheet from Perkins's 1991 guilty plea conviction for rape in the first degree. Perkins objected to the summary sheet on the grounds that, although the sheet reflected that he was represented by counsel, his counsel had a conflict of interest while he was representing Perkins and Perkins did not waive that conflict before pleading guilty. The trial court overruled Perkins's objection.
On appeal, Perkins maintains that "[o]nce defense counsel brought to [the judge's] attention the possibility that Mr. Perkins's prior conviction was tainted by his counsel's conflict of interest, it was the judge's duty to inquire further into whether that purported conflict rendered the prior conviction unconstitutional and thus incapable of supporting the prior violent felony circumstance." (Perkins's brief to *1125 this court, p. 210.) This argument is meritless.
Perkins's contention is nothing more than a collateral attack on his previous conviction. As stated above, the proper forum for such an attack is a Rule 32, Ala.R.Crim.P., petition for postconviction relief. See Bush v. State, 695 So.2d 70 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). Contrary to Perkins's contention, the trial court is under no duty to address a defendant's collateral attack on a prior conviction during the sentencing phase of a capital murder trial. Accordingly, we find no error as to this claim.

XXVIII.
Perkins contends that the trial court erred in allowing the State to introduce evidence regarding the details of a 1983 conviction for second-degree rape at his sentencing hearing to prove the aggravating circumstance that he was under a sentence of imprisonment when he murdered Mrs. Gilliam, see § 13A-5-49(1), Ala.Code 1975. (Issue XXX in Perkins's brief to this court.) In a related argument, he contends that the prosecutor's reference to the details of his 1983 conviction during opening statements at the penalty phase of his trial constituted prosecutorial misconduct and warrant a reversal of his death sentence. (Issue XXVIII.B in Perkins's brief to this court.) Specifically, Perkins claims that to prove that he was under a sentence of imprisonment at the time of the now-charged offense, the State did not have to reveal the nature of the crime for which he was on parole or the details surrounding it because, he says, the question is whether he was under a sentence of imprisonment, not why he was under a sentence of imprisonment. Thus, he concludes, any evidence about the nature of his prior conviction or the facts surrounding it was irrelevant and prejudicial.
Perkins complains about the following comment during the prosecutor's opening statement:
"Now the way the procedure works is, the State has got to prove beyond a reasonable doubt that aggravating circumstance exist. In this case, we've already proven one by the coming back of guilt of murder during a kidnapping, that's an aggravating circumstance we've already shown. We anticipate and we've got to prove beyond a reasonable doubt though there will be two other aggravating circumstances. In this case, I think literally, its [paragraph] one under the Code, that this defendant was on parole for a 1983 rape in the second degree of a mentally deficient 14-year-old when he committed this offense. I think the case, we will submit, its 83-009 from Fayette County. And you've heard the evidence, we also submit, other than the kidnapping of Cathy Gilliam and the facts surrounding that which is also another aggravating that's [paragraph] four, I believe, under the Codewe will also submit the aggravating circumstance, I think literally it's number two, that prior to this sentencing date, he was convicted of a crime of violence, specifically in this case, [B.P.'s] rape case."
(R. 2775-76.) (Emphasis added to indicate that portion of the argument complained of on appeal). Perkins did not object to this statement. In addition, Perkins complains of the following, which occurred during direct examination of Belinda Medders, his parole officer:
"[Prosecutor]: And did you have occasion to become familiar with Mr. Perkins concerning a Fayette County case 83-009?

*1126 "[Medders]: I'm not sure of the case number, but it was a Fayette County case on which he was paroled.
"[Prosecutor]: Okay. And what type of conviction was that?
"[Medders]: It was a rape in the second degree.
"[Prosecutor]: And, I believe, it was a 14-year-old
"[Perkins's counsel]: Well now, Judge, at this time, we're going to object to going into any facts about any other case. We object to that.
"The Court: State your grounds.
"[Prosecutor]: I'll rephrase the question.
"The Court: All right."
(R. 2793-94.) The prosecutor then questioned Medders about Perkins's parole. The prosecutor did not elicit anything else regarding the details of the prior conviction. Later, at the conclusion of the sentencing hearing, during the charge conference, Perkins's counsel moved for a mistrial on the grounds that the State had mentioned the details of Perkins's 1983 rape conviction during its opening statement and then had failed to introduce any evidence regarding that conviction. The trial court denied the motion, but offered to give the jury a curative instruction to disregard the details surrounding the 1983 conviction; Perkins refused the offer. Because Perkins failed to object to the prosecutor's opening statements, because he failed to receive an adverse ruling to his objection during the questioning of Medders, because his motion for a mistrial was untimely, and because he refused the trial court's offer of a curative instruction, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
While we agree that the details surrounding Perkins 1983 rape conviction, i.e., the fact that the victim was a 14-year-old mentally deficient child, were irrelevant to proving the aggravating circumstance that Perkins was under a sentence of imprisonment, and therefore, should not have been admitted, we do not see how Perkins was harmed by the prosecutor's attempt to elicit that testimony or by the prosecutor's reference to that evidence in his opening statement. It is well settled that the harmless error rule applies to capital cases at the sentencing hearing. Ex parte Whisenhant, 482 So.2d 1241 (Ala. 1983); Lawhorn v. State, 581 So.2d 1159 (Ala.Cr.App.1990), aff'd, 581 So.2d 1179 (Ala.), cert. denied, 502 U.S. 1050, 112 S.Ct. 919, 116 L.Ed.2d 818 (1992). For error during the sentencing phase of a capital trial to be harmless, this court must be satisfied beyond a reasonable doubt that, notwithstanding the error, the jury's verdict would have been the same. Ex parte Whisenhant, 482 So.2d 1247, 1248 (Ala.1984). In this case, we do not believe that the prosecutor's limited reference once during opening statements and once during the questioning of Perkins's parole officerto the 14-year-old rape victim had any effect on the jury's verdict.
Moreover, we point out that, although we hold that the details surrounding a prior conviction used to prove the aggravating circumstance that the defendant was under a sentence of imprisonment are irrelevant, and thus, inadmissible at the sentencing phase of a capital trial, the nature of the prior convictioni.e., what the defendant was convicted foris very relevant to the weight the jury gives to that aggravating circumstance. For example, whether the defendant was under a sentence of imprisonment for a misdemeanor or for a felony is extremely relevant to the weight to be assigned to that aggravating circumstance. Although we recognize that sometimes the nature of the *1127 past crime will work against a defendant, we also recognize that sometimes the nature of the crime will work in favor of a defendant. Thus, contrary to Perkins's contention, Medders's testimony that, at the time of Mrs. Gilliam's murder, Perkins was on parole for a second-degree rape conviction was properly admitted during his sentencing hearing.

XXIX.
Perkins contends that "the prosecutor engaged in severe misconduct during the penalty phase" of his trial. (Issue XXVIII in Perkins's brief to this court.)

A.
Perkins contends that the prosecutor's cross-examination of defense experts Ed Owens and Dr. John Goff violated his Fifth Amendment privilege against self-incrimination. Specifically, he claims, in an extension of another argument raised on appeal (see Part IV of this opinion), that the prosecutor's cross-examination of Owens and Dr. Goff regarding his prison records and a prison-ordered mental evaluation, and the results of a Minnesota Multiphasic Personality Inventory ("MMPI") administered by Dr. Goff as part of his evaluation of Perkins, was improper and amounted to prosecutorial misconduct.
At the sentencing phase of his trial, Perkins called Owens and Dr. Goff to testify regarding Perkins's family history and his mental status in order to establish the statutory mitigating circumstances that Perkins was under the influence of extreme mental or emotional disturbance at the time of the crime, see § 13A-5-51(2), Ala.Code 1975, and that he did not have the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, see § 13A-5-51(6), Ala.Code 1975, and to establish other nonstatutory mitigating circumstances. Owens testified that Perkins grew up in a poverty-stricken household, that he was subjected to physical abuse by his stepfather, that he witnessed the sexual abuse of his sister by his stepfather, and that his family had a history of alcohol abuse. Owens stated that a person subjected to such surroundings as a child would typically have poor impulse control and poor interpersonal skills, and would be socialized to accept violence. Owens characterized Perkins's family as "severely dysfunctional." (R. 2835.) On cross-examination, the prosecutor asked Owens what sources he used as a basis for his opinion. Owens stated that he considered interviews with Perkins, interviews with Perkins's family, Perkins's medical records, and Perkins's prison records. Included in the prison records, Owens said, was a mental evaluation by prison officials that concluded that Perkins was antisocial and paranoid. Owens admitted that he read this evaluation, factored it into his opinion, and even referred to it in his written report. Perkins objected to the prosecutor's questions regarding the prison-ordered mental evaluation on the grounds that the prison records were not in evidence and that Owens could not testify regarding the conclusions of someone else. Perkins's counsel was permitted to question Owens on voir dire to determine the extent of his reliance on the prison records. After this questioning, Perkins's counsel did not renew his objection, and the trial court never ruled on his previous objection.
Dr. Goff testified that he administered a battery of tests on Perkins, including a mental status exam, a brain functioning test, and an MMPI. In addition, he interviewed Perkins and Perkins's family, and looked at Perkins's medical and prison records as part of his evaluation. Dr. Goff diagnosed Perkins as an alcoholic with borderline personality disorder with paranoid *1128 features. In addition, he stated that Perkins had borderline intellectual functioning with an overall IQ of 76. Dr. Goff stated that it was his opinion that Perkins was suffering from severe emotional disturbance at the time of the crime and that he was heavily intoxicated at the time of the crime, but that, in general, Perkins knew the difference between right and wrong. On cross-examination, the prosecutor questioned Dr. Goff regarding the reference in his report to the MMPI results being invalid. Dr. Goff stated that there were several possible reasons for the results to be invalid, including the possibility that Perkins deliberately faked the results to make it appear as if he were mentally ill. Perkins did not object to the prosecutor's cross-examination of Dr. Goff regarding the MMPI results.
On appeal, Perkins contends that the prosecutor's cross-examination of Owens and Dr. Goff regarding his prison-ordered mental evaluation and his MMPI results violated his privilege against self-incrimination because, he says, he was compelled to undergo the tests. Initially, we note that we may review this claim only for plain error. Rule 45A, Ala.R.App.P. Perkins did not object to the prosecutor's cross-examination of Dr. Goff regarding the MMPI results. Although Perkins did object to the prosecutor's cross-examination regarding his prison-ordered mental evaluation, he objected on the grounds that his prison records were not in evidence and that Owens could not testify regarding another's opinion; he did not assert as grounds his privilege against self-incrimination. Specific grounds of objection waive all other grounds on appeal. See Brown v. State, 701 So.2d 314 (Ala.Cr. App.1997). In addition, we note that when reviewing allegedly improper prosecutorial conduct in questioning witnesses, we must consider the impact of the challenged question in the context of the particular trial and not in isolation or in the abstract. Henderson v. State, 583 So.2d 276 (Ala.Cr. App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).
We see no misconduct on the part of the prosecutor in his cross-examination of Owens and Dr. Goff. As stated in Part IV of this opinionwherein we held that the prison records and the MMPI results were discoverablethe State, like the defendant, is entitled to a thorough and sifting cross-examination. After Owens testified regarding his social assessment of Perkins, "the jury was entitled to hear any and all the information he used in arriving at his opinion." Varner v. State, 418 So.2d 961, 963 (Ala.Cr.App.1982). In addition, although the MMPI results were invalid, and, according to Dr. Goff's report, were "not particularly helpful," Dr. Goff nevertheless considered the results in forming his evaluation of Perkins. (C. 326.) These materials were proper subjects for crossexamination.
Moreover, we find that neither of these materials violated Perkins's Fifth Amendment privilege against self-incrimination. Perkins placed his mental state at issue by requesting a mental evaluation and then presenting two experts to testify to his mental state and his socialization from childhood. The State was clearly entitled to rebut that evidence. Doing so was not a violation of Perkins's Fifth Amendment rights. See Buchanan v. Kentucky, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). In Buchanan, the United States Supreme Court stated:
"[I]f a defendant requests [a psychiatric] evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested.

*1129 The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution."
483 U.S. at 422-23, 107 S.Ct. at 2916-17. See also McWilliams v. State, 640 So.2d 982 (Ala.Cr.App.1991), aff'd in pertinent part, 640 So.2d 1015 (Ala.1993); Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.), on return to remand, 672 So.2d 1353 (Ala.Cr. App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996); and Braswell v. State, 371 So.2d 992 (Ala.Cr.App.1979). The experts reports included references to both the MMPI results and Perkins's prison records; thus, they were properly used by the State to rebut Perkins's claim of mental illness. Merely because the prosecutor's cross-examination of Perkins's experts was harmful to Perkins's defense does not elevate it to the level of prosecutorial misconduct or to a violation of Perkins's constitutional rights. Contrary to Perkins's contention, he is not entitled to have the jury informed only of materials favorable to him.
Accordingly, we find no error, plain or otherwise regarding this claim.

B.
Perkins also contends that the prosecutor made improper comments about the victim and improper references to victimimpact evidence during his opening statement at the penalty phase. Perkins did not object to these comments, and, thus, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court held that victim-impact evidence was admissible for consideration by the jury at the sentencing phase of a capital murder case. "`[A] prosecutor may present and argue evidence relating to the victim and the impact of the victim's death on the victim's family in the penalty phase of a capital trial.'" Hyde v. State, 778 So.2d 199 (Ala.Cr.App.1998), quoting McNair v. State, 653 So.2d 320, 331 (Ala.Cr.App. 1992), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995). The prosecutor may also properly refer to the victim's characteristics at the sentencing stage of a capital case. Payne, 501 U.S. at 824-25, 111 S.Ct. 2597. "The United States Supreme Court's holding in Payne v. Tennessee, `was based in large measure on the premise that this type of evidence related to the harm done by the defendant and, consequently, was a valid consideration in determining punishment to be imposed.'" Price v. State, 725 So.2d 1003, 1034 (Ala. Cr.App.1997), aff'd, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999), quoting McNair, 653 So.2d at 331. We have reviewed the prosecutor's allegedly improper remarks about Mrs. Gilliam and conclude that those comments were proper comments about her characteristics. "`The State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered an individual, so too the victim is an individual whose death represents a unique loss to society and, in particular, [to the victim's] family.'" Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___ (Ala.Cr.App.1998), quoting Payne, 501 U.S. at 825, 111 S.Ct. 2597. Accordingly, we find no error, plain or otherwise, in the prosecutor's comments about Mrs. Gilliam or his reference to possible victim-impact evidence during opening statements.

XXX.
Perkins contends that the prosecutor made several comments during closing arguments *1130 at the sentencing phase of his trial that he says were improper and prejudicial and that he says require a reversal of his death sentence. (Issue XXXI in Perkins's brief to this court.) Perkins objected to only one of the comments he now complains of on appeal; thus, we may review the remainder of his claims only for plain error. Rule 45A, Ala.R.App.P.
Initially, "[w]e note that defense counsel's failure to object to these comments does not prevent our review. However, the failure to object should be weighed as part of our evaluation of the comments, because the failure to object may suggest that the defense did not consider the comments to be particularly harmful. Ex parte Payne, 683 So.2d 458, 465 (Ala.1996), cert. denied, 520 U.S. 1146, 117 S.Ct. 1319, 137 L.Ed.2d 481 (1997), citing, Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).

A.
First, Perkins contends that the prosecutor's comments regarding retribution and society's right to self-defense were improper and prejudicial. Because Perkins did not object to these comments by the prosecutor, we may review this claim only for plain error. Rule 45A, Ala. R.App.P.
The comments Perkins challenges are emphasized, and set out in the context in which they were made, as follows:
"This trial isn't a debate over the pros and cons of the death penalty. The people of this state and the courts of this state have already decided that the death penalty is appropriate in some cases. And you have all said that in some cases it is appropriate. A return of the death penalty in this case can be an act of self-defense by society. Society has to defend itself also. Everyone in our society has a right to be free from being murdered. And the poor, socioeconomic situation, a hard time background, is no excuse because there are millions of people in this country who have come from hard backgrounds, poor backgrounds, difficult backgrounds, perhaps some of you. Millions of people in this country have suffered untold hardships. But they haven't committed capital murder. Millions of them have made good citizens. They didn't go around kidnapping and murdering.
"The death penalty falls into one of three categories: We have punishments and penalties for rehabilitation. I don't thinkI submit to you, that's not appropriate or applicable in this case. Retribution, because society, I submit to you, needs also to feel that justice has been done, that the extreme penalty has been imposed for a horrendous crime. Society needs to feel that justice has been done and deterrence, to deter others from committing crimes like this so that people, hopefully, will feel safe in their own homes, hopefully, so that society can defend itself."
(R. 2982-83.)
This court has repeatedly upheld similar arguments in capital cases. See McWilliams v. State, 640 So.2d 982, 1001 (Ala.Cr. App.1991), aff'd in pertinent part, 640 So.2d 1015 (Ala.1993) ("[d]eterrence, retribution, and society's right to self-defense" are proper subjects of prosecutorial argument); Holladay v. State, 549 So.2d 122, 131 (Ala.Cr.App.1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989) (retribution argument held proper); and Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App. 1987), aff'd in pertinent part, reversed on other grounds, 523 So.2d 1118 (Ala.1988) ("[i]t is proper to argue deterrence in a sentencing phase closing argument"). In *1131 Kuenzel v. State, 577 So.2d 474 (Ala.Cr. App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), this court stated:
"`In Alabama, the rule is that a district attorney in closing argument may make a general appeal for law enforcement. Embrey v. State, 283 Ala. 110, 118, 214 So.2d 567 (1968).
"`This line of argument is "within the latitude allowed prosecutors in their exhortations to the jury to discharge their duties in such a manner as, not only to punish crime, but to protect the public from like offenses and as an example to deter others from committing like offenses." Varner v. State, 418 So.2d 961 (Ala.Cr.App.1982); Cook v. State, 369 So.2d 1243 (Ala.Cr.App.1977), affirmed in part, reversed in part on other grounds, 369 So.2d 1251 (Ala. 1978)....'"
577 So.2d at 503, quoting Ex parte Waldrop, 459 So.2d 959, 962 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). "`An argument ... urging the jurors to consider the deterrent effect of the [death] penalty, is not improper.'" Kuenzel, 577 So.2d at 504, quoting Brooks v. Kemp, 762 F.2d 1383, 1409 (11th Cir.1985), vacated on other grounds, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986). The complained-of portion of the prosecutor's argument was a classic argument for deterrence, and was therefore proper. Accordingly, we find no error, plain or otherwise, regarding this claim.

B.
Second, Perkins complains about the following comments made by the prosecutor:
"Well, the next thing [defense counsel] said is that we can consider, lower IQ. Well that's a new one on me. I don't thinkI don't think that one even deserves a comment. He said, he never had a chance. But he's not big on giving chances either, Roy Perkins is; or is he? Is he big on giving people chances?
"He said you should take into account his drinking and popping pills. Is that something we should consider as good and worthwhile, to spare him for?"
(R. 2980.) The prosecutor further stated, regarding Dr. Goffs mental evaluation of Perkins:
"Ladies and gentlemen of the jury, that's angry, out of control, drunk, is what's described in this report who is malingering on the MMPI to make himself look unavailable or has some effect on his ability to appreciate the criminality of his act."
(R. 2966.) Perkins maintains that the above-quoted comments by the prosecutor "severely mischaracterized mitigating evidence regarding Mr. Perkins's tragic background... improperly tried to persuade the jury to reject every bit of evidence tending to favor a sentence of life in prison, [and] impl[ied] that [the jury] should treat certain mitigating evidence as aggravating." (Perkins's brief to this court, p. 182.) Perkins did not object to these comments; therefore, we may review Perkins's claims only for plain error. Rule 45A, Ala.R.App.P.
After reviewing the prosecutor's closing argument in its entirety and examining the prosecutor's comments in the context of the entire trial, we find no error. Never did the prosecutor say or imply that the jurors should improperly use mitigating evidenceparticularly Perkins's alcohol abuse, low IQ, and mental state as an aggravating circumstance. To the contrary, the prosecutorspecifically told the jury that it had to consider all of the evidence submitted by Perkins in mitigation, and that it had to weigh that evidence against the evidence of the aggravating *1132 circumstances. Contrary to Perkins contention, the prosecutor did no more than suggest the inapplicability of certain mitigating factors, a permissible argument; the prosecutor never told the jury that "the law forbids consideration of such evidence as mitigating," as Perkins suggests. (Perkins's brief to this court, p. 184.) Reasonably construed, we do not believe that the prosecutor's argument could in any way have misled the jury into finding nonstatutory aggravating circumstances.
Moreover, we find that the prosecutor's argument that Perkins was drunk, out of control, and malingering was fully supported by the evidence presented by Perkins himself. Dr. Goff's report on Perkins's mental state diagnosed Perkins as an alcoholic with borderline personality disorder. Dr. Goff specifically stated in his report that Perkins's MMPI results were invalid, possibly because he had "malingered" or faked the results to make it appear that he was mentally ill. A prosecutor can properly comment on anything in evidence. Merely because that evidence was not favorable to Perkins does not make the prosecutor's argument improper.
Accordingly, we find no error, plain or otherwise, regarding this claim.

C.
Third, Perkins contends that the prosecutor improperly argued the aggravating circumstance that Perkins had been previously convicted of a violent felony, see § 13A-5-49(2), Ala.Code 1975, when, he says, his 1991 conviction had not been proven by the State. Because we hold in Part XXVII of this opinion that there was sufficient proof of the 1991 conviction, we find no error in the prosecutor's arguing that circumstance to the jury.

D.
Finally, Perkins contends that the prosecutor improperly suggested to the jury that it should return a verdict of death because Perkins had no remorse. During closing arguments, the prosecutor stated the following:
"The law and the evidence in the case support the death penalty; I submit to you. The weighing process that I told you about, I submit to you, is overwhelming. And this man who has, essentially, no sense of compassion, essentially, no empathy, no social conscience, accepts actual violence as normal and acceptable behavior, lack of respect for personal feelings and a disregard for the boundaries of normal decency, lacks a normal sense of guilt or remorse. That's the man the defense is asking to be spared. Those are the best reasons in the world for the death penalty."
(R. 2983-84.) Perkins maintains that the prosecutor's comment regarding his lack of remorse was improper because, he says, "a prosecutor may not argue that a defendant[] lack[s] remorse." (Perkins's brief to this court, p. 187.) In addition, he alleges that the "remorse argument" was an improper comment on his failure to testify. Because Perkins did not object to this statement by the prosecutor, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
Contrary to Perkins's contention, remorse is a proper subject of argument during the sentencing phase of a capital trial. See Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.1994), on return to remand, 672 So.2d 1353 (Ala.Cr.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996); Taylor v. State, 666 So.2d 36 (Ala. Cr.App.1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 *1133 S.Ct. 928, 133 L.Ed.2d 856 (1996); and Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). In Harris, this court held that a reference to the defendant's lack of remorse during the sentencing stage of the trial was not improper argument because the comment "was a proper inference from the evidence, because testimony had been introduced at trial that the appellant's reaction to being informed of her husband's death was so unemotional that she was questioned concerning her reaction." 632 So.2d at 536. Similarly, in Dobyne, this court held that a prosecutor's comment, during the sentencing phase of the trial, on the defendant's lack of remorse was a proper comment "on the appellant's demeanor when he made his statement to police." 672 So.2d at 1349.
Here, we find that the prosecutor's remark about Perkins's lack of remorse was a proper comment on the evidence presented by Perkins's own expert. Ed Owens, a social worker, testified to exactly what the prosecutor stated in his closing argumentsthat Perkins had no sense of compassion, no empathy, no social conscience, no respect for personal feelings, a total disregard for the boundaries of normal decency, and that he lacked a normal sense of guilt or remorse. Perkins cannot complain about the prosecutor reiterating his own expert's testimony. The prosecutor's remarks were proper comments on the evidence introduced by Perkins and did not constitute errorplain or otherwise.
Moreover, after reviewing the comments in context, this court is convinced that the prosecutor's reference to Perkins's lack of remorse was in no way a comment on his failure to testify, but was merely, as stated above, a recitation of the testimony of Perkins's own expert. See, e.g., Taylor, supra; Dobyne, supra.
Accordingly, we find no error, plain or otherwise, regarding this claim.

XXXI.
Perkins contends that the trial court committed several errors in its oral charge to the jury during the sentencing phase of his trial. (Issue XXXIII in Perkins's brief to this court.)

A.
First, Perkins claims that the trial court erred in instructing the jury on the aggravating circumstance that he had been previously convicted of a violent felony, see § 13A-5-49(2), Ala.Code 1975, because, he says, there was no evidence before the jury to support that circumstance. Because Perkins failed to object to this charge, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
Perkins's argument in this regard is merely a restatement of his previous argument that the trial court erred in permitting the State to use his 1991 conviction for the rape of B.P. to establish that he had been previously convicted of a violent felony because, he says, the State failed to prove the conviction. Because we held that the prior conviction was sufficiently proven, see Part XXVII of this opinion, the trial court's instruction on this aggravating circumstance was proper. Accordingly, we find no error, plain or otherwise, regarding this claim.

B.
Next, Perkins contends that the trial court erred in instructing the jury that the aggravating circumstance that the murder was committed during a kidnapping, see § 13A-5-49(4), Ala.Code 1975, had been proven beyond a reasonable doubt by virtue of the jury's guilt-phase verdict. He *1134 claims that the jury could not unanimously agree that the murder was committed during a kidnapping for purposes of sentencing because, he says, the jury's verdict at the guilt phase was not unanimous. He then restates his previous argument that the indictment was duplicitous and that the trial court erred in its guilt-phase instructions because it failed to give a specific unanimity instruction. Because we decided this guilt-phase issue adversely to Perkins (see Part I of this opinion), the trial court's instructions at the sentencing phase in this regard were likewise proper.

C.
Perkins also contends that the trial court's instructions on statutory mitigating circumstances were in error. Specifically, Perkins contends that because he presented evidence as to only two statutory mitigating circumstancesthat he was under severe emotional disturbance at the time of the crime, see § 13A-5-51(2), Ala. Code 1975, and that he was unable to appreciate the criminality of his conduct or to conform his conduct to the law, see § 13A-5-51(6), Ala.Code 1975the trial court's instruction listing all of the statutory mitigating circumstances in § 13A-5-51, "unduly emphasized the absence of [several] factors and invited the jurors to consider such absence as [an] aggravating [circumstance]." (Perkins's brief to this court, p. 195.) Because Perkins did not object to this instruction, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
The trial court's instructions were materially identical to those set out in the Alabama Proposed Pattern Jury Instructions for Use in the Sentence Stage of Capital Cases Tried Under Act No. 81-178. "A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error." Price v. State, 725 So.2d 1003, 1058 (Ala.Cr.App. 1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). We have reviewed the trial court's jury instructions in their entirety, and with Perkins's argument in mind, we find that the instruction on mitigating circumstances, which listed all the mitigators in § 13A-5-51, did not unduly emphasize the absence of evidence regarding certain factors. As we stated in Carroll v. State, 599 So.2d 1253, 1271 (Ala.Cr. App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994): "As a practical matter, it would be impossible for the jury to determine the existence of any statutory mitigating factor unless it had been instructed on what those factors were." Further, the jury was correctly instructed on the only aggravating circumstances it could consider in recommending sentence. Accordingly, we find no error, plain or otherwise, as to this matter.

D.
Perkins also contends that the trial court erred in failing to instruct the jury that it could consider mercy in arriving at its verdict. As Perkins did not request an instruction on mercy, nor did he object to the trial court's failure to give a mercy instruction, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
Contrary to Perkins's contention, it is well settled in Alabama that "[a] capital defendant is not automatically entitled to a mercy instruction." Boyd v. State, 715 So.2d 825, 846 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998). See also, Taylor v. State, 666 So.2d 36 (Ala.Cr. App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Rieber v. State, 663 So.2d 985 (Ala.Cr.App.1994), aff'd, 663 *1135 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995). In Kuenzel v. State, 577 So.2d 474, 495 (Ala. Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), this court stated that "[t]he Alabama provisions for the imposition of capital punishment nowhere mention mercy." Here, the trial court instructed the jury that its verdict should be based only on the evidence presented and the law as instructed by the court. The jury was instructed that it "must avoid any influence of passion, prejudice or any other arbitrary factor." (R. 3007-08.) In California v. Brown, 479 U.S. 538, 539, 107 S.Ct. 837, 838, 93 L.Ed.2d 934 (1987), the United States Supreme Court held that "an instruction informing jurors that they `must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling' during the penalty phase of a capital murder trial [does not violate] the Eighth and Fourteenth Amendments to the United States Constitution."
In addition, the trial court properly instructed the jury regarding its option to sentence Perkins to life imprisonment without the possibility of parole if it found that the aggravating circumstances did not outweigh the mitigating circumstances. The trial court's instructions on the existence of, and the jury's duty to weigh, the aggravating and mitigating instructions were also proper. In Williams v. State, 601 So.2d 1062 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992), this court stated:
"The jury may not recommend mercy without reason. See Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). The jury does not have an `unfettered option' to recommend a sentence of life without parole unless after weighing the aggravating and mitigating circumstances it finds that life without parole is warranted."
601 So.2d at 1081. Because the jury was properly instructed as to its duties, we find no plain error in the trial court's failure to sua sponte instruct the jury on mercy.

XXXII.
Perkins claims that his death sentence should be reversed because, he says, "the polling of the jury revealed that the jurors had not yet completed the deliberations process." (Issue XXXIV in Perkins's brief to this court, p. 198.) Perkins did not raise this issue in the trial court; therefore, we may review it only for plain error. Rule 45A, Ala.R.App.P.
After the jury returned its verdict of death, by a vote of 10-2, the following occurred:
"The Court: Okay. Ladies and gentlemen, I need to poll the jury. I should have asked about that first. But what we mean by that is that I'll be asking the question, if this is your verdict. And if it is your verdict, you nod your head up and downif you voted in favor of this verdict, you'll nod your head up and downyes. If you voted against this verdict, you'll nod your head side to side, no. Okay. As I point to you, you'll need to give that indication.
"(Eleven jurors indicate in the affirmative. One juror indicated in the negative.)
"The Court: Okay. Let me go through that again, ladies and gentlemen. Now if youwhen I point to you, if you did vote in favor of the verdict that the Defendant, Roy Edward Perkins, be punished by death, you'll need to nod up and down indicating yes.

*1136 "[Prosecutor]: Judge, sometimes there is confusion under this type of vote whether or not they should actually give what their vote was instead of whether or not this is the correct verdict of the jury, and sometimes there is some confusion concerning that.
"The Court: Okay. And is that the way you want the question asked, [defense counsel]; is this the correct verdict? "[Perkins's counsel]: No, sir. We want it asked just the way that you asked them.
"The Court: All right. Ladies and gentlemen, we'll need you to indicate now, if you voted for this verdict, nod your head up and down, yes. If you voted against this verdict, nod your head, no, side to side, okay, each one of you.
"(Ten jurors indicate in the affirmative. Two jurors indicate in the negative.)"
(R. 3020-22.)
Perkins contends that because the initial poll indicated that 11 jurors voted for death, rather than 10 as the verdict form indicated, at least "one juror had not yet reached a final decision as to what his or her vote would be," and thus, "the jury's written verdict did not represent the final decision of all the jurors." (Perkins's brief to this court, p. 198.) This argument is meritless.
It is obvious that what occurred during the polling process was not an indication that the jurors had not completed their deliberations, as Perkins contends, but that one of the jurorsthe "11th" juror who initially indicated a vote for death misunderstood the trial court's question. Clearly, that juror thought the court was asking if the verdict of 10-2 for death was the correct verdict of the jury, not whether he had voted for death or for life without parole. Upon the trial court rephrasing the question and polling the jury again, that juror then understood that he or she was required to indicate which way he or she voted, not whether the 10-2 verdict was correct. Accordingly, we find no error here, plain or otherwise.

XXXIII.
Perkins contends that the trial court's order sentencing him to death by electrocution was "tainted by a number of fundamental errors." (Issue XXXVI in Perkins's brief to this court, p. 200.)

A.
Perkins contends that the trial court erred in not finding that the capital offense was committed while he was under the influence of extreme mental or emotional disturbance, § 13A-5-51(2), Ala. Code 1975. Specifically, he claims that because he offered Dr. Goff's testimony that he was laboring under an extreme emotional disturbance, and that he had been on a drinking binge at the time of the crime, the trial court was required to find the existence of that statutory mitigating circumstance. He maintains that the trial court's failure to find this mitigator conclusively shows that the trial court failed to consider Dr. Goff's opinion. In addition, he claims that the trial court's consideration of his invalid MMPI results and Dr. Goff's testimony that he knew the difference between right and wrong was improper. This argument is meritless.
"`A sentencer in a capital case may not refuse to consider or be "precluded from considering" mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 71 L.Ed.2d 1, 102 S.Ct. 869, [874] (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 57 L.Ed.2d 973, 98 S.Ct. 2954, [2964-65] (1978)). The capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding *1137 the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).'"
Arthur v. State, 711 So.2d 1031, 1091 (Ala. Cr.App.1996), aff'd, 711 So.2d 1097 (Ala. 1997), quoting Bush v. State, 695 So.2d 70, 89 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997).
However, "[m]erely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact. Mikenas [v. State, 407 So.2d 892, 893 (Fla. 1981)]; Smith [v. State, 407 So.2d 894 (Fla.1981) ]." Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). In Carroll v. State, 599 So.2d 1253 (Ala.Cr. App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994), this court stated:
"We fully recognize that `[a] factfinder is not bound by expert testimony "even if all of the witnesses are presented by only one side."' Ellis v. State, 570 So.2d 744, 752 (Ala.Cr.App.1990). `In Alabama, opinion testimony of an expert witness is binding upon a jury only when such testimony concerns a subject which is exclusively within the knowledge of experts and the testimony is uncontroverted.' Jefferson County v. Sulzby, 468 So.2d 112, 116 (Ala.1985). `An expert's opinion, however, is not conclusive on the trial court, even though uncontroverted. See Kroger Co. v. Millsap, 280 Ala. 531, 196 So.2d 380 (1967). Rather, a trial court must look to the entire evidence and its own observations in deciding factual issues.' Williams v. City of Northport, 557 So.2d 1272, 1273 (Ala.Civ.App.1989), cert. denied, 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (1990). `Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact.' Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App.1984), affirmed, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985)."
599 So.2d at 1272.
Perkins contends that the evidence presented by Dr. Goff conclusively showed that he was suffering from an extreme mental or emotional disturbance at the time of the offense, and, he says, the trial court's failure to find that mitigating circumstance to exist indicates that the court ignored Dr. Goff's opinion. The sentencing order, however, clearly reflects that the trial court complied with the law in determining that death was the appropriate sentence. In its sentencing order, the trial court specifically stated that it had considered the testimony of Dr. Goff, including his conclusion that Perkins was suffering from an extreme mental or emotional *1138 disturbance and that Perkins had been drinking and taking drugs at the time of the crime, before finding that the mitigating circumstance did not exist. The trial court found that, although Perkins "had some degree of mental or emotional disturbance," the disturbance was not "extreme," and thus, did not support that statutory mitigating circumstance. (C. 250.) Instead, the trial court found the evidence to support the statutory mitigating circumstance that Perkins's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. See § 13A-5-51(6), Ala.Code 1975. In addition, he found Dr. Goffs diagnosis of Perkins to be a nonstatutory mitigating circumstance. Because the record reflects that the trial court considered the evidence presented by Perkins with regard to all mitigating circumstances, we believe the trial court carefully weighed the evidence when making its determination. Further, it is clear from a review of the entire record that the trial court understood its duty to consider all the evidence presented and that it did not abuse its discretion in finding that the statutory mitigating circumstance that Perkins was suffering from an extreme mental or emotional disturbance did not exist. See Ex parte Hart, 612 So.2d 536, 542 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993); Ex parte Jones, 520 So.2d 553, 555 (Ala.), cert. denied, 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988); Johnson v. State, 620 So.2d 679, 705-06 (Ala.Cr.App.1992), rev'd on unrelated grounds, 620 So.2d 709 (Ala.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993); and Bankhead v. State, 585 So.2d 97, 108 (Ala.Cr.App.1989), aff'd in pertinent part, 585 So.2d 112 (Ala. 1991).
Moreover, the trial court's consideration of Dr. Goffs testimony that Perkins knew the difference between right and wrong and of the possibility that Perkins's MMPI results were invalid because he purposely faked the results was proper. A trial court is required to consider all evidence offered by a defendant in mitigation. Here, Dr. Goffs report, which explained the possible reasons for the invalid MMPI results, and Dr. Goffs testimony that Perkins knew the difference between right and wrong was offered by Perkins as mitigation. Merely because the evidence was not actually mitigating does not permit the trial court to ignore it. If Perkins did not want this evidence considered by the trial court, he should not have offered it.
Accordingly, we find no abuse of the trial court's discretion in finding that Perkins was not laboring under an extreme mental or emotional disturbance at the time of the offense.

B.
Perkins contends that the trial court improperly considered certain portions of the presentence investigation report, which he says, were irrelevant and prejudicial. Specifically, he contends that the trial court erroneously considered his prior criminal history, including his juvenile adjudications and prior unadjudicated charges, and an "unwarned, uncounseled" statement he made during the presentence interview. (Perkins's brief to this court, p. 206.) Although Perkins objected to the presentence report being introduced into evidence at his sentencing hearing before the trial court, he objected on the grounds that the entire report was "one-sided" and was not "objective" (R. 3064), and that it was hearsay; he did not challenge the specific portions of the report he now challenges on appeal. Because specific grounds of objection waive all others, we *1139 may review this claim only for plain error. Rule 45A, Ala.R.App.P.
Alabama law specifically provides for consideration of a presentence investigation report by a trial court when sentencing a defendant. Section 13A-5-47(b), Ala.Code 1975, states:
"Before making the sentence determination, the trial court shall order and receive a written pre-sentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case."
Section 13A-5-45(d) addresses the evidence to be used at the sentencing hearing:
"Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama."
In addition, Rule 26.3(b)(1), Ala.R.Crim. P., prescribing the content of the presentence report, states that it may contain "[a] statement of the defendant's prior criminal and juvenile record." In construing this rule, this court has stated:
"It is clear that the inclusion of charges that did not result in convictions is proper because the Rule allows for juvenile charges to be included. It is well settled that juvenile charges, even those that result in an adjudication of guilt, are not convictions and may not be used to enhance punishment."
Thompson v. State, 503 So.2d 871, 880 (Ala.Cr.App.1986), aff'd, 503 So.2d 887 (Ala.), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987). See also Williams v. State, 710 So.2d 1276 (Ala.Cr. App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).
The trial court's consideration of Perkins's prior criminal history, including his juvenile adjudications, and arrests that did not result in convictions, when conducting the weighing process offended neither general constitutional principles nor specific provisions of Alabama law. Moreover, we find no error in the trial court's consideration of Perkins's allegedly uncounseled statements to the parole officer who prepared the presentence report. See Hyde v. State, 778 So.2d 199 (Ala.Cr.App.1998); Bush v. State, 695 So.2d 70 (Ala.Cr.App. 1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997); and Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Accordingly, we find no error, plain or otherwise, in the trial court's consideration of the presentence investigation report.

C.
Perkins also contends that the trial court erred in failing to find the existence of the statutory mitigating circumstance of no significant history of prior criminal activity. See § 13A-5-51(1), Ala.Code 1975. As the record clearly shows that Perkins had been convicted in 1983 for second-degree *1140 rape and in 1991 for first-degree rape, there was no error in the trial court's refusal to find this mitigating circumstance.

D.
Finally, Perkins contends that the trial court erred in using his 1991 first-degreerape conviction to support the aggravating circumstance that he had been previously convicted of a violent felony. Once again, Perkins reiterates his argument that the conviction could not be used because it occurred after the date of the capital crime, and because, he says, it was not properly proven. As we have already addressed these arguments, see Part XXVII of this opinion, we find no error, plain or otherwise, as to this claim.

XXXIV.
Finally, Perkins ventures to remind this court of its responsibility in reviewing cases where the death penalty has been imposed, as required by § 13A-5-53, Ala.Code 1975, and which we undertake to do in Part XXXV of this opinion. (Issue XXIX in Perkins's brief to this court.) In so doing, Perkins argues that a death sentence in his case is disproportionate, and urges us to set aside his sentence based on a comparison of the facts in his case with similar facts in other capital cases in which a life-imprisonment-without-parole sentence was imposed, or in which a death sentence has been set aside by an appellate court (all the cases Perkins cites in support of this contention are from other states). Such a comparative proportionality review is not constitutionally required, and we decline to make such a comparison. In Ex parte Barbour, 673 So.2d 473 (Ala. 1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996), the Alabama Supreme Court stated:
"The Legislature, in adopting § 13A-5-53(b)(3) [requiring the appellate court to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases], was attempting to follow the mandate of the United States Supreme Court, in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), that appellate courts examine all death sentences to ascertain `whether the crime was in fact one properly punishable by death, whether similar crimes throughout the state are being punished capitally and whether the sentence of death is appropriate in relation to the particular defendant.' Beck v. State, 396 So.2d 645, 664 (Ala.1980). The United States Supreme Court, in a decision after Gregg, has held that comparative proportionality review is not constitutionally required in every state court death sentence review. Pulley v. Harris, 465 U.S. 37, 43-51, 104 S.Ct. 871, 875-879, 79 L.Ed.2d 29 (1984). In fact, the United States Supreme Court has specifically rejected the claim that a capital defendant can prove an Eighth Amendment violation `by demonstrating that other defendants who may be similarly situated did not receive the death penalty.' McCleskey v. Kemp, 481 U.S. 279, at 306-307, 107 S.Ct. 1756, at 1774-1775, 95 L.Ed.2d 262 (1987)."
673 So.2d at 474 (emphasis added). See also Davis v. State, 718 So.2d 1148, 1162-63 (Ala.Cr.App.1995), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).

XXXV.
In accordance with Rule 45A, Ala.R.App. P., we have examined the record for any plain error with respect to Perkins's capital murder conviction and death sentence, whether or not brought to our attention or to the attention of the trial court. We find *1141 no plain error or defect in the proceedings, either in the guilt phase or in the sentencing phase of the trial.
We have also reviewed Perkins's sentence in accordance with § 13A-5-53, Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving Perkins's capital murder conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases in which the death penalty was imposed, considering both the crime and the defendant.
After the jury convicted Perkins of the capital offense charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and 13A-5-46, Ala.Code 1975. After hearing evidence concerning aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended a sentence of death by a vote of 10-2.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Perkins to life imprisonment without parole or to death as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala. Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense.
In its findings of fact, the trial court found the existence of three statutory aggravating circumstances: (1) that the murder was committed while Perkins was engaged in the commission of a first-degree kidnapping, see § 13A-5-49(4), Ala.Code 1975; (2) that the murder was committed while Perkins was under a sentence of imprisonment, see § 13A-5-49(1), Ala. Code 1975; and (3) that Perkins had been previously convicted of another capital offense or a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975. The trial court found the existence of one statutory mitigating circumstance: that Perkins's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, see § 13A-5-51(6), Ala.Code 1975. In addition, the trial court found the following to constitute nonstatutory mitigation: (1) that Perkins took Mrs. Gilliam to the Hood residence after shooting her; (2) that Perkins was drinking and taking drugs during the timeframe within which *1142 the offense was committed; (3) that Perkins suffers from borderline personality disorder, is of borderline intelligence, and possibly has organic brain dysfunction; (4) that Perkins was under some degree of mental or emotional disturbance, although not an extreme degree; (5) that Perkins had a traumatic childhood and lacked socialization; (6) that Perkins's IQ is 76; and (7) that Perkins's family was poverty-stricken when he was growing up.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the statutory and nonstatutory mitigating circumstances in the case, the trial court found that the aggravating circumstances outweighed the statutory and nonstatutory mitigating circumstances. Accordingly, the trial court sentenced Perkins to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence.
Perkins was convicted of the offense of murder committed during the course of a kidnapping in the first degree. This offense is defined by statute as a capital offense. See § 13A-5-40(a)(1), Ala. Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Loggins v. State, 771 So.2d 1070 (Ala.Cr.App.1999); Trawick v. State, 698 So.2d 151 (Ala.Cr. App.1995), aff'd, 698 So.2d 162 (Ala.1997); Land v. State, 678 So.2d 201 (Ala.Cr.App. 1995), aff'd, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996); Callahan v. State, 557 So.2d 1292 (Ala.Cr.App.), aff'd, 557 So.2d 1311 (Ala.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 216, 112 L.Ed.2d 176 (1990); Boyd v. State, 542 So.2d 1247 (Ala.Cr.App. 1988), aff'd, 542 So.2d 1276 (Ala.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989); Thompson v. State, 542 So.2d 1286 (Ala.Cr.App.1988), aff'd, 542 So.2d 1300 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Neelley v. State, 494 So.2d 669 (Ala.Cr.App.1985), aff'd, 494 So.2d 697 (Ala.1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987); and Heath v. State, 455 So.2d 898 (Ala.Cr.App. 1983), aff'd, 455 So.2d 905 (Ala.1984), cert. denied, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985).
After carefully reviewing the record of the guilt phase and the sentencing phase of Perkins's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstances outweigh the mitigating circumstances, and that death is the appropriate sentence in this case. Considering the crime committed by Perkins, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Perkins's conviction and sentence of death are affirmed.
AFFIRMED.
McMILLAN and BASCHAB, JJ., concur.
FRY, J., concurs specially.
COBB, J., recuses herself.
FRY, Judge, concurring specially.
I agree with the majority's holding in Part XV of this opinion that there was no plain error in admitting DNA evidence tending to connect Perkins with offenses *1143 committed before the offense charged. In Simmons v. State, 797 So.2d 1134 (Ala.Cr. App.1999), we remanded the case for an evidentiary hearing to determine the admissibility of the DNA population frequency statistical analysis evidence because we were unable to determine the reliability of the test as to the theory and technique used by the Department of Forensic Sciences and the DNA evidence. The impact of the DNA evidence in Simmons's trial was "pivotal" in that it tended to prove a fact in issuewhether Simmons was present in the victim's apartment and participated in the offense for which he was being tried. Unlike, Simmons, the DNA evidence admitted in this case was not determinative and, as the majority states, "did not have the powerful effect of `conclusively' establishing in the eyes of the jury some element of the capital offense for which Perkins was being tried or of uniquely `identifying' Perkins as the person who committed the now-charged offense." Therefore, I agree with the majority that Perkins has failed to show that the admission of the DNA evidence constituted plain error.
NOTES
[1] The experts testified at the sentencing phase of Perkins's trial.
[2] Panels 1 through 6 each consisted of 12 prospective jurors, and panel 7 consisted of 16 prospective jurors.
[3] In conjunction with his motion for a change of venue, Perkins also requested funds to conduct a public-opinion poll regarding the effect of the pretrial publicity on the community. The court denied the motion. In a footnote in his brief to this court, Perkins contends that the trial court erred in denying that motion. We, however, find no error. The proper method for determining the extent of pretrial publicity is through voir dire examination, not through extensive and expensive surveys. See Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Holladay v. State, 549 So.2d 122 (Ala.Cr.App.1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
[4] We note that, contrary to Perkins's assertion, the prosecutor did not introduce Mr. Gilliam to the venire; rather, the trial court introduced him as part of its general qualification of the venire to determine if anyone on the venire was acquainted with the victim or with the victim's family.
[5] During voir dire, Perkins's counsel informed the trial court that he had been appointed by the court and was currently representing C.R. in an unrelated case.
[6] To the contrary, it is clear from the voir dire examination and the jury questionnaires that many of the blacks struck by the State shared several characteristics other than race. For example, many of those struck either had been convicted of a crime themselves or knew someone who had been convicted of crime. One of those struck was strongly opposed to the death penalty; although his answers during voir dire examination were not enough to justify a challenge for cause (the trial court denied the State's challenge for cause as to this particular veniremember) they were more than sufficient to justify a peremptory strike. Also, one indicated during individual voir dire examination that she had heard rumors that Perkins and Mrs. Gilliam had had a personal, intimate relationship before Mrs. Gilliam's abduction. Thus, Perkins's contention that "the only common criterion among the ten struck African-American jurors was their race" is clearly belied by the record. (Perkins's brief to this court, p. 89.)
[7] Although Perkins does cite two federal cases in which the court found Batson violations by a prosecutor in Tuscaloosa County, this, alone, is not sufficient to establish a history of discriminatory striking for the prosecutor in this case.
[8] The record reveals that Perkins was not convicted for the rape of D.W.; the case was nol-prossed. However, Perkins did plead guilty to the first-degree rape of B.P. and was sentenced to 99 years' imprisonment for that offense.
[9] Candace was the State's first witness at trial. Although she did begin testifying about the day her mother was abducted, Candace was able to answer only a few introductory questions before she requested a break. During that break, Perkins's counsel offered to stipulate to Candace's testimony, based on a statement she had given to police just after her mother's abduction, so that she would not have to return to the stand. Clearly, this strategic decision by Perkins's counsel was to prevent highly emotional testimony from 14-year-old Candace.
[10] The Alabama Rules of Evidence did not become effective until January 1, 1996, after Perkins's trial in 1994.
[11] See Part XXIV.B. of this opinion, wherein we note that Perkins concedes that there was, in fact, no evidence that Mrs. Gilliam read a newspaper article about him before her abduction and, in fact, argues that the prosecutor's closing arguments regarding the possible inference that Mrs. Gilliam had read the article was actually an impermissible argument based on facts not in evidence.
[12] Although the Perry test for admissibility of DNA evidence has since been superseded in Alabama by a more flexible standard of admissibility, see § 36-18-30, Ala.Code 1975, and Turner v. State, 746 So.2d 355 (Ala.1998), the Perry test was still in effect at the time of Perkins's trial in April 1994.
[13] Perkins did object to Dr. Warner's testimony concerning his observations of State's Exhibits 51, 52, and 53, but he objected to the testimony on the grounds that the exhibits had not yet been admitted into evidence. That objection was sustained by the trial court.
[14] Section 13A-1-2(11), Ala.Code 1975, provides that a firearm is a deadly weapon.
[15] See Part XIV of this opinion, where we address Perkins's argument, contrary to this argument, that Candace Gilliam's testimony that she heard her mother cry "rapist" was double hearsay because, he claimed, there was evidence that the victim had read a newspaper article about Perkins.
[16] The trial court did instruct the jury on the lesser included offense of felony murder with the underlying felony of first-degree kidnapping.